Norman E. Siegel (MO 44378) *pro hac vice*
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
siegel@stuevesiegel.com

*Counsel for Plaintiff*
*Claire Paddy and Neil Haven*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: 23ANDME, Inc., Customer Data Security Breach Litigation<br><br>This Document Relates to:<br><br>*Paddy et al v. 23andMe, Inc.*,<br>Case No. 3:23-cv-06698-EMC | Case No. 24-md-03098-EMC |

**APPLICATION OF NORMAN E. SIEGEL TO SERVE**
**AS SETTLEMENT COUNSEL AND INTERIM CLASS COUNSEL**

1         On behalf of Plaintiffs Claire Paddy and Neil Haven, and pursuant to the
2 Court's February 26, 2024, Order, I submit the following application to serve as
3 Settlement Counsel and Interim Class Counsel. As detailed below, I have served as
4 lead counsel in dozens of data breach class actions, including many of the largest
5 data breach cases litigated to date. I have also been heavily involved in this litigation
6 since its inception, and I respectfully submit that I am well suited to continue
7 exploring early resolution of this case in the best interests of the nearly 7 million
8 victims of this breach. In my view, there are two critical factors that will have to be
9 carefully weighed and balanced by Settlement Counsel and Interim Class Counsel:
10 (1) the severity of this breach, which ranks among the worst in history due to the
11 sensitive nature of the compromised data and its potential for misuse; and (2)
12 23andMe's financial condition, which is objectively precarious.
13         I have participated in two mediations with 23andMe in an effort to find a path
14 forward for the benefit of the class and have taken the lead on several aspects of a
15 proposed framework for resolution, including business practice changes to protect
16 the sensitive information at issue in this case. Although no settlement has been
17 reached, an early resolution may be the only path forward for the proposed class,
18 and therefore I respectfully submit that a 45-day period be provided to allow the
19 negotiating parties to determine whether a settlement can be achieved. Given the
20 financial condition of the Defendant and the limited funds available to the class, I
21 propose to represent the class through the settlement process on a lodestar basis. If
22 a settlement cannot be achieved in the near term, I respectfully request to serve as
23 Interim Class Counsel. I pride myself on working well with others, have worked
24 cooperatively with many of capable lawyers involved in this litigation, and I am
25 pleased to serve with whomever else the Court appoints to lead this important case.

## I. FACTUAL BACKGROUND

### A. The Suits Against 23andMe

Beginning in the first week of October, 2023, hackers began selling samples of 23andMe genetic user data on the dark web, including on the hacking forum BreachForums. The files contained the genetic data of one million 23andMe users of Jewish Ashkenazi descent, and another 100,000 of Chinese descent. On October 6, 2023, 23andMe confirmed it was the source of the stolen genetic data, and later acknowledged the total number of victims was close to 7 million. On October 9, 2023, Plaintiffs filed the first of 39 complaints against 23andMe, asserting claims for a raft of common law torts and various state statutory claims—including several that provide statutory damages for the disclosure of genetic information (collectively, the "Litigation"). On December 21, 2023, 23andMe filed a Motion to Transfer Actions to the Northern District of California Pursuant to 18 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings with the Judicial Panel on Multidistrict Litigation, MDL No. 3098 ("MDL Motion to Transfer"). On April 11, 2024, the Panel granted the motion ordering that the litigation be centralized before this Court.

### B. 23andMe's Financial Condition

Even before the data breach and the wave of lawsuits now centralized in this Court, 23andMe was in a challenging financial position. Revenue and earnings were in steep decline, and by September 2023 (a month before the breach) the stock of the public company started trading below $1. 23andMe's financial troubles were exacerbated by revelation of the breach, and by November 14, 2023, the Nasdaq sent 23andMe a deficiency letter noting that 23andMe was not in compliance with exchange regulations that require listed stocks maintain a minimum bid price of $1

per share. The Nasdaq noted that 23andMe fell out of compliance due to its price falling below the threshold for 30 consecutive days, and the stock would be delisted if the price could not be maintained above $1. At the time, 23andMe had recently reported a $179.9 million loss in the first half of its fiscal year on revenue of $110.9 million, compared to a first-half loss of $155.6 million on revenue of $140.2 million in the previous fiscal year.[1]

