1  Rafey S. Balabanian (SBN 315962)
2  rbalabanian@edelson.com
   EDELSON PC
3  150 California Street, 18th Floor
   San Francisco, California 94111
4  Tel: 415.212.9300
   Fax: 415.373.9435
5

6  *Counsel for Plaintiffs David Melvin, J.L., and Putative Class*

7

8

9

10                     **UNITED STATES DISTRICT COURT**
                        **NORTHERN DISTRICT OF CALIFORNIA**
11                          **SAN FRANCISCO DIVISION**

12  | | |
    |---|---|
    | **IN RE 23ANDME, INC., CUSTOMER DATA SECURITY BREACH LITIG.** | Case No. 24-md-03098-EMC |
    | This Document Relates to: ALL ACTIONS | **RESPONSE TO MOTIONS TO APPOINT INTERIM LEADERSHIP OF CLASS ACTION** |
    | | **Hearing Date:** May 30, 2024<br>**Time:** 1:30 p.m.<br>**Judge:** Hon. Edward M. Chen<br>**Place:** Courtroom 5, 17th Floor (via Zoom Webinar) |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

The lead briefs in this case are an object lesson in the very problem the *Melvin* Plaintiffs identified: the way leadership has historically been decided invites argument in the most general terms, leaving the Court with little to hold on to in making a key decision for the Class. We suggested a pragmatic remedy for that—the Class's actual preferences. We invited other firms to engage with those preferences, and we hope that they will.

Meanwhile, though, the Court is left with a dizzying spread of cherrypicked settlements, verdicts, and gestures at unrelated leadership experience without explanation as to how they might impact the outcome for the Class here. *E.g.*, *In re: Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 15-md-2672-CRB (N.D. Cal.). While there's nothing wrong with an argument to a firm's general reputation, those results often say more about a firm's ability to win lead over large cases than the on-the-ground result they'd produce in this specific case—for a comparatively small but uniquely harmed class.

The Class was clear: they care about specific experience in privacy cases. And when it comes to privacy cases, the results discussed by the other firms are focused on credit monitoring to puff up a thin deal or *cy pres*-only settlements. *See In re Google LLC Street View Elec. Commc'n. Litig.*, No. 10-md-2184-CRB (N.D. Cal.) ($13 million, *cy-pres* only settlement releasing claims of 60 million class members, complaint sought billions of dollars in statutory damages); *In re Equifax Inc. Customer Data Security Breach Litig.*, No. 17-md-2800 (N.D. Ga.) ("$380.5 million" settlement with only $31 million "alternative" in cash, class of 147 million). To be sure, those deals were approved—sometimes over Edelson's objection—but it's this paint-by-numbers approach that holds down the value of privacy cases everywhere. Worse, it undermines the public's confidence in the plaintiffs' bar: getting credit monitoring or a check for a few dollars is an experience that should graduate to the dustbin of history.

Now that the briefs are in, a few things have become clear:

1. Edelson is the only firm with interest in litigating the case. Every other brief (including new filer, Lieff Cabraser) advocates the "just-keep-mediating" approach.

2. Edelson has unmatched experience in developing the law in first-of-their-kind cases, including privacy cases specifically. We've led the way under nearly every legal theory that rapidly became a "household name" in plaintiffs' work for the last decade-plus—the Illinois Biometric Information Privacy Act ("BIPA"), the Telephone Consumer Protection Act, state right-of-publicity statutes, Washington's gambling statute, and the Michigan Preservation of Personal Privacy Act—to name a few. We've also done that under the specific genetic privacy statutes at issue here, which no other firm can claim.

3. We convert those wins into *tangible* results for our classes, sending hundreds of millions home to class members under theories that we've uniquely advanced. *E.g.*, *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617 (N.D. Cal. 2021) ($650 million cash BIPA settlement, 6.9 million-member class); *Benson v. Double Down Interactive*, No. 18-cv-525 (W.D. Wash.) ($415 million cash gambling settlement, less than 3 million members); *Fischer v. Instant Checkmate LLC*, No. 19-cv-4892 (N.D. Ill.) ($10 million cash right-of-publicity settlement, 80,000 class members).

We're also the only firm to limit its fee request (20% of what is actually received by the Class), and also to tie that to another concrete result: the claims rate. The Court should appoint a firm with the on-point experience that the Class wants, the efficient slate that they're asking for, and the commitment that they deserve. Plaintiffs' motion should be granted.