Revelation about the data breach compounded 23andMe's financial struggles. Now dealing with dozens of lawsuits (including extraterritorial lawsuits related to the breach that are not centralized before this Court) 23andMe slid further down a financial hole. On January 31, 2024, the *Wall Street Journal* published an article documenting the company's distress and predicting further trouble ahead.[2] The following week, on February 7, 2024, 23andMe released its quarterly results, showing further reduced revenue, increased losses, and reduced guidance. And just this week, 23andMe's stock hit an all-time low of $0.35 a share, resulting in market capitalization of about $175 million and a negative enterprise value.[3]

---

[1] https://investors.23andme.com/news-releases/news-release-details/23andme-reports-third-quarter-fiscal-2024-financial-results

[2] *See* 23andMe's Fall From $6 Billion to Nearly $0, https://www.wsj.com/health/healthcare/23andme-anne-wojcicki-healthcare-stock-913468f4.

[3] On April 17, 2024, ABEEC 2.0, LLC—a company controlled by 23andMe's Chief Executive Officer Anne Wojcicki—filed a Schedule 13D with the Securities and Exchange Commission outlining potential plans to take 23andMe private. On April 18, 2024, the Special Committee of the board of directors indicated it "will carefully review Ms. Wojcicki's proposal when and if it is made available and evaluate it in light of other available strategic alternatives, including continuing to operate as a publicly traded company."

### C. The Settlement Process to Date

Starting sometime in January, some Plaintiffs' counsel and Defendant 23andMe began discussing the possibility of an early mediation. I was not initially invited to participate in the mediation but learned of the plans through other Plaintiffs' counsel. Although I strongly opposed any settlement discussions prior to the appointment of interim class counsel, I agreed to participate following (1) notice to the Court regarding the planned mediation; (2) confirmation of 23andMe's financial condition; and (3) assurances that the mediation was opened to *all* Plaintiff's counsel. In advance of the mediation I consulted with experts, conferred with other Plaintiffs' counsel, and made specific requests for information to 23andMe. On January 31, 2024, over 35 Plaintiffs' lawyers representing nearly every case filed against 23andMe participated in person or by Zoom in a mediation overseen by Randall Wulff. I actively participated as a main spokesperson for Plaintiffs during the mediation session on a variety of issues, which although productive in some respects, did not result in a settlement.

On February 22, 2024, the Court held a video hearing on 23andMe's motion to stay pending the JPML's determination on whether to centralize the litigation. Arguments were made in favor and against the proposed stay, which included further disclosure regarding the ongoing settlement discussions. On February 26, 2024, the Court granted 23andMe's motion to stay. With the stay in place, 23andMe broached the subject of continued mediation, but expressed concern that the number of lawyers participating in the process was unworkable, and further expressed worry that non-participating lawyers voluntarily absent from the first mediation were privy to information shared during the mediation that was subject to the mediation privilege. A smaller group of Plaintiffs' counsel therefore agreed to participate in a

second mediation with 23andMe before Mr. Wulff. The group was formed from non-aligned groups of Plaintiffs' lawyers—I was not aligned with any of the mediation participants—who agreed to participate as representatives of the Plaintiffs at large.[4] Prior to the mediation, this group engaged an independent forensic accounting firm to advise it with respect to 23andMe's financial condition, and continued to work with other experts on business practice changes designed to protect the class's sensitive data. On March 20, 2023, the parties engaged in a second day-long mediation session under the direction of Randall Wulff. Like the first mediation, the process was productive but did not result in settlement. Following the second mediation, the parties engaged in several additional constructive communications that have extended to through this week but have not resulted in a settlement.

Continued settlement discussions may prove to be productive, but the Court should appoint Settlement Counsel specifically designated to attend to the task on behalf of the class. Given my extensive work to date in negotiating with 23andMe over the last several months, and my long history of achieving successful settlements in data breach litigation, I respectfully submit that I am well suited for this role. If the case does not settle in the next 45 days (or an alternative period imposed by the Court), I respectfully request to continue to serve the class as Interim Class Counsel.