**II.   ARGUMENT**

   **A.  Edelson stands alone in opposing 23andMe's quick settlement.**

Virtually every other firm's brief argues for a version of "let's settle."[1] More explanation for why that is best for the *Class* is required, beyond passing handwringing over 23andMe's finances.[2] The reality is that 23andMe is clearly putting a pot of money on the table

---

[1] 23andMe implies that Edelson somehow breached confidentiality (dkt. 25), which is nonsense. Not only did we not participate in the mediation, but once we made that determination, we promptly advised all counsel that we would not be participating. To the extent anyone breached a confidentiality obligation (which we don't believe happened), it was not Edelson. The far more notable fact is 23andMe's and other Plaintiffs' counsel's coincidentally unified view about immediate settlement.

[2] 23andMe's financial condition demands principled exploration once lead is appointed. At the least, this should involve (1) formal discovery requests, (2) a deposition of an individual knowledgeable on the company's finances, and (3) exploration of others liable.

1  right now—which means whoever gets appointed lead has a standing offer of a path to quick
2  fees. Edelson has been the only firm to argue consistently against a quick settlement, and the
3  only firm to identify other potentially liable parties. (*See Melvin*, dkt. 26.)
4        Even if 23andMe's finances are the main hurdle, there are creative ways to respond.
5  First, a defendant can pay over time, which we've successfully done. *E.g.*, *Rottner v. Palm
6  Beach Tan, Inc.*, No. 2015-CH-16695 (Cir. Ct. Cook Cty.) ($10 million payment over four
7  years, more than $1,300 to each claimant); *Sosa v. OnFido Inc.*, No. 20-cv-4247 (N.D. Ill.)
8  ($28.5 million over three years, claimants receive about $300 or $100). The firm gets its fees
9  over time in this arrangement, which is fine by us. Second, our firm has negotiated innovative
10 structures that allow a class to share in a company's ultimate improvement (in sale or stock).
11 For instance, our firm proposed a settlement in the Mt. Gox litigation that would have given the
12 class an ownership interest in the restructured bank—worth billions. *See Greene v. Karpeles*,
13 No. 14-cv-1437, dkts. 79, 94 (N.D. Ill.) (preliminarily approved, but ultimately rejected by the
14 bankruptcy court in Japan). The firm has also negotiated settlements that simply pay the class
15 in the event of a sale. *See Crossley v. Joya Commc'ns*, No. 16-CH-14771 (Cir. Ct. Cook Cty.)
16 (paid class $3.75 million in sale four years later). The point is that there's no one-size-fits-all
17 solution: instead, putting the Class's interests first allows more creativity even with constraints.
18     **B.  Edelson's privacy settlements are unmatched.**
19       Experience in privacy cases is a critical factor to the Class, and one the Court should
20 consider. (*See* dkt. 9-1 at 10.) As we previously argued, our settlements are the vanguard of
21 what should be the modern trend in privacy cases: substantial monetary relief that actually gets
22 paid to the Class. (*Id.* at 10–11.) Unfortunately, many of the results that other firms rely on
23 don't follow that trend. We discuss the major cases relied on by the other applicants below, but
24 provide more information on the relief and claims rates of the applicants' cases in Exhibit 1.
25       One of Edelson's chief value-adds is our clear record of responding to new types of
26 harms, particularly in privacy. The attached declaration discusses the fact that the firm has not
27 just been the first mover in numerous privacy claims, but also the first to succeed in trial and
28 appellate courts on those theories—paving the way that many other lawyers followed. (*See*