## II.   ARGUMENT IN SUPPORT OF APPOINTMENT AS SETTLEMENT COUNSEL AND AS CLASS COUNSEL

Federal Rule of Civil Procedure 23(g) sets out the criteria for appointment of class counsel. "In every case, the judge must inquire into the work counsel has done

---

[4] The participants in the second mediation were Norman Siegel, Anderson Berry, Gayle Blatt, Ryan Clarkson, Michael Reese and Laura VanNote.

1  in investigating and identifying the particular case; counsel's experience in handling
2  class actions, other complex litigation, and claims of the type asserted in the action;
3  counsel's knowledge of the applicable law; the resources counsel will commit to
4  representing the class; and any other factors that bear on the attorney's ability to
5  represent the class fairly and adequately." Manual for Complex Litigation, Fourth §
6  21.271 (summarizing Fed .R. Civ. P. 23(g)). "If there are multiple applicants"—as
7  will be the case here—"the court's task is to select the applicant best able to represent
8  the interests of the class." *Id*.

### A. Proposed Leadership Structure for this MDL

Settlements reached prior to the appointment of interim class counsel are fraught with risk. They can suffer from a "race to the bottom" dynamic where a defendant seeks out any counsel willing to settle early, without regard to the merits of the case and before interim counsel is considered under the criteria set forth in Rule 23(g). *See, e.g., Brown v. Accellion, Inc.*, No. 5:21-CV-01155-EJD, 2023 WL 1930348, at *3 (N.D. Cal. Feb. 10, 2023) ("Although there is no prohibition on engaging in settlement negotiations before the appointment of interim class counsel, justifiable suspicions arise about the motivations underlying the settlements.") (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006)).

Here, although there were robust pre-appointment negotiations open to all Plaintiffs' counsel and ongoing efforts to resolve the case made in good faith, no settlement has been reached. Still, given the financial condition of the Defendant, the process should continue in conjunction with the Court's consideration of Interim Class Counsel appointments under Rule 23(g). I therefore respectfully suggest that the Court appoint *both* Settlement Counsel and Interim Class Counsel. Settlement

1  Counsel can continue to focus on early resolution, while Interim Class Counsel can
2  prepare the case for litigation, including by filing a Consolidated Complaint within
3  45 days of appointment. If the case does not resolve within a designated period, I
4  suggest that Settlement Counsel continue service as Interim Class Counsel.
5  Settlement Counsel can be filled by a limited number of the qualified counsel that
6  participated in the mediation process, with the addition of one or more additional
7  counsel that has not participated in all negotiations as additional Interim Class
8  Counsel. *See id*. ("Because the parties have indicated that early settlement and class-
9  wide resolution are real possibilities, the Court finds that the class would be best
10 served by a lean and efficient lead counsel arrangement, as opposed to a towering
11 leadership structure with committees. . . . Of course, should negotiations and
12 settlement prospects change course, the Court may entertain renewed motions to
13 appoint counsel or a committee at that later time."). Thus, if the case does not settle
14 and Interim Class Counsel believes a larger structure is necessary to litigate the case,
15 the Court can supplement its appointment order.

### B. Stueve Siegel Hanson is Well Positioned to Serve as Settlement Counsel and, if no Settlement is Reached, Interim Class Counsel.

18 I respectfully submit that consideration of objective criteria supports my
19 appointment as counsel "best able to represent the interests of the class." Fed. R.
20 Civ. P. 23(g)(2). Over the last decade, I have led or substantively participated in
21 nearly every major consumer data breach case on record, including serving as court-
22 appointed co-lead counsel in data breach litigation centralized by the JPML
23 including *Target* (110 million class members), *Home Depot* (56 million class
24 members), *Equifax* (149 million class members), *Quest Diagnostics* (11.5 million

class members), *Capital One* (100 million class members) and *T-Mobile* (75 million class members).[5]

This experience will serve the class and the Court here in several respects. First, I am intimately familiar with the legal issues that are likely to be at the forefront of this litigation. Stueve Siegel Hanson's legal work in this field includes achieving groundbreaking opinions at the trial and appellate court level that have helped develop the law in this emerging area. By way of example, my firm helped secure one of the first favorable motion to dismiss orders in the *Target* data breach litigation, which sustained consumer protection claims under the laws of multiple states and largely rejected Target's bid to dismiss the case. *See In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154 (D. Minn. 2014). *Equifax* presented a different challenge as the vast majority of victims had no direct relationship with the company. Again, I led briefing efforts that resulted in a favorable opinion recognizing a duty of care owed to data breach victims even where there is no privity between the parties. *See In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295 (N.D. Ga. 2019).