1  Balabanian Decl. ¶¶ 3-8.) Most importantly to the Class here, we're doing the same in the new
2  landscape of genetic privacy, where we've achieved the first-ever adversarial class
3  certification. *Melvin v. Sequencing, Inc.*, 344 F.R.D. 231, 233 (N.D. Ill. 2023). We're also,
4  evidently, the only firm seeking lead that's taken a privacy class action to trial. *Wakefield v.
5  ViSalus, Inc.*, No. 15-cv-1857, dkt. 282 (D. Or. Apr. 12, 2019). In sum, our decades-long
6  record of protecting privacy in unprecedented circumstances should hold considerable weight.
7        The other firms submitting applications here don't have this level of privacy experience.
8  The application by Robbins Geller and Lieff Cabraser is a clear example. To be sure, these
9  firms are well-known in the bar, but their Motion relies heavily on general experience in MDLs
10 without a concrete explanation of how that will improve the Class's outcome here. The firms'
11 results in privacy cases, specifically, are thinner—and that's something the Class cares about.
12       Aside from the *Facebook* case, the bulk of Robbins Geller's cited experience is *In re
13 Yahoo! Inc. Customer Data Security Breach Litigation*—sticker price $117.5 million—in
14 which a Robbins attorney was on the Executive Committee. No. 16-md-2752-LHK (N.D. Cal.)
15 But the *Yahoo* settlement is a case study in what Edelson seeks to prevent here. The court
16 initially rejected the settlement, finding among other things that the firms' $35 million fee
17 request relied on an eye-popping $22 million in lodestar—work from 143 lawyers at 32
18 firms—where the case had required "limited" legal work. *See Yahoo*, dkt. 357 at 13, 17, 19.[3]
19       Judge Koh ultimately approved a re-worked settlement, but called the result
20 "unremarkable." Dkt. 497 at 65. The settlement followed a regrettable model with the relief
21 focused on credit monitoring ($24 million), and the cash relief limited to "alternative
22 compensation," if the claimant already had credit monitoring, and a fund for out-of-pocket
23 expenses. *See id.* at 32, 64. The class overwhelmingly picked the "alternative compensation"
24 option, with 72% preferring an unknown sum to credit monitoring. *See* dkt. 464 ¶ 11. In the
25 end, even counting credit monitoring, much of the settlement's nine-figure result was driven by

---

[3]     Beyond *Yahoo*, as a general matter, allowing billing from hundreds of lawyers at dozens of firms is not just inefficient but produces implausible results. Were a court to ask individual lawyers what their claimed lodestars were—just in cases where they'd submitted a lodestar over the last few years—the yearly billables would make that clear. One of many reasons for that is firms start to engage in "competitive billing" to ensure a cut of the fee.

the sheer size of the class, as the court explained in approving a significantly-reduced fee:

> Here . . . the per-capita recovery is roughly $0.60 per Settlement Class Member. In light of this disparity, the Court is therefore convinced that the size of the Settlement Fund is largely a function of the size of the Settlement Class, and not entirely attributable to class counsel's skill.

Dkt. 497 at 48 (internal quotations omitted). The claims rate was about 0.6%. *See id.* at 39. In stark contrast, when Edelson was with Robbins on the *Facebook* case, "per-capita" recovery was about $94 a person, with greater than 22% claims. *See In re Facebook*, No. 15-cv-3747-JD, dkt. 511 at 2, 16 (N.D. Cal. Dec. 16, 2020). And we did it far more efficiently: the case was at the brink of trial—past class certification, summary judgment, and an appeal—with less lodestar than the "limited" work in *Yahoo* took. *See* dkt. 499 at 23 ($20 million in lodestar).

  Lieff Cabraser's history in privacy cases has some of the same issues. In the lead case cited by the firm, *In re Anthem, Inc. Data Breach Litigation*, the firms—Lieff was on the PSC—submitted bills from 329 lawyers at 53 firms, including firms that the court had expressly cut from the original roster, prompting the Court to say she "would never have appointed [the co-leads] had I known you were going to pile on 53 law firms on this case." No. 15-md-2617-LHK, dkt. 974 at 19:20–22 (N.D. Cal.). The court appointed a special master to review the bills. Dkt. 972. Like *Yahoo*, the Court ultimately approved the $115 million Settlement, but it had the same structure: credit monitoring, up to a $13 million fund for a cash payment *only if* the class member didn't already have credit monitoring, and a $15 million fund for out-of-pocket losses. The remainder went to fees, costs, and incentive awards. *See* dkt. 1042 (describing breakdown). Of the 79 million class members, under 200,000 received any cash at all. Dkt. 1041 ¶ 4. Even counting people who wrote in to claim their credit monitoring, the Court noted the "relatively low" claims rate of 1.8%. Dkt. 1046 at 28.[4]

---

[4] Nor does Lieff's late-breaking interest in this litigation particularly bolster its stated commitment to the Class. To be sure, we're the first to advocate a thorough investigation. But Lieff's complaint adds nothing new to the discussion, nor does the firm explain why it is joining now. (*See* dkt. 14.) The focus on the vulnerable classes is right—but the Edelson firm was vocal about that months ago, and indeed, has made it a feature of its practice for years. (*See Melvin*, dkt. 4 at 22–24); *see Protecting Vulnerable Communities*, EDELSON, https://edelson.com/inside-the-firm/vulnerable-communities/. Put simply, Lieff has not justified appointment to lead here.