In the recently settled *Capital One* case, I argued in favor of class certification premised on unique damages theories supported with expert opinions that had never been presented in a prior data breach case. On the appellate level, I argued the key data breach standing case in the Fourth Circuit, *Hutton v. National Board of Examiners in Optometry*, 892 F.3d 613 (4th Cir. 2018), which resulted in an opinion reversing the district court's dismissal of the case for lack of Article III standing. And recently, my partner Austin Moore argued another precedent-setting appeal in

---

[5] Additional recent experience in the field is reflected on the attached resume. *See* Exhibit A.

the Third Circuit. *See Clemens v. ExecuPharm Inc.*, 48 F.4th 146 (3d Cir. 2022) (reversing dismissal of data breach class action for lack of Article III standing to sue and clarifying the contours of "injury" based on the threat of future harm).[6]

This unparalleled substantive experience in the data breach field will benefit the class in this case as it will help narrow the issues before the Court and promote arguments that have the best opportunities for success. Additionally, Stueve Siegel Hanson's experience has permitted the firm to work with many of the leading experts in this field, including developing new experts and damages theories that have expanded potential avenues of recovery for data breach victims. This experience will serve the Court and the class, whether or not the case is ready for early settlement.

### C.   Stueve Siegel Hanson has Achieved Outstanding Results.

I have achieved significant settlements and trial victories in a wide range of cases, including in the largest data breach cases litigated to date. In *Equifax*, I served as co-lead counsel and chaired the settlement committee and served as the principal negotiator on behalf of the consumer class. Ultimately, I was able to help secure a settlement that provided for a non-reversionary $380.5 million fund, which had the ability to increase to $505.5 million in cash benefits, along with state-of-the-art injunctive relief requiring Equifax to spend at least $1 billion for systems to better secure its data. The settlement drew the endorsement of the Federal Trade Commission, the Consumer Financial Protection Bureau, and 48 state Attorneys

---

[6] Stueve Siegel Hanson was also part of plaintiffs' briefing team in the seminal D.C. Circuit data breach opinion reversing the district court's dismissal of the case on standing grounds, *see In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42 (D.C. Cir. 2019), and has achieved favorable appellate decisions on issues relating to class action data breach settlements. *See, e.g., In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968 (8th Cir. 2018) (affirming approval of class settlement in the face of challenges to Article III standing and other issues); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021) (same).

General. In approving the settlement, Judge Thrash noted the settlement "exceeds what has been achieved in other data breach settlements." and that "the settlement is the direct result of all counsel's experience, reputation, and ability in complex class actions including the evolving field of privacy and data breach class actions." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *33-34 (N.D. Ga. Mar. 17, 2020) (cleaned up).

More recently, I have secured settlements in *Capital One* and *T-Mobile* that rank only behind *Equifax* in size and scope. In *Capital One* (in which I served as co-lead counsel), the case settled only after Plaintiffs completed fact and expert discovery, briefed and argued motions for class certification and summary judgment, and fended off numerous other collateral attacks on Plaintiffs' claims. In approving the settlement, Judge Anthony Trenga remarked:

> This Court previously commended Class and Defense Counsel at the September 8, 2022 Final Approval Hearing for the exceptional outcome for all the parties given the difficult legal issues, calling it an outstanding result attributed in no small measure, to counsel, counsel's efforts, and the level of competence and professionalism that they've brought to every aspect of this case. The Court stands by that statement. Class Counsel effectively and efficiently pursued the case, resulting in purportedly the second largest data breach settlement to date, in addition to the injunctive relief.