Keller Rohrback argues that it produced the largest privacy settlement ever. *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-md-2843-VC (N.D. Cal.) But the boast is superficial: the settlement resolved the claims of *250 million* people nationwide. *See* Dkt. 1145 at 6. The settlement fund was 11% larger than the *Facebook Biometric* settlement, but the class size was 36 times larger. And where Edelson had just shown how to post strong claims rate with Facebook users, the 6% claims rate was a step in the wrong direction. *Id.*[5]

As Exhibit 1 makes clear, Tycko Zavareei's privacy record should not move the Court. But also notable was the firm's refusal to advise their clients to voluntarily transfer their cases to this Court—despite the inevitability of eventual transfer—on the perplexing reasoning that 23andMe hadn't asked or moved. (Edelson had asked, which Tycko notably omitted.) But that option always remained, and the refusal to do so gave 23andMe cover to generate months of delay with the MDL process. Whatever advantage Tycko hoped to obtain (hopefully, not just with respect to lead) does not outweigh that injury to the Class.

Last, a number of firms note that they touched *In re Equifax* in some way or another, and Stueve Siegel was co-lead in the case. As we argued at the time—joined by a chorus of objectors—that settlement was the leading example of how firms use credit monitoring to beef up a settlement's sticker price in order to claim fees. The settlement was reported as a total of $380.5 million, but just $31 million was allocated to "alternative compensation"—that is, cash—that most class members could claim. Dkt. 956 at 5. Again, 75% of the class members picked the cash instead of the credit monitoring—even knowing that the cash relief would be a "very small amount." *Id.* at 10 (of 15 million claims, just 3.3 million for credit monitoring).[6]

Compared to these results, Edelson's comparative record in its cases is stark.

### III.  CONCLUSION

Plaintiffs respectfully request that Rafey S. Balabanian be appointed lead.

---

[5] The claims difference was so notable it merited a "*but see*" in the approval motion. Dkt. 1145 at 12.

[6] The FTC warned consumers that they would not receive the publicly-claimed amount of a $125 "alternative" payout from the settlement, and instead that consumers would be "disappointed" due to the $31 million cap on the fund and the number of claims. *See* Janna Herron, *Equifax breach settlement: You're not getting that $125. Here's why.* USA TODAY (July 31, 2019), https://www.usatoday.com/story/money/2019/07/31/equifax-cant-pay-full-125-breach-settlement-claims/1879942001/.

|   |   |
|---|---|
| | Respectfully Submitted, |
| | **DAVID MELVIN and J.L.**, individually and on behalf of all others similarly situated, |
| Dated: April 25, 2024 | By: /s/ Rafey S. Balabanian<br>*One of Plaintiffs' Attorneys* |
| | Rafey S. Balabanian (SBN 315962)<br>rbalabanian@edelson.com<br>EDELSON PC<br>150 California Street, 18th Floor<br>San Francisco, California 94111<br>Tel: 415.212.9300<br>Fax: 415.373.9435 |
| | Jay Edelson (admitted *pro hac vice*)<br>jedelson@edelson.com<br>Ari Scharg (admitted *pro hac vice*)<br>ascharg@edelson.com<br>J. Eli Wade-Scott (admitted *pro hac vice*)<br>ewadescott@edelson.com<br>Michael Ovca (admitted *pro hac vice*)<br>movca@edelson.com<br>Emily Penkowski Perez (admitted *pro hac vice*)<br>epenkowski@edelson.com<br>Hannah P. Hilligoss (admitted *pro hac vice*)<br>hhilligoss@edelson.com<br>EDELSON PC<br>350 North LaSalle Street, 14th Floor<br>Chicago, Illinois 60654<br>Tel: 312.589.6370<br>Fax: 312.589.6378 |
| | *Counsel for Plaintiffs and the Putative Class* |