*See In re: Capital One Consumer Data Sec. Breach Litig.*, MDL No. 1:19-md-2915, 2022 WL 17176495, at *2 (E.D. Va., November 17, 2022) (cleaned up).[7]

---

[7] In approving the Settlement, Judge Trenga also reflected on his choice of Lead Counsel: "Class Counsel were carefully selected for their skill and experience in a process that featured more than three dozen applications for class leadership. The performance of counsel and the strong result for class members demonstrates Class Counsel's skill and efficiency and validates the Court's selection." *In re: Capital One*, 2022 WL 17176495, at *2 (cleaned up).

Even more recently, I served as co-lead counsel in the *T-Mobile* case, securing $500 million for the class including a non-reversionary cash fund of $350 million. The settlement is second only to *Equifax* in monetary value (for a class half the size) and presents a new high-water mark in data breach litigation. *In re: T-Mobile Customer Data Sec. Breach Litig.*, Case No. 4:21-MD-03019-BCW (W.D. Mo.); Siegel Decl., ¶ 12.

Finally, a note regarding cases that fail to resolve through settlement. Stueve Siegel Hanson is one of the few firms in the country that has taken multiple class action cases to trial, having secured six favorable jury verdicts for class plaintiffs over the last several years. *See, e.g., Garcia v. Tyson Foods, Inc.*, No. 06-cv-2198 (D. Kan.) (class verdict for insufficient compensation for pre-and post-shift activities under Fair Labor Standard Act), *aff'd* 770 F.3d 1300 (10th Cir. 2014); *In re: Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591 (D. Kan. 2017) ($217.7 million jury verdict on behalf of a class of farmers, leading to $1.5 billion nationwide settlement); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170-NKL (W.D. Mo.) (I served as lead trial counsel in class action against State Farm for insurance overcharges, securing $34.3 million jury verdict for Missouri policyholders), aff'd 963 F.3d 753 (8th Cir. 2020); and *Karr v. Kansas City Life Ins*. Co., No. 1916-CV26645 (16th Mo. Cir. Ct. 2022) ($28.4 million class verdict related to insurance overcharges).

In short, I and my firm have achieved outstanding results in class action litigation, and in particular data breach litigation. The firm has a culture of professionalism and a reputation for excellence with both opposing counsel and presiding judges. In this respect, I invite this Court to contact the federal judges before whom I have appeared as lead counsel for a judicial perspective on how the

firm has performed its obligations when appointed class counsel in complex class litigation.

### D. Stueve Siegel Hanson's Commitment to Diversity in the Legal Profession.

As detailed in the firm resume, I am supported by a diverse bench of experienced attorneys, many of whom are recognized as national leaders in data breach and privacy litigation in their own right. For example, two of my partners, Austin Moore and Lindsay Todd Perkins, have been recognized by Law360 as "Rising Stars" in the field of Cybersecurity and Privacy Law, which recognizes attorneys under the age of 40 "whose legal accomplishments transcend their age." If appointed, I will call upon a diverse group of lawyers at Stueve Siegel to actively work on this case, including providing opportunities for young and diverse lawyers to handle substantive portions of the litigation. Moreover, Stueve Siegel Hanson has been active in working to advance a diverse bar—both through sponsoring and supporting the Kansas City Metropolitan Bar Association's Diversity, Equity, and Inclusion Campaign, and by funding $2 million in scholarships for Black law students at regional law schools.

### CONCLUSION

I appreciate the Court's consideration and respectfully request appointment as Settlement Counsel and Interim Class Counsel.

Dated: April 18, 2024        **STUEVE SIEGEL HANSON LLP**

/s/ *Norman E. Siegel*
Norman E. Siegel (MO 44378) (*pro hac vice*)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
Facsimile: 816-714-7101
siegel@stuevesiegel.com

*Counsel for Plaintiff*
*Claire Paddy and Neil Haven*

# CERTIFICATE OF SERVICE

I certify that on April 18, 2024, I filed the foregoing document with the Clerk of the Court for the United States District Court, Northern District of California, by using the Court's CM/ECF System, which sends notifications of such filings to all counsel of record.

/s/ *Norman E. Siegel*
Norman E. Siegel