# EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *IN RE* **23ANDME, INC., CUSTOMER DATA SECURITY BREACH LITIG.**<br><br>This Document Relates to:<br>*Melvin et al v 23andMe, Inc.*, Case No. 24-cv-00487-EMC | Case No. 24-md-03098-EMC<br><br>**EXPERT REPORT OF JOSEPH J. AVERY, Ph.D., J.D., AND ALISSA DEL RIEGO, J.D.**<br><br>Judge: Hon. Edward M. Chen |

**TABLE OF CONTENTS**

I.     **INTRODUCTION**................................................................................................1

II.    **EXECUTIVE SUMMARY** ...............................................................................1

III.   **QUALIFICATIONS** ..........................................................................................2

     A.    **Prof. Joseph J. Avery, Ph.D. & J.D.** ...................................................2

     B.    **Prof. Alissa Del Riego, J.D.** ...............................................................3

     C.    **Our Joint Research on Class Counsel and Class Member Preferences** ............4

IV.   **METHODOLOGY** ..............................................................................................8

     A.    **Definition of the Relevant Population and Sampling** ........................9

     B.    **Survey Questions**................................................................................10

     C.    **Protocol for Calculating Results** .......................................................12

     D.    **Quality Contol and Validation** .........................................................14

     E.    **Key Considerations and Limitations** ................................................15

V.    **RESULTS** .........................................................................................................16

     A.    **Population** ............................................................................................17

     B.    **Analysis** ...............................................................................................18

VI.   **CONCLUSION**.................................................................................................21

**EXHIBIT 1-A: Curriculum Vitae of Prof. Joseph J. Avery, Ph.D. & J.D.**
**EXHIBIT 1-B: Curriculum Vitae of Prof. Alissa del Riego, J.D.**
**EXHIBIT 1-C: Class Preferences Survey**

## I.      INTRODUCTION

1.      In connection with the above-captioned matter, we were engaged by Edelson PC ("Counsel") to assist in developing a survey targeting potential class members in this litigation. The objective was to ascertain class members' preferences regarding class counsel, litigation strategies, and related matters. This initiative aims to supply the Court with empirical data to aid it in the decision-making process of appointing interim class counsel, in accordance with Federal Rule of Civil Procedure 23(g). This effort also reflects a commitment to ensuring that class members' preferences are taken into consideration during the critical phases of litigation.

2.      This report proceeds in four parts. First, we provide an executive summary of the survey results. Second, we discuss our qualifications and relevant research. Third, we explain the survey methodology employed. Fourth, we analyze and discuss the survey results.

## II.     EXECUTIVE SUMMARY

3.      Our survey aimed to understand the preferences and expectations of class members for the present litigation against 23andMe. We, Professors Joseph Avery and Alissa del Riego, have a particular focus on class actions in our academic work and are pioneers in using empirical methods to communicate with and understand class members. We led this study designed to capture a wide range of perspectives on class counsel and litigation strategies.

4.      The methodology behind the survey was rigorously developed to ensure the collection of meaningful data from which reliable conclusions could be drawn. Employing a variety of questions, from quantitative scales to an open-ended response, allowed us to explore the nuances of class member preferences.

5.      The results can be distilled across four main themes:

6.      **First, Litigation Strategy Preferences**: Class members strongly favored law firms that commit to a detailed investigation before filing suit and that litigate through the public court system prior to settling, demonstrating a preference for more informed litigation strategies. Moreover, there was a clear inclination towards engaging a lean legal team (i.e., a team of one or two law firms).

7.      **Second, Desired Litigation Outcomes**: Beyond monetary compensation, class

members highly valued non-monetary protections, such as measures against data misuse and special protections for particularly vulnerable groups.

8. **Third, Law Firm Experience and Capabilities**: Expertise of the law firm in privacy class actions and experience litigating state genetic privacy laws were highly prized. Additionally, class members preferred firms that have demonstrated an ability to secure high claims rates (i.e., getting a high a percentage of the class members paid), emphasizing the importance of results-driven legal representation.

9. **Fourth, Law Firm Communication and Resource Allocation**: Open communication between class members and law firms emerged as a critical factor, with a substantial number of respondents considering it vital. Moreover, there was a pronounced preference for law firms showing long-term financial viability and a commitment to prioritizing the interests of the class over maximizing the law firms' financial returns.

10. As we delve into the intricacies of the survey's findings, these themes guide our discussion, offering insights into the class members' collective voice.

## III. QUALIFICATIONS

### A. Prof. Joseph J. Avery, Ph.D. & J.D.

11. I am an Assistant Professor at the University of Miami Herbert Business School, where I hold three faculty appointments: in the Department of Business Law, in the Department of Psychology, and in the Institute for Data Science and Computing. I also am an Affiliated Fellow at Yale Law School's Information Society Project.

12. I received my Bachelor of Arts in Economics and Philosophy from New York University, graduating *magna cum laude*. I received a Juris Doctor degree from Columbia Law School, and I received both an M.A. and a Ph.D. in Psychology from Princeton University. I also completed a postdoctoral fellowship at Yale Law School. A current copy of my curriculum vitae is attached hereto as Exhibit 1-A.

13. I have practiced law, co-created an artificial legal intelligence named Claudius, and co-founded a National Science Foundation-supported legal technology company.

14. I am an expert on the intersection of law, the social and behavioral sciences, and

technology. For example, my Ph.D. dissertation focused on "legal data" and involved the use of experimental designs to study legal questions. This dissertation received two of the most prominent dissertation awards in my field: one from the Society for the Psychological Study of Social Issues and another from the American Psychology-Law Society.

15.     My research has been published or is forthcoming in top journals of both experimental psychology and law, including the Journal of Social Psychology, Basic and Applied Social Psychology, Yale Journal of Law & Technology, Northwestern Journal of Technology and Intellectual Property, University of Pennsylvania Journal of Constitutional Law, Cornell Journal of Law & Public Policy, UC Irvine Law Review, Utah Law Review, Arizona State Law Journal, the Journal of Legal Studies, and many more. I also have published multiple book chapters and co-edited two book volumes.

16.     My work has received numerous grants, including from the National Science Foundation, the Horowitz Foundation for Social Policy, the American Psychology-Law Society, the University of Miami, and Princeton University.

17.     I am being compensated for my services in this matter at a rate of $750 per hour. No part of my compensation depends on the outcome of this survey or litigation.

**B.      Prof. Alissa Del Riego, J.D.**

18.     I am an Assistant Professor of Legal Studies at the University of Miami Herbert Business School. Prior to joining the regular faculty at the University of Miami, I was a practicing class action attorney for several years.

19.     I obtained my Bachelor of Arts in Political Science with a Minor in Spanish and Legal Studies at the University of Miami, graduating *summa cum laude*. I then obtained my Juris Doctorate degree from Harvard Law School, where I served as Co-Editor-in-Chief of the Harvard Latin American Law Review. A current copy of my curriculum vitae is attached hereto as Exhibit 1-B.

20.     In addition to practicing for several years prior to joining academia, I clerked for the Honorable Adalberto Jordan on the Eleventh Circuit Court of Appeals.

21.     My legal practice focused on complex civil litigation, including class actions and

multidistrict litigation. I worked on various class action MDLs, including but not limited to the Takata Airbag Products Liability Litigation, MDL 2599, in the Southern District of Florida and the ZF-TRW Airbag Control Units Product Liability Litigation, MDL 2905, in the Central District of California. I also have experience with data breach class action litigation.

22.     As a class action attorney, I was involved not only in the research and legal briefing of class claims but was primarily charged with communicating with class representatives and other class members. These communications ranged from gathering information from class members prior to filing a complaint, providing updates on the status of the litigation to class members, gathering detailed information from class representatives during the discovery process, preparing class representatives for depositions, defending class representative depositions, communicating with class representatives regarding a potential settlement, communicating with class members regarding a settlement presented to the court for preliminary and final approval, and communicating with class members during the settlement claims administration process.

23.     My research primarily focuses on MDL and class action litigation and, specifically, on the roles of class counsel and class members in such litigation. My research has been published in several premier journals, including but not limited to the Stanford Law Review Online, the Michigan Journal of Law Reform, the Yale Journal of Law & Technology, and the North Carolina Law Review.

24.     I have presented my research at various conferences across the United States. Most recently, in March 2024, I presented a paper on class counsel applicants at a panel hosted by the University of Michigan Law School. And in November 2023, I presented a research paper on court appointment of class counsel in MDL class action litigation at the Southeast Academy of Legal Studies in Business.

25.     I am being compensated for my services in this matter at a rate of $750 per hour. No part of my compensation depends on the outcome of this survey or litigation.

**C.     Our Joint Research on Class Counsel and Class Member Preferences**

26.     Our joint research has focused on developing and exploring ways to provide class members with a much-needed seat and voice in class action litigation, especially through the use

of surveys, technology, and behavioral science tools that enable a better understanding of class members' preferences.

27.     Our research outlines the many representational problems in class action litigation, focusing on the lack of communication between class counsel and the class members they represent. *See* Alissa del Riego & Joseph J. Avery, *The Class Action Megaphone: Empowering Class Members with an Empirical Voice*, 76 Stan. L. Rev. Online 1, 1–4 (2023) ("*Class Action Megaphone*").

28.     These representational problems begin at the outset of the litigation, as class members presently provide no input on which attorneys the court, pursuant to Rule 23(g), appoints as interim class counsel to represent class members in the litigation. *See id.*; Alissa del Riego & Joseph Avery, *Inadequate Adequacy?: Empirical Studies on Class Member Preferences of Class Counsel*, 2024 Utah L. Rev. 499 (2024) ("*Inadequate Adequacy*"). Even after class counsel is chosen, absent class members are afforded no opportunity to weigh in on the claims asserted, injuries pled, remedies sought, and the litigation strategies employed to secure those remedies. As a result, the ensuing litigation and any class-wide settlements often sacrifice remedies favored by the class in exchange for others favored by class counsel (i.e. remedies that would result in greater compensation to the attorneys at the class's expense). *See Class Action Megaphone*, at 3-4.

29.     Indeed, class members are only entitled to communicate their preferences as objectors to settlements. However, practically speaking, class members lack sufficient knowledge to make reasoned and well-informed objections because of the communication void that exists between them and class counsel throughout the litigation. *Id.* Courts naturally defer to class counsel's nearly irrefutable claims that it obtained the best outcome possible, given the undisclosed, confidential information uncovered in discovery and the uncertainties and delays that accompany further litigation and a potential trial and appeal. *Id.*

30.     While there are obvious impracticalities associated with involving thousands or millions of class members in litigation decisions, our research demonstrates these realities should not preclude class members from having *any* voice in the litigation. *Id.* at 4.

31.     Starting with the appointment of interim class counsel, courts use the Rule 23(g) factors as a guide to appoint the attorneys "best able to represent the interests of the class." Fed. R. Civ. Proc. 23(g)(2). Our research shows, however, that courts may not necessarily choose the same attorneys that the class would choose for themselves. While courts undoubtedly have unique expertise in applying 23(g), these decisions can be assisted by knowing what class members actually prefer in their attorneys based on the context of any given case. We dive into this in our article published this Spring in the Utah Law Review titled *Inadequate Adequacy?: Empirical Studies on Class Member Preferences of Class Counsel*. *See generally Inadequate Adequacy*, 2024 Utah L. Rev. 499 (2024).

32.     In the article, we surveyed individuals about the type of counsel they would want in three real class actions in which multiple attorneys applied to serve as class counsel: a products liability class action, a data breach class action, and a data privacy class action. *Id.* at 522–25. We provided class members with a summary of the claims raised against each of the defendants in the litigation and a brief biography or description of the attorneys that applied to represent the class based on those attorneys' own submissions to the district court when they applied to serve as interim class counsel in the particular case. *Id.* We asked survey respondents generally about their preferences in counsel and then specifically as to which attorneys they would choose. *Id.*

33.     We note two key findings from this research:

34.     First, surveyed participants valued Rule 23(g)'s appointment criteria (experience, knowledge of the law, resources willing to dedicate to the litigation, and work done identifying and investigating claims) but also valued other factors such as attorneys' integrity, trustworthiness, and willingness to listen to class members. *Id.* at 526–33.

35.     Second, surveyed participants invariably chose different attorneys and/or attorney teams than those ultimately appointed by the court, despite indicating that they value the same Rule 23(g) criteria courts applied. *Id.* at 535–40.

36.     These findings indicate that there can be a disconnect between what courts think class members want and what they actually want. Our proposed solution to this problem is "representational notice." *Id.* at 543–51. Representational notice involves notice to and a survey

of a sample of identifiable class members at the outset of class litigation and prior to the appointment of class counsel. *Id.* at 543–46. The notice is meant to inform class members of their potential claims and to learn about their preferences. *Id.* at 543–49. Practically, it affords a subset of class members an opportunity to convey their preferences on counsel, claims, litigation strategies, and litigation outcomes to the court and prospective class counsel. *Id.* at 547–49.

37.     Representational notice is not meant to supplant the court's ultimate obligation to appoint class counsel and interim class counsel under Rule 23(g). Courts have unique expertise and responsibilities that cannot and should not be replaced with class members' preferences. But courts, pursuant to Rule 23(g)(1)(B) that permits them to consider any "matter pertinent to counsel's ability to fairly and adequate represent the interests of the class," should consider and acknowledge class members' preferences when appointing counsel. *Id.* at 550–51.

38.     Obtaining and openly discussing class member preferences via representational notice has multiple benefits, not least the following:

39.     **Legitimacy and transparency.** The process of selecting class counsel becomes more open when prospective class members have the opportunity to respond to representational notice, even if the court eventually appoints different attorneys. If the court's selection aligns with the preferences of the sampled class members, it enhances the perceived legitimacy of the appointment. Conversely, if the court appoints counsel contrary to the members' preferences, transparency is achieved when the court provides an explanation for its decision, thereby acknowledging the difference and justifying its choice of representation.

40.     **Affording class members a voice.** The essence of class litigation is to serve the interests of the entire class, yet, traditionally, class members have lacked any means to engage or express their preferences, with the exception of a select few representatives chosen by the attorneys. This is a rather serious deficiency, and it is one that scholars, such as us, are increasingly working to redress. Providing class members with the means to voice their opinions offers valuable insights to both prospective class counsel and the court regarding their choice of representation, the harms they seek to address, and their desired outcomes in the litigation. Although class counsel must balance the collective best interests with practical considerations,

incorporating the perspectives of class members should guide their approach in advancing the lawsuit.

41.     **Avoiding bias.** Without insight into class members' preferences, courts are forced to act in a vacuum, relying on their own preferences and deciding under the influence of their own biases. While this is not necessarily a negative—after all, such decisions fall within courts' purview for good reason—additional information regarding class members' preferences would undoubtedly be useful and would provide alternative and perhaps countervailing perspectives. In other words, while both courts and class members will bring their own biases to evaluating counsel, the combined effect should be a more complete evaluation of attorneys, better understanding of the class and its preferences, and a more balanced selection outcome. *Id.* at 543.

42.     Based on our research, we recommend that courts employ representational notice or similar mechanisms to solicit class preferences on counsel, litigation strategy, and litigation outcomes prior to appointing interim class counsel in consolidated actions. That is what the survey described below was designed to do, and it can assist the Court in appointing lead counsel in this matter.

## IV.     METHODOLOGY

43.     In the present litigation, Counsel sought to increase communication with class members. To that end, Counsel asked for our assistance in developing a survey eliciting a subset of putative class members' preferences for class counsel, litigation strategy, and desired litigation outcomes to inform the Court's selection of interim lead counsel.[1] As discussed in the previous section, we have conducted the leading research to date on surveying class members. *See, e.g.*, *Class Action Megaphone*; *Inadequate Adequacy*. This work formed the foundation for thinking about how Counsel could accomplish their goal of meaningfully communicating with class members and identifying members' preferences.

44.     This section will cover the methodology—informed by our leading research on this topic and the generally accepted principles for the design of surveys to be used as evidence in litigation—for the following: (A) defining the relevant population and sampling; (B) developing

---

[1]     The survey fielding was managed by NERA Economic Consulting ("NERA"), a firm providing expert statistical and survey research analysis.

1   the survey questions; (C) the protocol for calculating the results; (D) the quality control and data

2   validation measures; and (E) key considerations and limitations of the survey.

3   **A.      Definition of the Relevant Population and Sampling**

4   45.     For the current litigation, the definition of the relevant population is clear: all

5   individuals in the United States whose personal genetic information was accessed by third parties

6   without consent as a result of the data breach announced by 23andMe on October 6, 2023.

7   23andMe sent email notifications to those affected by the breach, making putative class members

8   easily identifiable. To identify potential class members, then, survey respondents were asked a set

9   of screening questions and were only permitted to take the survey if they had received an email

10  notification about a breach involving their personal data from 23andMe.

11  46.     Furthermore, in any survey there is always a risk that people not in the relevant

12  population will take the survey. To prevent non-class members from participating, respondents

13  were not told the purpose of the survey, and each screening question contained at least seven

14  other potential responses, obfuscating the selection criteria. In addition, respondents were

15  screened out if they failed an attention check question, were younger than 18 years old, resided

16  outside the United States, their stated gender did not match panel data, or their stated zip code did

17  not accord with their stated U.S. state of residence.

18  47.     In any survey, the sample drawn needs to be well-powered[2] enough to enable

19  accurate and reliable conclusions to be drawn. In the current litigation, the potential class is nearly

20  7 million individuals. As explained below, most of the survey questions used a 7-point Likert

21  scale, for which common practice is to aim for a 95% confidence level and a margin of error

22  around 5%. This setup strikes a good balance between accuracy and feasibility of collecting

23  responses. So, using a 95% confidence level ($Z = 1.96$) and a margin of error of 5%, and applying

24  a finite population correction, which slightly reduces the sample size needed compared to an

25  infinite population assumption, the required sample size was approximately 350 to 400

26  respondents. The survey ultimately had 395 respondents. (*See* Exhibit 2,, "Data Sheet" at 1.)

27

28  [2]   Statistically "well-powered" means that a study has a sufficient sample size or statistical capacity to detect a true effect or difference if one exists. That is, a well-powered study reduces the risk of concluding that there is no significant effect when, in fact, there is one.

Respondents were recruited by Veridata Insights ("Veridata") using Veridata's online panel and through social media advertising.

**B.      Survey Questions**

48.      The survey followed generally accepted procedures for the design of questionaries used in research for litigation, including neutrally worded survey questions that are not leading or biased, and rotated and randomized questions and responses (to reduce order effects).[3] The survey consisted of (i) threshold questions designed to admit only qualified population members, as described above; (ii) primary survey questions, which included 17 questions with discrete response options and one open-ended free response question; and (iii) questions regarding respondent demographics. The full survey is attached hereto as Exhibit 1-C, "Class Preferences Survey."

49.      The two primary challenges in designing these survey questions were (1) to design survey questions in a way that minimized biases resulting from question wording, and (2) to include enough questions to gather general preferences on class counsel in the current litigation, while at the same time not being so expansive as to overwhelm, distract, or fatigue respondents. We address each of these in turn.

50.      First, to minimize biases, we took multiple actions. First, we created questions that spanned four different categories, as described below, thus avoiding overreliance on questions that might matter more to any one firm or party. Second, we mirrored prompt wording so that, for questions that presented binary comparisons (e.g., do class members prefer a small team of counsel, such as just one or two firms, or do they prefer to have a larger number of firms involved?), each option would receive fair consideration. And third, for the bulk of the questions, we used a 7-point Likert scale, which is particularly useful for measuring unobservable characteristics such as attitudes, feelings, or opinions. This scale is consistently used by Prof. Avery in his research, and Likert scales in general are considered the most fundamental and

---

[3]      Diamond, Shari S. (2011), *Reference Guide on Survey Research in  Reference Manual on Scientific Evidence* (Federal Judicial Center 3rd ed. 2011), https://www.fjc.gov/sites/default/files/2012/SciMan3D09.pdf; Federal Judicial Center, *Manual for Complex Litig.* § 11.493, 102-04 (4th ed. 2004).

frequently used psychometric tools in social science research.[4] Our scale ranged as follows: Not Important at All, Unimportant, Somewhat Unimportant, Neither Unimportant Nor Important, Somewhat Important, Important, Very Important. This scale provided an intuitive and simple mechanism for respondents to express the full range of their opinions, including expressing neutrality.

51.     Second, to meet the exploratory aim of the survey without overwhelming, distracting, or fatiguing respondents we developed a set of questions that could be logically organized into four key categories that align with and supplement the Rule 23(g) factors: litigation strategy, litigation outcomes, law firm experience and capabilities, and demonstrated ability and willingness to dedicate resources to the litigation. The questions formulated for each of the categories were as follows:

52.     **Litigation Strategy**: We asked four questions in this category to understand class members' preferences on both procedural and substantive litigation strategy, including: (i) whether it was important to class members that the case be filed quickly as opposed to after a thorough investigation of the claims, (ii) whether the class preferred a quick settlement or to litigate the case in court; (iii) whether it was important that the law firms representing the class were pursuing claims under state genetic privacy statutes; and (iv) whether the class preferred a legal team of one or two firms or a coalition of many firms.

53.     **Litigation Outcomes:** We asked three questions in this category on whether respondents thought it was important for the firms representing the class to: (i) prioritize securing large cash payments for class members; (ii) prioritize securing measures that would prevent bad actors from using their data to harass, intimidate, harm, or discriminate against them; and (iii) seek special protection for members of certain ethnic groups that have been specifically targeted by the 23andMe breach.

54.     **Law Firm Experience and Capabilities**: We asked respondents seven questions in this category about whether they thought it was important that the law firms representing the class (i) have extensive experience litigating privacy class actions, (ii) have experience litigating

---

[4]      Ankur Joshi, Saket Kale, Satish Chandel, & D. Kumar Pal, *Likert Scale: Explored and Explained*, 7 BRIT. J. APPLIED SCI. & TECH. 397 (2015).

claims under state genetic privacy statutes, (iii) have a track record of getting large settlements in privacy class actions, (iv) have a track record of getting high claims rates, (v) have an in-house forensic investigation team, (vi) have the ability to attract the best attorneys, and (vii) have attorneys from diverse backgrounds doing meaningful work on the case.

55.     **Demonstrated Ability and Willingness to Dedicate Resources to the Litigation**: We asked respondents three questions in this category including whether they thought it was important that the law firms representing the class (i) make an effort to communicate with the class, (ii) have demonstrated long-term financial viability such that the firm has enough money to handle the case without being constrained by its own finances, and (iii) agree to seek no more than 20% of the settlement in attorneys' fees.

56.     Lastly, we wanted to ensure that respondents were given an opportunity to opine about the topics they thought were important. Thus, question number 18 permitted open-ended feedback: "Is there anything else you would like the court to consider as it chooses the law firm(s) who will lead this case to ensure you have the best representation possible?" (Ex. 1-C at 13.)

57.     In all, we asked 18 questions, a number large enough to approach exhaustiveness but not so large as to hazard participant fatigue. These questions were not ordered by category, so the categorical groupings were not readily evident to respondents.

### C.     Protocol for Calculating Results

58.     Given that our sample was sufficiently powered, *see* Part IV Results, our protocol for the analyses is as follows:

59.     For each question, we make use of a table to present the distribution of responses. The tables display two key pieces of information: the count (number of responses) and the percentage of the total responses that each category represents. (*See* Ex. 2, Data Sheet.) This allows for an efficient assessment of how respondents generally feel about a survey item. In addition, the table shows the calculated mean score of all the responses.

60.     From this foundation, we prioritize tests of statistical significance. The survey contains two types of questions. The first type includes those that, as described above, make use of a 7-point Likert scale ranging from "Not important at all" to "Very Important." (*See, e.g.*, Ex.

1-C at 7.) These can be analyzed for statistical significance via both a conservative and less conservative approach. The less conservative approach compares the mean to the floor of the scale ("Not important at all"). The more conservative approach compares the mean to the midpoint of the scale ("Neither Uunimportant Nor Important"), creating a much higher bar (it compares the outcome to a neutral opinion). (*Id.*) Although this higher bar makes significance less likely to be found, we believe best practices call for this more demanding test, allowing us to rest comfortably in any conclusions regarding significant outcomes. Furthermore, because there are 14 questions of this type (on the 7-point Likert scale), all significance tests need to be adjusted for multiple comparisons. Again, erring on the side of being conservative (i.e., not wanting to find significance when there is none), we choose the Bonferroni Correction,[5] which reduces the risk of Type I errors (erroneously finding effects where there are none) but may increase the risk of Type II errors (failing to detect true effects).

61.    The second type of question presents respondents with two strategies to choose between (for example, do class members prefer that only one or two firms comprise the legal team, or do they want a larger set of firms involved?). (*See, e.g.*, *id.* at 9.) For these questions, there are five set outcomes that can be selected: the first option, the second option, "No preference," "Not enough information to determine," or "Something else." (*Id.*)

62.    For these questions, tabular presentation allows for sufficient description of the results. With the tables we provide, readers can note that, say, nearly two-thirds of respondents prefer option one, which is more than those who prefer option two. To assess the significance of such a result, however, more is needed. The chi-square goodness-of-fit test is appropriate, enabling determination as to whether the observed distribution significantly differs from a

---

[5]    The Bonferroni correction is a method used in statistical analysis to reduce the likelihood of obtaining false-positive results when multiple hypothesis tests are conducted simultaneously. To understand it in practical terms, consider a legal scenario where multiple pieces of evidence are being presented. Each piece of evidence is scrutinized to determine if it significantly supports the case. The more pieces of evidence there are, the higher the chance that at least one will appear to be significant purely by chance, even if it's not truly related to the case at hand. Applying the Bonferroni correction is akin to raising the standard of proof for each individual piece of evidence when the overall quantity of evidence is large. It tightens the criteria that each piece of evidence must meet to be considered statistically significant. By doing so, it controls for the risk of a false positive, ensuring that the evidence deemed significant is more likely to be genuinely pertinent to the case and not just a result of chance due to the high number of tests.

1   uniform or expected distribution.[6] For the questions we ask, it makes sense to assume an equal

2   split (50% each) for the two options presented, and this is what we do. Furthermore, because there

3   are three questions of this type, all significance tests need to be adjusted for multiple

4   comparisons. Again, erring on the side of being conservative, we choose the Bonferroni

5   Correction.

6       63.     In addition, because our focus for these questions is on the two primary options (to

7   use the previous example, do respondents want a small set of firms involved or larger set?),

8   additional statistical tests to dig deeper into these dyadic comparisons are useful. First, we run the

9   chi-square test of independence, which tells us if there is a significant preference for one option

10  over the other, considering all options available. Second, we run a Z-test for two proportions. This

11  enables us to compare options 1 and 2 while treating the other responses as a separate category of

12  non-preference.

13      **D.     Quality Control and Validation**

14      64.     Several quality control procedures were used throughout the survey process to

15  ensure reliable data. First, the panel provider, Veridata, utilized digital fingerprinting to ensure

16  that a respondent only took the survey once, and ensured high-quality panelists by confirming

17  their identity using email and double opt-in validation.

18      65.     Second, additional quality controls were built into the survey program itself, (*see*

19  Ex. 1-C, Class Preferences Survey, at 1-5), to ensure that the data were of the highest quality,

20  namely:

21          i.      Respondents were asked to adhere to a set of instructions, including taking

22                  the survey in one session and refraining from consulting outside material

23                  during the survey. Respondents who indicated that they did not understand

24                  or were unwilling to adhere to these instructions, or selected "Don't know /

25                  unsure" were screened out of the survey.

26  [6]     In lay terms, we can describe the method as follows. To understand if the survey results
    were truly notable, we used a statistical method called the chi-square goodness-of-fit test. For
27  some questions, we expected answers to be split evenly between two choices, with half of the
    people choosing one option and the other half choosing the second option. This assumption of an
28  even split allowed us to check if the actual answers we got were surprising or just due to random
    chance.

ii.     Respondents needed to indicate the device type on which they were taking the survey, and if their answer did not match the actual device type used (which is detected by the survey program), or if they selected "Other," they were screened out.

iii.    Respondents had to correctly answer a Google reCAPTCHA question to ensure that a person, and not a computer or "bot," was taking the survey. Respondents who did not accurately answer this question were screened out.

iv.     Each respondent was required to enter their state of residence and ZIP code, and if these data conflicted with one another (or if the ZIP code entered was invalid), the respondent was excluded.

v.      Each respondent also needed to enter their age, and if these data conflicted with the data Veridata had on file, or if the respondent selected "Prefer not to answer," the respondent was excluded.

vi.     Respondents were also asked a series of questions about how many times per week they engaged in different activities. As an attention check, respondents were told to make a specific selection for one of the items and were screened out if they did not correctly answer this question.

vii.    In addition, open-ended responses were reviewed and respondents who entered nonsensical data were excluded.

**E.      Key Considerations and Limitations**

66.     In conducting the survey, we navigated the inherent complexities and limitations characteristic of such research methodologies. Here, we outline several key considerations that shaped our approach and interpretation of the findings:

67.     **Sample Representativeness**: Despite rigorous efforts to meticulously define and target a demographically relevant subset of a potential class exceeding 7 million individuals, the finite nature of our sample precludes a complete encapsulation of the diverse perspectives within the entire class. While our sample size was statistically powered to yield significant insights, the

vast scale of the class poses challenges to capturing the full spectrum of nuanced opinions that an exhaustive survey might reveal.

68. **Question Interpretation in a Legal Context**: Crafting questions that are both clear and neutral is a paramount concern, particularly given the legal nuances of our inquiry. Despite these efforts, the subjective nature of language and individual differences in interpretation can lead to variability in how questions are understood by respondents. This variability underscores the challenges in achieving perfectly uniform comprehension across all respondents.

69. **Exploratory Analysis Constraints**: Our data analysis navigated the limitations inherent in exploratory surveys of this nature. While our principal findings emerged with strong statistical significance, our commitment to methodological integrity compels us to interpret these results with a measured degree of caution.

70. **Multiple Comparisons Consideration**: The application of the Bonferroni correction was a necessary step in mitigating the risk of Type I errors due to multiple comparisons. However, this conservative approach also raises the potential for Type II errors, where meaningful differences may be overlooked. This delicate balance between Type I and Type II error risks is crucial for a nuanced understanding of our analytical framework.

71. **Evolving Class Member Preferences**: Recognizing that attitudes and preferences are not static, we acknowledge that the sentiments expressed by respondents may shift over time, influenced by ongoing developments in the litigation or broader societal changes. This temporal dynamism highlights the snapshot nature of our findings within a continually evolving context.

72. By addressing these considerations, we aim to provide a transparent and comprehensive overview of the methodological landscape that framed our survey. These limitations not only inform our interpretation of the data but also underscore the thoughtful and deliberate approach we have taken to ensure the reliability and relevance of our findings.

## V. RESULTS

73. The survey fielding was managed by NERA through Veridata. It was run from March 21, 2024 through March 29, 2024. In this section, we discuss the population that participated, and we analyze the results obtained. Before delving into comprehensive analysis,

however, we synthesize key insights drawn from the survey.

74.     **Litigation Strategy**: Class members displayed a clear preference for law firms that conduct thorough investigations before filing suit, preferred a lean legal team of one or two firms, and preferred firms pursuing litigation through public court systems rather than those pursuing a quicker settlement through private negotiations.

75.     **Litigation Outcomes**: Survey respondents valued monetary compensation in litigation outcomes but also placed high importance on non-monetary protections. This included a strong emphasis on safeguarding against data misuse and ensuring special protections for vulnerable groups, indicating a holistic approach to what constitutes meaningful compensation and security.

76.     **Law Firm Experience and Capabilities**: Respondents highly valued law firms with extensive experience in privacy class actions and those knowledgeable about state genetic privacy laws. Also important was a firm's proven ability to secure higher claims rates for class members, highlighting a desire for competent and results-oriented legal representation.

77.     **Demonstrated Ability and Willingness to Dedicate Resources to the Litigation**: The importance of open communication between law firms and class members was underscored, with a significant number of respondents considering it very important. Furthermore, class members expressed a preference for firms demonstrating long-term financial viability and a willingness to prioritize clients' interests over maximizing firms' financial gains.

78.     In all, from strategic litigation approaches and desired litigation outcomes to the specific qualifications and operational capabilities of law firms, these findings provide a roadmap for how class members wish to be represented in the present litigation against 23andMe.

**A.     Population**

79.     As discussed above, the power analysis called for approximately 350-400 respondents. Our final survey population included 395 respondents. The panel was balanced across gender and age, such that 51% were male, 48% were female, and the remaining respondents selected "Gender Variant / Non-conforming." For both male and female respondents, approximately 33% fell into each of three age groups: 18-34 years old, 35-54, and 55+.

Respondents were geographically diverse, with 22%, 16%, 35%, and 27% residing in the Northeast, Midwest, South, and West, respectively. (Ex. 2, Data Sheet, at 1.)

**B.   Analysis**

80.   For tabular displays of all survey results, *see* Ex. 2, Data Sheet.

81.   In this discussion, we focus on three items from each of the four question categories.

82.   **Litigation Strategy**: in this category, we found that respondents preferred the following:

    i.   Law firms that take their time to thoroughly investigate claims before filing suit, as opposed to filing a case quickly after the data breach (67% of respondents versus 18%), (Ex. 2, Data Sheet, at 5);

    ii.   A legal team limited to one or two law firms over a legal team of many law firms (50% versus 25%), (*id*. at 6); and

    iii.   Law firms that intend to work through the public court system, engage in discovery, and test the merits of the claims prior to reaching a settlement over firms that intend to settle the case more quickly through private mediation (47% versus 34%), (*id*. at 4).

83.   All three of these observed distributions were significantly different from the expected distribution, after adjusting for multiple comparisons (the chi-square goodness-of-fit test with Bonferroni correction). In addition, focusing on just the two primary response options, we again found significance for all three of the above results pursuant to the chi-square test of independence and the Z-test for two proportions. Said again, the outcomes were significantly different from the expected 50%/50% distribution split across the two primary options, and the differences between the two primary option choices were significant.

84.   **Litigation Outcomes**: In the second category, we found emphasis on both monetary compensation and specialized non-monetary protections. Speaking to the first point, respondents were asked the following: "There are a range of possible outcomes in class action litigation. Many privacy settlements primarily offer credit monitoring—i.e., a service that reviews

your credit report for suspicious activity to protect your credit score—or small cash amounts (like $10 or $20). Other settlements are focused on providing larger amounts of cash relief to class members. How important is it to you that the law firm representing the class has a track record of negotiating settlements that result in **larger cash payments** to class members?" (Ex. 1-C, Class Preferences Survey.) The mean score was 6.17 with a standard deviation of 1.04, a result that approached the ceiling of "Very Important" (numerical score of 7.00). More importantly, this result was significantly different from the midpoint of the scale ("Neither Unimportant Nor Important"): a one-sample t-test was conducted to determine whether the mean score significantly differed from the midpoint value of 4.00, after adjusting for multiple comparisons using the Bonferroni correction.  The analysis revealed that the mean score (M = 6.17, SD = 1.04) was significantly different from the midpoint, $t(394) = 41.05$, $p < .001$, adj.$p = .001$.[7]

85.     Speaking to the second point, the key questions involved the importance respondents placed on being represented by a firm that focuses on obtaining measures preventing others from using the breached data to harass, intimidate, harm, or discriminate against class members. Respondents considered this highly important (mean = 6.50, standard deviation = .89; p and adj-p < .001). Likewise, respondents affirmed the importance of special protection for members of two especially vulnerable groups, those of Ashkenazi Jewish and of Chinese descent: mean = 5.96, standard deviation = 1.30, both p-value and adjusted p-value < .001. This strong consensus reflects a growing awareness and concern among respondents about the potential risks associated with data breaches and misuse. It underscores the necessity for legal representation that not only advocates for their rights but also proactively works to safeguard their personal information from any form of exploitation. The emphasis on privacy and data protection highlights a critical aspect of what class members value in a law firm: a commitment to proactive defense of their digital safety and dignity.

86.     **Law Firm Experience and Capabilities**: Third, we zoom in on three particularly salient matters, ones that the Court can use to differentiate firms.

---

[7]     We repeat this form of analysis for the remaining questions, but for ease of reading, from this point onward we report only means, standard deviations, and p-values with attendant significance statements.

87.     There were two related questions on firms' specific litigation experience and expertise:

    i.    From a broader perspective: "How important is it to you that the law firm representing the class has significant experience (i.e., more than ten years) handling **privacy class actions**?" (Ex. 1-C, at 10.)

    ii.    And from a more narrow perspective: "How important is it to you that the law firm representing the class has **experience handling legal cases under state genetic privacy laws**?" (*Id.*)

88.     For these items, both means were greater than 6.0 on the 7-point scale, and both were highly significant, even after adjusting for multiple comparisons.

89.     Third, respondents affirmed the importance of representation by a firm with a track record of getting higher percentages of class members paid (i.e., higher claims rates): mean = 6.10, standard deviation = 1.15, p-value and adjusted p-value < .001. Combined, these results can be understood as class members desiring a firm that is deeply experienced in the subject matter but also active in ensuring that all class members are accounted for and well-represented.

90.     **Demonstrated Ability and Willingness to Dedicate Resources to the Litigation**: In the final category, our analysis begins with class communication and preferences, an issue that goes to the pith of Counsel's efforts with respect to class members. Respondents were asked, "How important is it to you that the law firm representing the class makes an effort to **communicate with the class** in order to consider class members' preferences?" (*Id.* at 13.) The mean response was 6.26 with a standard deviation of 1.05. Indeed, a full 55% of respondents selected "Very Important," which was the ceiling on the scale. (Ex. 2, Data Sheet, at 21.) The mean of 6.26 was highly significant: p-value < .001 and adjusted p-value < .001. In lay terms, this means that class members strongly believed that counsel should communicate with them in order to take their preferences into account.

91.     This unequivocal result sets the stage for the final two analyses. Having established that communicating with class members and considering their preferences matters to class members, we now turn to the economic substance of firms and firms' aims. First,

respondents want a firm that is capable of sustaining extended and financially taxing litigation: "Litigating large class actions can take time (often years), and the law firms representing the class front much of the costs of litigation. How important is it to you that the law firm representing the class has demonstrated long-term **financial viability** (i.e., that the firm has enough money to handle the case without being constrained by its own finances)?" (Ex. 1-C, at 12.) The results were a mean of 6.29 with standard deviation of .96. Both the p-value and the adjusted p-value were less than .001. Second, class members wanted a firm that would temper its own financial aspirations: "How important is it to you that the law firm representing the class agrees to seek **attorneys' fees** of no more than **20%** of the settlement fund?" The mean approached 6.0 and was highly significant. (Ex. 2, Data Sheet, at 7.)

92. Now that we have discussed the questions with quantitative outcomes, it is worth discussing the single open-ended survey question, wherein respondents were given space to opine about whatever factors or issues they deemed important and/or relevant. While analysis of qualitative responses poses challenges, there are a few strands we picked up. First, and dovetailing with the just-discussed quantitative results, respondents emphasized that firms should communicate with them. This included transparency in the process, such as keeping class members apprised of updates and answering questions that might arise (e.g., one respondent wondered if a deceased family member who otherwise qualified did, indeed, qualify). This also included a general desire to be heard, to have class members' opinions be taken into consideration. After all, the incentives for counsel do not perfectly align with those of class members, especially when class members seek non-pecuniary outcomes.

93. In addition, of the various Rule 23(g) factors, in their open-ended responses, respondents emphasized experience and knowledge. This accords with the quantitative outcomes discussed above.

## VI.   CONCLUSION

94. Our comprehensive analysis has illuminated the critical factors that class members are looking for in their legal representation for this specific class action against 23andMe. Through a meticulously designed survey and well-founded interpretation of its results, the

findings demonstrate a clear preference among potential class members for legal representation that not only champions transparent and open communication but also considers their expectations, concerns, and aims.

95.     Our opinions and conclusions as expressed in this report are to a reasonable degree of professional and scientific certainty. These conclusions were reached through proper application of the survey methods and using methodology reasonably relied upon by experts in the fields of law and social science. Our work is ongoing, and our opinions will continue to be informed by any additional material that becomes available to us.

Dated: April 18, 2024                By: /s/ Joseph Avery
                                     Joseph Avery
                                     Assistant Professor, Herbert Business School
                                     Assistant Professor, Department of Psychology
                                     University of Miami

Dated: April 18, 2024                By: /s/ Alissa del Riego
                                     Alissa del Riego
                                     Assistant Professor, Herbert Business School
                                     University of Miami

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)**

I, Rafey S. Balabanian, attest that concurrence in the filing of this document has been obtained from the other signatories.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of April, 2024 at San Francisco, California.

/s/ Rafey S. Balabanian

# EXHIBIT 1-A

# Joseph J. Avery

5250 University Drive • Coral Gables, Florida
University of Miami
joseph.avery@miami.edu

## ACADEMIC APPOINTMENTS

**University of Miami** — Miami, FL
Assistant Professor, Miami Herbert Business School — 2022-present
Assistant Professor (secondary), Department of Psychology — 2022-present
Faculty Member, Institute for Data Science and Computing — 2022-present

**Yale Law School** — New Haven, CT
Affiliated Fellow, Information Society Project — 2022-present
Postdoctoral Resident Fellow, Information Society Project — 2021-2022

## EDUCATION

**Princeton University** — Princeton, NJ
Ph.D. in Psychology, received May 2021
M.A. in Psychology, received January 2019

**Columbia Law School** — New York, NY
J.D., received May 2013

**New York University** — New York, NY
B.A. in Economics and Philosophy, *magna cum laude*, received May 2008

## FELLOWSHIPS, HONORS & AWARDS

New Outstanding Reviewer, **American Business Law Journal** — 2023
Dissertation Award, 1st Place, **Society for the Psychological Study of Social Issues** — 2022
Dissertation Award, **American Psychology-Law Society** — 2022
Center for Quantum Networks Visiting Fellow, **National Science Foundation** — 2021-2022
National Defense Science & Engineering Graduate Fellowship, **DOD** — 2018-2021
Woodrow Wilson Scholars Fellowship, **Princeton University** — 2019
Behavioral Sciences Training Fellowship (Declined), **NIDA** — 2018
Ungerleider/Zimbardo Award, **American Psychological Foundation** — 2018
Anne Anastasi Award, Div. 1 of the **American Psychological Association** — 2017
Harlan Fiske Stone Scholar, **Columbia Law School** — 2012, 2013
University Honors Scholar & Founders Day Award Recipient, **New York University** — 2008
Presidential Scholar, **New York University** — 2004

RESEARCH GRANTS

**University of Miami, Office of the Vice Provost for Research & Scholarship**                    2023
"I vs. AI: Pilot research on the impact of artificially intelligent actors on negotiations"
$10,000 (PI)

**National Science Foundation**, SBIR Phase I                    2021-2022
"Artificial intelligence tool for analysis of legal documents"
$256,000 (PI at time grant was awarded)

**American Psychology-Law Society**                    2020
"Criminal subtypes: Exploring 'normative' and 'deviant' offending"
$1,000 (PI)

**Princeton University**, Faculty New Ventures Assistance Fund                    2020
"Claudius Legal Intelligence: AI for civil legal prediction problems"
$15,000 (Co-PI)

**Princeton University**, Keller Center eLab Entrepreneurship Grant                    2020
"Princeton Gavel: Artificial legal intelligence"
$5,000 (Co-PI)

**Princeton University**, Princeton Research in Experimental Social Science                    2020
"Experiments on bias in the law and using technology to correct for bias in the law"
$900 (PI)

**Horowitz Foundation for Social Policy**                    2019-2020
"When your own team is against you: racial bias in criminal defense"
$7,500 (PI)

**IBM**, Center for the Business of Government                    2019
"Improving prosecutorial efficiency and equitability through machine learning and advances in
data-driven management"
$20,000 (PI)

**Princeton University**, Council on Science & Technology                    2019
"Two lines of research on the intersection of technology and human decision making"
$600 (PI)

**Princeton University**, Graham '83 Student Research Fund                    2019
"Racial bias in post-arrest and pretrial decision making: Psychological explanations and policy
responses"
$1,000 (PI)

**Society for the Psychological Study of Social Issues**  2018
"The impact of defendants' race on defense attorneys' legal decision making"
$1,000 (PI)

**American Psychology-Law Society**  2017
"A confluence of stigma and bias in criminal defense"
$600 (PI)

**Princeton University**, Program in Cognitive Science  2017
"A novel application of predictive analytics and machine learning: Understanding and improving legal decision making"
$2,294 (PI)

## PUBLICATIONS

### I. ARTICLES & CHAPTERS

[32]  **Avery, J. J.**, & Schuster, W. M. (forthcoming 2025). AI artists on the stand: Bias against artificial intelligence-generated works in copyright law. *UC Irvine Law Review*

[31]  **Avery, J. J.**, & Abril, P. S., & del Riego, A. (forthcoming 2024). A Badge of Legal Authorship: Disclosing AI's Role in Text Creation. *Northwestern Journal of Technology and Intellectual Property.*

[30]  **Avery, J. J.**, Abril, P. S., & del Riego, A. (2024). ChatGPT, Esquire: Recasting unauthorized practice of law in the era of generative AI. *Yale Journal of Law & Technology, 26*, 64-129.

[29]  del Riego, A., & **Avery, J. J.** (2024). Inadequate adequacy? Empirical studies on class member preferences for class counsel. *Utah Law* Review, 2024, 499-559.

[28]  del Riego, A., & **Avery, J. J.** (2023). The class action megaphone: Empowering class members with an empirical voice. *Stanford Law Review Online, 76*, 1-9.

[27]  **Avery, J. J.** (2022). Fumble! Anti-human bias in the wake of socio-technical system failures. *Arizona State Law Journal, 53*, 1009-1090.

[26]  **Avery, J. J.** (2022). Predicting, up and down: A framework for legal prediction. *University of Pennsylvania Journal of Constitutional Law, 24*, 480-540.

[25]  **Avery, J. J.**, Oh, D., Feldman, L., & Cooper, J. (2022). Criminal stereotypes of Muslim and Arab Americans: How standards of proof can attenuate the effects of jurors' extralegal considerations. *Journal of Legal Studies, 51*(1), 177-208.

[24]   **Avery, J. J.**, Oh, D., & Cooper, J. (2021) Race and perceived immorality in stereotypes of criminal subtypes. *Basic and Applied Social Psychology, 43*(5), 307-318. doi:10.1080/01973533.2021.1931220

[23]   **Avery, J. J.**, Starck, J., Zhong, Y., Avery, J. D., & Cooper, J. (2021). Is your own team against you? Implicit bias and interpersonal regard in criminal defense. *Journal of Social Psychology, 161*(5), 543-559. doi:10.1080/00224545.2020.1845593

[22]   Cooper, J., & **Avery, J. J.** (2021). Value framing and support for populist propaganda. In J. P. Forgas, W. D. Crano, & K. Fiedler (Eds.), *The psychology of populism* (pp. 319-331). New York: Routledge.

[21]   Sundaresh, S., Appel, G., Ho, K., Card, A., **Avery, J. J.**, & Avery, J. D. (2021). Demonstrating the *Efficacy of Incorporating Peers into Addiction Training for Internal Medicine Residents*. *Primary Care Companion for CNS Disorders, 23*(5), 20m02875. doi:10.4088/PCC.20m02875

[20]   Appel, G., **Avery, J. J.**, Ho, K., Livshits, Z., Rao, R. B., Avery, J. D. (2020).  Improved emergency medicine physician attitudes towards individuals with opioid use disorder following training in Naloxone rescue kit distribution. *American Journal of Emergency Medicine*. doi:10.1016/j.ajem.2019.11.019

[19]   Appel, G., Zaidi, S. R., Han, B. H., **Avery, J. J.**, & Avery, J. D. (2020). A call for increased psychiatric training in emergency medicine: Physician attitudes toward substance use disorders and co-occurring borderline personality disorder. *Primary Care Companion For CNS Disorders, 22*(4), 20br02674. Doi:10.4088/PCC.20br02674

[18]   **Avery, J. J.** (2020). Greatly exaggerating dualism's death: Neuroscience and U.S. Law. *Cornell Law Review Online, 105*, 127-139.

[17]   **Avery, J. J.**, Agha, A. A., Glynn, E. J., & Cooper, J. (2020). Using artificial intelligence to improve the fairness and equity of government decision making. [White paper funded and peer-reviewed by the *IBM Center for the Business of Government*].

[16]   **Avery, J. J.**, Avery, J. D., Mouallem, J., Demner, A. R., & Cooper, J. (2020). Physicians' and attorneys' beliefs and attitudes related to the brain disease model of addiction. *American Journal on Addictions, 29*(4), 305-312. doi:10.1111/ajad.13023

[15]   **Avery, J. J.**, & Cooper, J. (2020). Racial bias in post-arrest and pretrial decision making: The problem and a solution. *Cornell Journal of Law & Public Policy, 29*, 257-294. **Cited in *State of Washington v. Horntvedt*, No. 38928-6-III, (Wash. Ct. App. Dec. 12, 2023).

[14]   **Avery, J. J.**, & Cooper, J. (2020). Technology in the legal system: Uses and abuses. In J. Avery & J. Cooper (Eds.), *Bias in the law: Racial prejudice in the U.S. criminal justice system*. Maryland: Lexington Books.

4

[13]   Avery, J. D., Taylor, K. E., Kast, K., Kattan, J., Gordon-Elliot, J., Mauer, E., **Avery, J. J.**, Penzner, J. B. (2019). Attitudes toward individuals with mental illness and Substance Use Disorders among resident physicians. *The Primary Care Companion: CNS Disorders, 21*(1), 18m02382. doi:10.4088/PCC.18m02382

[12]   **Avery, J. J.** (2019). Addiction stigma in the U.S. legal system. In J. D. Avery & J. J. Avery (Eds.), *The stigma of addiction: an essential guide* (pp. 153-166). New York: Springer Publishing.

[10]   **Avery, J. J.** (2019). An uneasy dance with data: Racial bias in criminal law. *Southern California Law Review Postscript, 93*, 28-35.

[9]    **Avery, J. J.** (2019). Rethinking the Freud-Rolland relationship: A translation and explication of Freud's "Acropolis Letter." *American Imago, 76*(1), 99-122.

[8]    Cooper, J., & **Avery, J. J.** (2019). Gullibility and the envelope of legitimacy. In J. P. Forgas & R. F. Baumeister (Eds.), *The social psychology of gullibility* (pp. 304-318). New York, NY: Taylor & Francis.

[7]    Avery, J. D., Knoepflmacher, D., Mauer, E., Kast, K., Greiner, M., **Avery, J. J.**, & Penzner, J. (2018). Improvement in residents' attitudes toward individuals with Substance Use Disorders following an online training module on stigma. *HSS Journal, 15*(1), 31-36. doi:10.1007/s11420-018-9643-3

[6]    **Avery, J. J.** (2018). Picking and choosing: Inconsistent use of neuroscientific legal evidence. *Albany Law Review, 81*(3), 941-974.

[5]    **Avery, J. J.**, Starck, J., Xu, Y., Avery, J. D., & Cooper, J. (2018). Attitudes towards defendants with substance-related charges: An analysis of a national sample of criminal defense attorneys. *American Journal on Addictions, 27*, 639–645. doi:10.1111/ajad.12825

[4]    Avery, J. D., Han, B. H., Zerbo, E., Wu, G., Mauer, E., **Avery, J. J.**, Ross, S., & Penzner, J. B. (2017). Changes in psychiatry residents' attitudes towards individuals with substance use disorders over the course of residency training. *American Journal on Addictions, 26*, 75-79. doi:10.1111/ajad.12406

[4]    **Avery, J. J.** (2016). Professional and lay skepticism concerning the validity of current psychology. *Journal of Critical Psychology, Counselling and Psychotherapy, 16*, 241-244.

[3]    **Avery, J. J.** & Muse, E. M. (2015). Altruism found: David Sloan Wilson's multilevel explanation. *Evolution, Mind and Behaviour, 13*, 53-55. doi:10.1556/2050.2015.0005

## II. EDITED BOOKS

[2]   **Avery, J. J.**, & Cooper, J. (Eds.). (2020). *Bias in the law: A definitive look at racial prejudice in the U.S. criminal justice system*. Maryland: Lexington Books.

[1]   Avery, J. D., & **Avery, J. J.** (Eds.). (2019). *The stigma of addiction: An essential guide*. New York: Springer Publishing. doi:10.1007/978-3-030-02580-9_1

## INVENTIONS & OTHER INTELLECTUAL PROPERTY

**Claudius Legal Intelligence, Inc.**                    Princeton, NJ
Co-Founder                                              2019-Present

**Artificial Intelligence for Civil Legal Prediction**           Princeton, NJ
Inventors: **Joseph J. Avery**, Joel Cooper, Zhe Chen
Granting Agency: Princeton University Office of Technology Licensing
Identification Number: Docket No. 20-3661-1 (2019)

## LICENSURE

**Virginia State Bar**                                   Richmond, VA
Associate Member                                        2016-Present
Active Member                                           2013-2016

# EXHIBIT 1-D

University of Miami Herbert Business School
*Last Revised: April 12, 2024*

## ALISSA DEL RIEGO

305.284.6332
5250 University Drive, Jenkins 323E
Coral Gables, Florida 33146

Current Academic Rank:     Assistant Professor
Primary Department:        Business Law
Citizenship:               USA

## HIGHER EDUCATION

### Institutional:

Harvard Law School, Cambridge, Massachusetts                          2012
   *Juris Doctor*

University of Miami, Coral Gables, Florida                            2009
   B.A., *summa cum laude*
   Major: Political Science
   Minors: Business Law and Spanish
   Henry King Stanford Scholarship
   Greenberg Pre-Law Scholarship
   Miami Commitment Work Scholarship
   Florida Bright Futures Scholarship

### Licensure:

The Florida Bar, Member in Good Standing                          2012 – Present
U.S. District Court for the S.D. Fla., Member in Good Standing     2012 – Present
U.S. Eleventh Circuit Court of Appeals, Member in Good Standing    2013 – Present
U.S. District Court for the M.D. Fla., Member in Good Standing     2019 – Present
U.S. District Court for the N.D. Fla., Member in Good Standing     2019 – Present

## EXPERIENCE

### Academic:

UNIVERSITY OF MIAMI HERBERT BUSINESS SCHOOL

| | |
|---|---|
| Assistant Professor, Business Law | 2020 – Present |
| Adjunct Professor, Business Law | 2013 – 2019 |

**Non-Academic:**

| | |
|---|---|
| *Associate*, Class Action, MDL, & Commercial Litigation Practice | 2015 – 2022 |
| *Law Clerk Recruiting Coordinator & Manager* | 2017 – 2020 |
| Podhurst Orseck P.A., Miami, Florida | |

| | |
|---|---|
| *Law Clerk*, Federal Appellate Court | 2014 – 2015 |
| U.S. Circuit Court of Appeals for the Eleventh Circuit | |
| for the Honorable Adalberto Jordan | |

| | |
|---|---|
| *Associate*, Litigation and Internal Investigation Practices | 2012 – 2014 |
| Holland & Knight LLP, Miami, Florida | |

| | |
|---|---|
| *Judicial Intern*, State Court | 2012 |
| Suffolk County Superior Court, Boston, Massachusetts | |
| for the Honorable Bonnie M. McLeod | |

| | |
|---|---|
| *Summer Associate*, Corporate and Litigation Practices | 2010 – 2011 |
| Holland & Knight LLP, Miami, Florida | |
| Hughes Hubbard & Reed LLP, Miami, Florida | |

| | |
|---|---|
| Research Assistant to Prof. Lawrence Lessig | 2010 |
| Harvard Law School, Cambridge, Florida | |

## PUBLICATIONS

**Law Review Articles & Essays:**

*Inadequate Adequacy?: Empirical Studies on Class Member Preferences of Class Counsel* 2024 UTAH L. REV. 499 (2024), with Joseph Avery.

*ChatGPT, Esq.: Recasting Unauthorized Practice of Law Claims in the Era of Generative AI*, 26 YALE J. L. & TECH. 64 (2024), with Joseph Avery and Patricia Sánchez Abril.

*The Class Action Megaphone: Empowering Class Members with an Empirical Voice*, Essay, 76 STANFORD L. REV. ONLINE 1 (2023), with Joseph Avery.

*Driving Diverse Representation of Diverse Classes*, 56 U. MICH. J. L. REFORM 67 (2022).

*Judging Offensiveness: A Rubric for Privacy Torts*, 100 N.C. L. REV. 1557 (2022), with Patricia Sánchez Abril.

*Deconstructing Fallacies in Products Liability Law to Provide a Remedy for Economic Loss*, 58 AM. BUS. LAW. J. 387 (2021).

*Blurred Boundaries: Social Media Privacy and the 'Reasonable' 21st Century Employee*, 49 AM. BUS. L. J. 63 (2012), with Patricia Sánchez Abril and Avner Levin. [Hoeber Memorial Award for Excellence in Research]

**Other Publications:**

*Courts Must Tackle Lack Of Diversity In Class Counsel*, LAW360, May 12, 2022.

*Growing Fintech Demand Spotlights Trademark Protection*, BLOOMBERG LAW, July 24, 2020.

*Smart Auto Tech Is Shifting Risk, Liability Landscape*, BLOOMBERG LAW, Feb. 20, 2020, with Lea Bucciero.

*United States New York District Court Limits the Applicability of the PSLRA's Safe Harbor*, Holland & Knight Securities Update, May 1, 2013.

*'Your Password or Your Paycheck?': A Job Applicant's Murky Right to Social Media Privacy*, 16:3 J. INTERNET L. 1 (Sept. 2012), with Patricia Sánchez Abril and Avner Levin.

*Ladies in White: The Peaceful March Against Repression in Cuba and Online*, 24 HARV. HUM. RTS. J. 221 (2011), with Adrianna C. Rodriguez.

*Striking the Balance Between Public Accessibility and Privacy: Florida Supreme Court Adopts New Rules to Protect Personal Information*, DADE COUNTY BAR BULLETIN (Dec. 2011), with Aviva L. Wernick.

*The Effect of Plea Bargains (and Possibly Civil Settlements) on Florida Corporate Indemnification*, DADE COUNTY BAR BULLETIN (Oct. 2011), with Gisela M. Munoz.

*Context for the Net: A Defense of the FTC's New Blogging Guidelines*, HARV. J. L. & TECH. DIG. (Dec. 2009).

**Forthcoming Publications:**

*The Class Counsel Draft Gender Gap: An Empirical Analysis of Class Counsel Applicants*, 31 MICH. J. GENDER & L., (forthcoming 2024).

*Attributing AI Authorship: Towards a System of Icons for Legal and Ethical Disclosure* (with Joseph Avery and Patricia Sánchez Abril), 22 NW. J. TECH. & INTELL. PROP., (forthcoming 2024).

**Working Papers:**

*Luck of the Transfer: Courts' Influence on Class Counsel Appointments*

*The Artificially Intelligent Class Action*

*Class Conflicts: A Class Member Perspective and Solution* (with Joseph J. Avery)

*Redefining Service in Class Service Awards*

*Class Counsel Repeat Players: Problem or Panacea?*

*Evaluating Offensiveness: Legal Models for Business Decisionmaking* (with Patricia Sánchez Abril)

*A Tale of Two Settlements: Class Member Settlement Satisfaction*

*Are You My Representative?: A Class Member Perspective on Class Representative Adequacy*

*The Multiple Identities of the Offended Reasonable Person: An Empirical Analysis of "Reasonable" Offense in Privacy Tort Law* (with Joseph Avery and Patricia Sánchez Abril).

# PROFESSIONAL

## Funding

| | |
|---|---|
| Provost's Research Award ($17,000) | 2021 |

## Editorial Responsibilities:

| | |
|---|---|
| Article Reviewer, JOURNAL OF LEGAL STUDIES IN BUSINESS | 2024 |
| Article Reviewer, AMERICAN BUSINESS LAW JOURNAL | 2023 – present |
| Editor-In-Chief, HARVARD LATINO LAW REVIEW | 2011 – 2012 |
| Article Editor, HARVARD LATINO LAW REVIEW | 2009 – 2011 |
| Digest Editor, HARVARD JOURNAL OF LAW & TECHNOLOGY | 2009 – 2010 |

**Professional and Honorary Organizations:**

| | |
|---|---|
| Cuban American Bar Association, Member | 2012 – Present |
| Federal Bar Association, Member and Conference Panel Coordinator | 2013 – Present |
| Miami Dade County Bar Association, Member | 2015 – Present |
| American Association for Justice, Member | 2015 – Present |

**Honors and Awards:**

| | |
|---|---|
| Academy of Legal Studies in Business, Best Interdisciplinary Paper Finalist & First Runner Up | 2021 |
| Most Effective Lawyers in Products Liability, Daily Business Review | 2020 |
| Rising Star, SuperLawyers | 2020 |
| Litigation Department of the Year, Daily Business Review | 2019 |
| Rising Star, SuperLawyers | 2019 |
| Most Effective Lawyers in Class Action/Mass Torts, Daily Business Review | 2018 |
| Rising Star, SuperLawyers | 2018 |
| Rising Star, SuperLawyers | 2017 |
| Hoeber Memorial Award for Excellence in Research | 2012 |

**Other Professional Activities (e.g., papers presented, conference panel moderator, guest lecturer, etc.)**

Research Presented: *The Class Counsel Draft Gender Gap: An Analysis of Class Counsel Applicants*, University of Michigan Law School, Michigan Journal of Gender & Law Author Panel, March 2024.

Research Presented: *Luck of the Transfer: The Court's Impact on Appointed Class Counsel*, Southeast Legal Studies in Business Annual Conference, November 2023.

Research Presented: *Inadequate Adequacy: A Class Member's Perspective on Class Counsel*, Huber Hurst Conference, January 2023.

Panelist: *Business Writing Taught by JDs: Strategies to Improve Communication in Any Course*, Academy of Legal Studies in Business Annual Conference, July 2022.

Research Presented: *Evaluating Offensiveness: Legal Models for Business Decision-making*, Academy of Legal Studies in Business Annual Conference, July 2022.

Research Presented: *Testing Class Counsel Adequacy: A Class Member Perspective*, Academy of Legal Studies in Business Annual Conference, July 2022.

Research Presented: *Driving Diverse Representation of Diverse Classes*, Miami Herbert Business School Spring Colloquium, April 2022.

Research Presented: *Driving Diverse Representation of Diverse Classes*, Indiana Kelley School of Business, Business Law & Ethics Department Lecture Series, March 2022.

Research Presented: *Driving Diverse Representation of Diverse Classes*, Huber Hurst Seminar Series, January 2022.

Research Presented: *Judging Offensiveness: A Rubric for Privacy Torts*, Academy of Legal Studies in Business Annual Conference, August 2021.

Panelist: *Getting Published in the ABLJ: Debunking Myths and Writing the Best Scholarship—New Authors' Perspectives*, Academy of Legal Studies in Business Annual Conference, August 2021.

Research Presented: *Judging Offensiveness: A Rubric for Privacy Torts*, Privacy Law Scholars Conference, June 2021.

Research Presented: *Deconstructing Fallacies in Products Liability Law to Provide a Remedy for Economic Loss*, Academy of Legal Studies in Business Annual Conference, August 2020.

Guest Lecturer, *Practicing in Big Law Ethically*, Florida International University Pre-Law Course Law and the Legal Profession, November 2019.

Panel Moderator, *Avances y retrocesos en la transparencia y el acceso a la información*, Conferencia: Medios y Democracia en las Américas, Fundamedios, Washington D.C., March 2018.

Panel Coordinator, *Mindfulness in Legal Practice*, Federal Bar Association South Florida Chapter Conference, November 2017.

**TEACHING**

**Teaching Specialization (courses taught):**

BSL 212 – Introduction to Business Law

BUS 300 – Critical Thinking and Persuasion for Business

BTE 689 – Topics in Business Technology

**SERVICE**

| | |
|---|---|
| Miami Herbert Community Service Award Selection Committee, Member | 2023 |
| Business Law Department Fall Lecturer Series Coordinator | 2023 |
| Business Law Department Spring Lecturer Series Coordinator | 2023, 2024 |
| Business Law Department Representative, School Council | 2023 |
| Business Law Department, BUS 300 Critical Thinking and Persuasion for Business, Course & Curriculum Co-Coordinator | 2022, 2023 |
| Business Law Department, Committee of Faculty Updating Department's Professional Values, Aspirations, and Expectation Guidelines for Faculty | 2022-2023 |
| Business Law Department, Lecturer Search Committee | 2022 |
| University of Miami, Provost Research Award Review Committee | 2022 |
| Business Law Department, Tenure-Track Faculty Search Committee | 2021 |
| University of Miami Herbert Business School, Interfolio Committee | 2021 |
| University of Miami School of Law Moot Court Competition, Judge | 2013, 2020 |
| Eleventh Circuit Court of Appeals, Appointed Amicus | 2018 – 2019 |
| Federal Bar Association, Conference Coordinator | 2016 |
| Guardian Ad Litem, Guardian | 2007 – 2009 |

## MEDIA MENTIONS

*Juez aprueba acuerdo por US$85 millones entre productores de salmón*, SALMONEXPERT, mentioned as one of a group of attorneys that negotiated class settlement for direct salmon purchasers in antitrust action, Sept. 12, 2022.

*Norwegian Fisheries Pay Up To $85 Million to End Salmon Antitrust Case*, BLOOMBERG LAW, mentioned as one of the attorneys that represented a class of direct salmon purchasers that achieved successful settlement for class, Sept. 9, 2022.

*Life Insurer Nabs Win Over Trustee's Foreign Tax Credit Suit*, LAW360, mentioned as counsel representing class of insureds at summary judgment, May 9, 2022.

*Court OKs $42M VW Deal, $12.6M Fee in Takata Air Bag MDL*, LAW360, listed as one of the attorneys representing a class for Volkswagen purchasers with defective Takata airbags that secured final approval of a class settlement, Apr. 4, 2022.

*401(k) Plan Trustees Get Class Cert. In Foreign Tax Credit Row*, LAW360, mentioned as one of the attorneys representing a class of employee retirement plan administrators against John Hancock for improperly benefitting from foreign tax credits and obtaining class certification, Jan. 14, 2022.

*Class Ok'd In Camry HVAC Odor Suit, But Not RICO Claims*, LAW360, mentioned as one of the attorneys representing certain Toyota Camry owners that obtained class certification, Dec. 8, 2021.

*Univision Avoids Defamation Suit Despite Anti-SLAPP Whiff*, LAW360, mentioned as counsel representing Univision in defamation suit filed by Guatemalan pastor Cash Luna in Florida Third Circuit Court of Appeal affirming dismissal of Luna's claims, Oct. 13, 2021.

*Toyota Can't Escape Suit Over Camry HVAC Systems*, LAW360, mentioned as one of the attorneys representing class of Toyota Camry purchasers that survived summary judgment, Oct. 1, 2021.

*Burger King Workers Fight To Revive No-Poach Suit*, LAW360, listed as one of the attorneys representing class of Burger King employees on appeal in article discussing recent oral argument before the Eleventh Circuit panel, Sept. 22, 2021.

*VW Inks $42M Deal To Resolve Takata Air Bag MDL*, LAW360, listed as one of the attorneys that was part of the plaintiff's executive committee to secure settlement on behalf of Volkswagen vehicle owners with defective Takata airbags, Sept. 1, 2021.

*DOJ Gets Time at Eleventh Circuit For Burger King No Poach Appeal*, LAW360, listed as one of the attorneys representing a class of Burger King workers on their appeal of dismissed antitrust claims, Sept. 1, 2021.

*Judge Backs Certifying Narrower Class in Toyota HVAC Suit*, LAW360, listed as part of class counsel for Toyota Camry vehicle purchasers that the magistrate court recommended class certification to proceed against Toyota for defective HVAC claims, Aug. 13, 2021.

*Consumers Ask Court to OK Class in Toyota Camry HVAC Suit*, LAW360, mentioned as one of the attorneys representing Camry vehicle owners seeking class certification, July 14, 2021.

*Consumers Make Push for Trial in Toyota Camry HVAC Suit,* LAW360, mentioned as part of class counsel defending against summary judgment in class action seeking economic loss damages for purchasers of Toyota Camrys with defective HVAC system, July 13, 2021.

*Burger King Workers Urge 11th Cir. To Apply NCAA Ruling*, LAW360, mentioned as one of the attorneys representing uncertified class of Burger King workers in antitrust litigation, July 6, 2021.

*Chrysler Can't Dodge Defective Head Restraint Claims*, LAW360, mentioned as one of the attorneys representing vehicle owners with allegedly defective head restraints that survived a motion to dismiss, Mar. 31, 2021.

*Chrysler Looks to Boot Defective Head Restraint Claims*, LAW360, mentioned as one of the attorneys representing uncertified class of Chrysler vehicle owners with defective head restraints defending against a motion to dismiss, Mar. 4, 2021.

*Toyota Says Faulty HVAC Suit Is Nothing But Hot Air*, LAW360, listed as one of the attorneys representing class of Toyota Camry purchasers in economic loss claims defending against summary judgment, Dec. 16, 2020.

*DOJ Tells 11th Circ. No Poach Franchise Analysis Needs Work*, LAW360, mentioned as part of class counsel representing present and former Burger King workers in antitrust appeal in the Eleventh Circuit, Dec. 9, 2020

*Getting Things Done: The DBR's 16 Annual Most Effective*, LAW.COM, recognized as part of a team of most effective lawyers in products liability law, Dec. 7, 2020.

*Products Liability: Podhurst Orseck Team Drives $57M Settlement with Volkswagen*, LAW.COM, mentioned as team of lawyers featured for achieving a settlement for vehicle

owners against auto manufacturer Volkswagen for alleged suspension system defect, Dec. 7, 2020.

*Burger King Workers Say Franchisees Lack 'Economic Unity'*, LAW360, listed as one of the attorney's representing Burger King workers that filed appellate brief in the Eleventh Circuit to reinstate dismissed antitrust claims, Dec. 1, 2020.

*Ski Pass Insurance Row Highlights Complex Route for Virus Suits*, BLOOMBERG LAW, quoted giving general explanation of the multidistrict litigation practice and commenting on whether other COVID-related lawsuits would make their way to the multidistrict litigation sphere, Oct. 20, 2020.

*Litigation Department of the Year: Podhurst Orseck*, LAW.COM, mentioned as serving part of the legal team that achieved a $57 million dollar settlement for class members from Volkswagen, Oct. 12, 2020.

*Burger King Workers Ask 11th Circuit to Revive No Poach Suit*, LAW360, mentioned as one of the attorneys representing employees in antitrust suit against Burger King that was dismissed by the district court and recently appealed, Sept. 23, 2020.

*PayCargo helps shippers, forwarders pay it forward*, FREIGHTWAVES, quoting *Bloomberg Law* article on Fintech authored earlier this year, Aug. 10, 2020.

*GM Gets Claims Trimmed in Takata Airbag MDL*, LAW360, mentioned as one of the attorneys representing consumers against General Motors for economic losses suffered as a result of the Takata airbag defect in certain GM vehicles, May 29, 2020.

*Carmakers Shake Off Some Claims In Takata Air Bag Suit*, LAW360, mentioned as one of the attorneys serving class counsel for Volkswagen and Mercedes owners and lessees of vehicles equipped with defective Takata airbags, May 27, 2020.

*Burger King Workers Push Bid to Revive No-Poach Suit*, LAW360, mentioned as consolidated class counsel for Burger King employees asserting antitrust claims against Burger King, May 5, 2020.

*Burger King Fights Workers' Bid to Revive Antitrust Suit*, LAW360, mentioned as counsel for consolidated class of Burger King employees asserting antitrust claims against Burger King, Apr. 28, 2020.

*VW's $57M Suspension Defect Deal with Drivers Gets Final OK*, LAW360, mentioned as having served as counsel for consumer class plaintiffs that were able to achieve a settlement valued at $57 million for an alleged suspension defect that is present in certain Volkswagen CCs, Jan. 27, 2020.

*Florida Court Dismisses Pastor's, Mega Church's Defamation Suit Against Univision Under Anti-SLAPP Statute*, MLRC MEDIALAWLETTER, mentioned as one of the attorneys represent Univision that secured dismissal under Florida Anti-SLAPP statute, Dec. 2019.

*11th Circuit Offers Witty Take on 'The Case of the Polite Bank Robber,'* DAILY BUS. REV., interviewed concerning my role of serving as amicus curiae before the Eleventh Circuit, Nov. 27, 2019.

*Toyota Must Face Faulty HVAC Class Action*, Top Class Actions, mentioned in article as serving as class counsel for consumers, Oct. 3, 2019.

*Lawsuit Advances Against Toyota Over Allegedly Toxic, Smelly Air Vents*, DAILY BUS. REV., mentioned as serving as class counsel for consumers in class action case against Toyota and others for allegedly manufacturing and concealing a heating ventilation air conditioning defect in certain Camry vehicles, Oct. 1, 2019.

*Toyota Can't Escape Claims It Hid Faulty Camry AC Systems*, LAW360, mentioned serving as consumer class counsel in case against Toyota for defective HVAC systems in Camrys that survived a motion to transfer or alternatively stay the case, Sept. 30, 2019.

*Podhurst Orseck: Litigation Boutique With Focus on Class Actions, MDLs, Aviation*, DAILY BUS. REV., mentioned as rising star when discussing future of the firm, Sept. 10, 2019.

*How Miami Attorneys Negotiated $57M Preliminary Settlement With Volkswagen*, DAILY BUS. REV., interviewed regarding settlement achieved against Volkswagen in alleged suspension defect class action, Aug. 2, 2019.

*VW Settles Suspension Defect Class Action For $57 Million*, LAW360, mentioned in article as consumer plaintiffs' counsel in alleged suspension defect case against Volkswagen that settled, July 29, 2019.

*German Automaker Parent Cos. Win Dismissals in Takata MDL*, LAW360, mentioned as serving as class counsel in the Takata airbag class action MDL, June 21, 2019

*Hausfeld, Podhurst Picked to Lead Salmon Price-Fixing Suit*, LAW360, mentioned as one of the lawyers serving as lead counsel representing U.S. distributors affected by Norwegian Atlantic farming companies alleged antitrust price-fixing processes, June 3, 2019.

*GM And Other Automakers Can't Shake Takata Air Bag Case*, Law360, mentioned as serving as one of the lawyers representing consumer plaintiffs in the Takata airbag case that survived a motion to dismiss, May 6, 2019.

11

*Podhurst Orseck Coordinates Work Generating $1.5 Billion in Takata Air Bag Settlement*s, DAILY BUS. REV., mentioned as serving as one of the four main lawyers under lead counsel in largest auto defect case to date, Dec. 10, 2018.

*Toyota Drivers Seek to Keep Distributor In Faulty HVAC Suit*, LAW360, mentioned as one of the lawyers representing a consumer class in claims against Toyota and distributor South East Toyota for defective HVAC systems, Nov. 13, 2018.

*DBR Announces 2018 Most Effective Lawyers*, LAW.COM, named, along with three other colleagues at Podhurst Orseck, P.A., 2018's most effective lawyer in the class action and mass tort section for securing $1.5 billion settlement in the Takata airbag MDL, Nov. 1, 2018.

*Drivers Urge Court to Keep Economic Claims in Air Bag Case*, LAW360, mentioned as one of the lawyers representing the economic loss class in its claims against GM, FCA, Volkswagen, and Mercedes, Oct. 15, 2018.

*Toyota Distributor Wants Out of Defective HVAC Suit*, LAW360, mentioned as one of the attorneys representing the class against Toyota and Southeast Toyota in defective HVAC class action case, Oct. 2, 2018.

*Ford Gets Initial OK on $300M Deal to Exit Takata MDL*, LAW360, mentioned as one of the attorneys representing Florida class members against Takata and Ford in the Takata MDL, Sept. 5, 2018.

*Ford Agrees to $300M Deal to Exit Takata Air Bag MDL*, LAW360, mentioned as one of the attorneys representing the economic loss class members achieving a settlement with Ford, July 16, 2018.

*Ford Wants Fla. Plaintiffs Dropped in Takata MDL*, LAW360, mentioned as one of the attorneys representing economic loss class members against Ford and Takata, June 26, 2018.

*Ally Financial Settles Contract Fee Fight for $20M*, LAW360, mentioned as one of the attorneys representing class members in contract dispute against Ally for undisclosed dealer fees, June 18, 2018.

*Fla. Judge Urges Takata MDL Attys To Pick Up The Pace*, LAW360, mentioned as one of the attorneys representing economic loss class members against Takata and other automakers, June 12, 2018.

*GM, Fiat, VW, Mercedes Hid Takata Airbag Defect*, Suits Say, LAW360, mentioned as one of the attorneys representing economic class members in their claims against GM, FCA, Volkswagen, and Mercedes, Mar. 14, 2018.

*Honda Gets Final Nod on $605M Deal in Takata Air Bag MDL*, LAW360, mentioned as one of the attorneys representing economic loss class members in suit against Takata and Honda and achieving settlement with Honda, Feb. 28, 2018.

*Judge Questions Atty's Fees in 2 Takata Air Bag Deals*, LAW360, mentioned as one of the attorneys representing economic loss class members in their claims against Honda and Nissan, Feb. 7, 2018.

*Honda, Nissan, Class Defend $702M Air Bag Settlements*, LAW360, mentioned as one of the attorneys representing economic loss class members in their claims against Honda, Nissan, and Takata, Jan. 25, 2018.

*Top 20 Class Action Settlements in the United States*, TOPVERDICT.COM, listed, along with colleagues, for work in the Takata airbag MDL, 2017.

*VW Wants Fla. Engine Defect Class Action Moved to NJ*, LAW360, mentioned as one of the four attorneys representing class members in their claims against Volkswagen for defective timing engine, May 25, 2017.

*Litigation Department of the Year – Products Liability/Mass Torts: Podhurst Orseck*, DAILY BUS. REV., mentioned as a member of the recipients of the best litigation department of the year in South Florida, May 19, 2017.

*VW, Audi Class Action Says Companies Concealed Engine Defect*, TOP CLASS ACTIONS, mentioned as one of the attorneys representing consumers with allegedly defective engine chains, Apr. 10, 2017.

*VW, Audi Defective Engine Class Action Lawsuit*, BIGCLASSACTION.COM, named as class counsel in alleged engine chain defect case against Volkswagen and Audi, Apr. 7, 2017.

*Audi, VW Ignored Engine Defect, Class Action Alleges*, LAW360, mentioned as one of the attorneys representing economic loss class members in their claims against Volkswagen and Audi for defective time chain engines, Apr. 6, 2017.

*Consumer files suit over alleged injuries from Takata airbag*, FLORIDA RECORD, mentioned as one of the attorneys representing personal injury victim of Takata airbag deployment, Jan. 26, 2017.

*Drivers Fight Honda, Toyota Bids to Clip Takata MDL Claims*, LAW360, named as one of the attorneys representing economic loss class members in their claims against Takata and other automakers, Mar. 21, 2016.

*9th Circ. Ruling Bolsters Takata Air Bag Suit, Drivers Say*, LAW360, mentioned as one of the attorneys representing economic loss class members in their claims against automakers and Takata, Feb. 5, 2016.

*New Hire Alissa Del Riego*, S. FLA. BUS. J., short column on my new employment at Podhurst Orseck, P.A., Nov. 19, 2015.

# EXHIBIT 1-C

# *Class Preferences Survey*

**[EACH QUESTION DISPLAYED ON ITS OWN PAGE UNLESS OTHERWISE SPECIFIED]**

**[NO SURVEY TITLE TO BE DISPLAYED TO RESPONDENTS]**

**[DO NOT ALLOW ROUTED SURVEY TRAFFIC]**

## INTRODUCTION AND SCREENING

**[INTRO 1]** Thank you for your willingness to participate in our survey. The responses you give to our questions are very important to us. Your answers will only be used in the aggregate and your personal information will be kept confidential. The results of this survey will not be used to try to sell you anything.

When you are ready to get started, please select the "Continue >>" button.

**[NEXT SCREEN]**

S1.   Before continuing with this survey, please carefully read these instructions:
- Please take this survey in one session.
- No tabs or other windows may be opened on your computer or device while you take this survey.
- Do not consult any written material when taking this survey.
- Do not consult or discuss the survey with anyone while taking it.
- You will not be able to go back to previous screens to change your answers.
- If you normally wear eyeglasses or corrective lenses, please wear them while you complete this survey.

   Do you understand the above instructions and agree to follow them? **[ROTATE 1-2, 2-1]**
   1. Yes
   2. No **[SCREEN OUT]**
   3. Don't know / unsure **[SCREEN OUT]**

S2.   What type of device are you using to complete this survey?
   **[RANDOMIZE 1-4]**
   1. Desktop computer
   2. Laptop computer
   3. Tablet computer
   4. Mobile phone or cell phone
   5. Other **[ANCHOR; SCREEN OUT]**

S3.   Please verify that you are human.
   **[INSERT RECAPTCHA]**

S4.   Which of the following best represents you?
1.   Male
2.   Female
3.   Gender Variant / Non-Conforming
4.   Other *(Please specify)*
5.   Prefer not to answer

**[FLAG IF GENDER DOES NOT MATCH PANEL DATA]**

S5.   Please select your age. **[PROVIDE DROP DOWN BOX WITH AGE]**
      **[CHECK BOX]** Prefer not to answer **[SCREEN OUT]**

      **[TERMINATE IF RESPONDENT IS UNDER 18; FLAG IF AGE DOES NOT MATCH PANEL DATA]**

S6.   In which state do you currently reside?
      **[INSERT DROP DOWN BOX WITH U.S. STATES & DC; INCLUDE "**Outside of the U.S.**" OPTION, SCREEN OUT IF SELECTED]**

S7.   Please enter your ZIP code.
      **[TERMINATE IF ZIP DOES NOT MATCH STATE; CODE INTO STANDARD REGION PUNCH, ETC.]**

**[NEXT SCREEN]**

S8.   Have you <u>**ever done**</u> the following? *(Please select one response per item)* **[RANDOMIZE 1-8; ROTATE ORDER OF YES/NO COLUMNS KEEP ORDER CONSISTENT S8-S10]**

2

|  | Yes | No | Don't know / Don't recall |
|---|---|---|---|
| 1. Used an at-home genetic or ancestry test | ○ | ○ | ○ |
| 2. Used an at-home health test (e.g., for COVID or allergies) | ○ | ○ | ○ |
| 3. Visited a primary care physician | ○ | ○ | ○ |
| 4. Visited a medical specialist | ○ | ○ | ○ |
| 5. Shopped for groceries at a big box store (e.g., Walmart or Target) | ○ | ○ | ○ |
| 6. Shopped for groceries using an online service (e.g., Instacart or DoorDash) | ○ | ○ | ○ |
| 7. Purchased a used vehicle from an online service (e.g., Carvana) | ○ | ○ | ○ |
| 8. Purchased a used vehicle from a dealership | ○ | ○ | ○ |

[ASK S9 IF S8=1 "AT-HOME GENETIC OR ANCESTRY TEST", OTHERWISE TERMINATE]

S9.   Have you **ever used** any of the following **at-home genetic or ancestry tests**? *(Please select one response per item)* [RANDOMIZE 1-7; ROTATE ORDER OF YES/NO COLUMNS KEEP ORDER CONSISTENT S8-S10]

3

|  | Yes | No | Don't know / Don't recall |
|---|---|---|---|
| 1. 23andMe | ○ | ○ | ○ |
| 2. AncestryDNA | ○ | ○ | ○ |
| 3. FamilyTreeDNA | ○ | ○ | ○ |
| 4. Living DNA | ○ | ○ | ○ |
| 5. HomeDNA | ○ | ○ | ○ |
| 6. MyHeritage DNA | ○ | ○ | ○ |
| 7. tellmeGen | ○ | ○ | ○ |

**[ASK S10 IF S9=1 "23ANDME", OTHERWISE TERMINATE]**

S10.  You mentioned that you have used **23andMe**. Thinking about 23andMe, have you **ever received** any of the following types of information from 23andMe? *(Please select one response per item)* **[RANDOMIZE 1-7; ROTATE ORDER OF YES/NO COLUMNS KEEP ORDER CONSISTENT S8-S10]**

|  | Yes | No | Don't know / Don't recall |
|---|---|---|---|
| 1. Email notification about a breach involving your personal data | ○ | ○ | ○ |
| 2. Background on how the genetic testing works | ○ | ○ | ○ |
| 3. How to register a new testing kit | ○ | ○ | ○ |
| 4. Family tree/relative finder | ○ | ○ | ○ |
| 5. Your ancestry breakdown/composition | ○ | ○ | ○ |
| 6. Notification of sales or promotions | ○ | ○ | ○ |
| 7. Request for consent to share your data with third-party research organizations | ○ | ○ | ○ |

**[TO QUALIFY, RESPONDENT MUST SELECT S10=1, OTHERWISE, TERMINATE]**

S11.   Approximately how many times each week, if at all, do you do each of the following?
   *(Please select one response per item)* **[RANDOMIZE ROWS]**

| | Never or less than 1 time each week | 1 time each week | 2 times each week | 3 times each week | 4 times each week | 5 times each week | More than 5 times each week | Don't know / unsure |
|---|---|---|---|---|---|---|---|---|
| Watch a professional sports event either at home or in person | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Engage in strenuous activity for 30 minutes or more | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Stream or download a full-length movie | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Please select "**[RANDOMIZE: 1-5]** times each week" | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Go out to eat in a restaurant | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Post on a social media account | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Send emails | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

**[IF S11R4=RANDOMIZED SELECTION CONTINUE, ELSE TERMINATE]**

5

**MAIN QUESTIONNAIRE**

**[NEXT SCREEN]**

**[INTRO 3]**

**READ CAREFULLY. THIS PAGE INCLUDES IMPORTANT BACKGROUND INFORMATION.**

Based on your answers to the questions, you may be a class member in a class action lawsuit against 23andMe.

**What's a class action?:** A class action is a lawsuit in which an individual or individuals called "class representatives" bring a single lawsuit on behalf of themselves and other people ("class members") who have similar legal claims.

**What is this case about?:** In 2023, the private genetic information of approximately 7 million 23andMe customers was breached by hackers. The breached information included customers' genetic heritage, ancestral origin, full names, home addresses, profile pictures, and birth dates. Hackers have already posted some of this information on hidden internet marketplaces, specifically targeting members of certain vulnerable groups.

23andMe is facing several lawsuits for:

1.  Negligence in not protecting customer data adequately,
2.  Not informing customers promptly about the breach,
3.  Violating consumer protection laws, and/or
4.  Violating state genetic privacy laws.

**[NEXT SCREEN]**

The court will ultimately determine which law firm or group of law firms will represent the class based on applications submitted by the law firms. The legal team chosen will make crucial decisions about how to litigate the case.

We will now ask you—as a potential class member—some questions to understand your preferences about your legal representation in the class action against 23andMe.

**[NEXT SCREEN]**

**[RANDOMIZE ORDER OF QUESTIONS 1 – 17. RANDOMIZE QUESTIONS 8 AND 9 AS A BLOCK]**

**Q1:** The law firms seeking to represent the class disagree about which litigation strategy to pursue: **[ROTATE ORDER OF STRATEGY 1 AND STRATEGY 2 IN QUESTION; STRATEGY THAT APPEARS FIRST SHOULD ALWAYS BE LABELLED STRATEGY 1]**

**Strategy 1**: Some attorneys believe that the best way to help the class is to negotiate the case privately with 23andMe and settle the case quickly by using a third-party mediator, directly obtaining information from 23andMe on a voluntary basis, and resolving the case before the court weighs in on the validity of the claims.

The *pros* of this strategy include lower risk (i.e., greater certainty in the case's outcome and greater certainty in securing some compensation for the class), and a speedy resolution. The *cons* of this strategy are that it can result in smaller settlements or incomplete relief due to the lack of full information about the extent of the defendant's actions, the data breach, and the breach's negative effects.

**Strategy 2**: Some attorneys believe that the best way to help the class is to work through the public court system before reaching a settlement. The goal is to obtain full information through the formal court-supported discovery process and to get a sense of the strength of the class's claims by first advancing them in court.

The *pros* of this strategy include the possibility of a larger settlement or more complete relief resulting from a fuller picture of the defendant's conduct, the extent of the data breach, and the breach's negative effects on class members. The *cons* of this strategy are that it could be riskier (i.e., less certainty in the case's outcome and less certainty of obtaining compensation for class members) and that it takes longer to resolve the case.

Which **strategy** do you prefer?

1. Strategy 1
2. Strategy 2
3. No preference
4. Not enough information to determine
5. Something else *(Please specify)*

**Q2:** There are a range of possible outcomes in class action litigation. Many privacy settlements primarily offer credit monitoring—i.e., a service that reviews your credit report for suspicious activity to protect your credit score—or small cash amounts (like $10 or $20). Other settlements are focused on providing larger amounts of cash relief to class members.

How important is it to you that the law firm representing the class has a track record of negotiating settlements that result in **larger cash payments** to class members? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q3**: In most class action settlements, class members receive cash payments only if they submit a valid claim form to the settlement administrator. The percentage of people that submit claims and get paid (called a "claims rate") can range on the low end from 1%-5%, to as high as 25% or more.  Law firms play a significant role in determining the percentage of class members who get paid by, among other things, designing a strong notice program that tells class members about the settlement and making it easy to submit a claim.

How important is it to you that the law firm representing the class has a track record of having **higher percentages of class members that get paid**? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q4**: The 23andMe data breach involved incredibly sensitive information, including customers' genetic heritage, ancestral origin, full names, home addresses, profile pictures, and birth dates. Hackers have already posted some of this information on the Dark Web identifying lists of certain vulnerable groups.

How important is it to you that the law firm representing the class focuses on getting measures that would **prevent others from using your data to harass, intimidate, harm, or discriminate against you** online or in real life? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q5**: Individuals of Ashkenazi Jewish and Chinese descent are facing a greater risk of harm because hackers put their specific data up for sale on the Dark Web. This opens the door to threats of "domestic extremism" (as one Congressman put it) or being targeted by government actors.

How important is it to you that the law firm representing the class **seeks special protection for members of these ethnic groups**? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

8

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q6**: After a data breach like 23andMe's happens, law firms typically take one of two strategies:
   **[ROTATE ORDER OF STRATEGY 1 AND STRATEGY 2 IN QUESTION; STRATEGY THAT APPEARS FIRST SHOULD ALWAYS BE LABELLED STRATEGY 1]**

**Strategy 1:** File a lawsuit against the company as quickly as possible.

**Strategy 2:** Take time to thoroughly investigate the breach (including its extent and the defendant's conduct before and after the breach) and customers' potential claims prior to filing suit.

Which **<u>strategy</u>** do you prefer?

1. Strategy 1
2. Strategy 2
3. No preference
4. Not enough information to determine
5. Something else (***Please specify***)

**Q7**: A court will ultimately decide which law firm or law firms will represent the class against 23andMe in the lawsuit. Some attorneys believe the court should appoint a team of many firms to collaborate on the case, dividing work amongst themselves. Other attorneys believe that the court should pick just one or two law firms with the capacity to handle all of the work efficiently.

Which **<u>approach</u>** do you prefer? **[ROTATE APPROACH 1 AND 2]**

1. Prefer a team of many firms
2. Prefer a team of one or two firms
3. No preference
4. Not enough information to determine
5. Something else (***Please specify***)

**[NEXT SCREEN]**

9

**[PROGRAMMER: KEEP QUESTIONS 8 AND 9 ON SAME SCREEN. RANDOMIZE ORDER OF QUESTIONS 8 AND 9 WITHIN BLOCK.]**

Some states have genetic privacy laws that may apply to the 23andMe data breach. For example, under Illinois's Genetic Information Privacy Act, a person can get $2,500 if it's proven that 23andMe negligently violated the law, and $15,000 if 23andMe is found to have intentionally or recklessly violated the law. With this in mind, please respond to the following questions:

**Q8:** How important is it to you that the law firm representing the class **pursues claims under state genetic privacy laws**? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q9:** How important is it to you that the law firm representing the class has **experience handling legal cases under state genetic privacy laws**? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**[NEXT SCREEN]**

**Q10:** How important is it to you that the law firm representing the class has significant experience (i.e., more than ten years) handling **privacy class actions**? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important

10

7. Very Important

**Q11**: How important is it to you that the law firm representing the class has a track record of obtaining **large settlements or verdicts** (i.e., over $500 million in cash relief) in privacy class actions? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q12**: How important is it to you that the law firm representing the class has attorneys from **diverse backgrounds** performing meaningful work on the case (e.g. diversity based on age, gender, race, etc.)? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q13**: Data breach cases, like this one, can be highly technical. They require knowledge of data security best practices and industry standards. It is also often necessary to analyze complex source code to understand how the breach happened and how it could have been prevented.

How important is it to you that the law firm representing the class has its own team of **forensic investigators** or other technical experts on staff? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

11

**Q14**: In the court where this case will be litigated, lawyers typically seek 25% of the settlement fund as attorneys' fees, but they can request more or less in fees. When the law firms apply to be the main firm in charge of the case, they can promise to limit their fee request.

How important is it to you that the law firm representing the class agrees to seek **<u>attorneys' fees</u>** of no more than **<u>20%</u>** of the settlement fund? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q15**: Litigating large class actions can take time (often years), and the law firms representing the class front much of the costs of litigation.

How important is it to you that the law firm representing the class has demonstrated long-term **<u>financial viability</u>** (i.e., that the firm has enough money to handle the case without being constrained by its own finances)? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q16**: Law firms have different approaches to recruiting top talent. For example, some law firms pay significant salaries, recruit at top law schools, and/or provide unique benefits.

How important is it to you that the law firm representing the class has been able to **<u>attract the best attorneys</u>**? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant

4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**Q17:** How important is it to you that the law firm representing the class makes an effort to **communicate with the class** in order to consider class members' preferences? **[ROTATE ORDER OF SCALE 1-7, 7-1; KEEP ORDER CONSISTENT ACROSS Q2-Q5, Q8-Q17]**

1. Not Important at All
2. Unimportant
3. Somewhat Unimportant
4. Neither Unimportant Nor Important
5. Somewhat Important
6. Important
7. Very Important

**[DO NOT RANDOMIZE Q18 WITH REST]**

**Q18**: Is there anything else you would like the court to consider as it chooses the law firm(s) who will lead this case to ensure you have the best representation possible? *(Please type in your response)* **[TEXT BOX]**

**END QUESTIONS**

**[NEXT SCREEN]**

We have just a few more questions for you.

**[NEXT SCREEN]**

S12.    Do you or does anyone in your household work for any of the following?
         *(Select all that apply)* **[RANDOMIZE 1-7]**
1. A marketing research or advertising company **[FLAG]**
2. A company that makes or sells at-home genetic test kits **[FLAG]**
3. A company that makes or sells at-home COVID test kits
4. A company that makes or sells vitamins or supplements
5. A company that makes or sells over-the-counter pain relief products
6. A company that makes or sells organic snack foods
7. A company that makes or sells bottled water
8. None of these **[ANCHOR; EXCLUSIVE]**

13

9.   Don't know / unsure **[ANCHOR; EXCLUSIVE; FLAG]**

S13.   In the <u>past month</u>, have you taken any surveys on the following?
*(Select all that apply)* **[RANDOMIZE 1 - 6]**
1.   At-home genetic test kits **[FLAG]**
2.   At-home COVID test kits
3.   Vitamins or supplements
4.   Over-the-counter pain relief products
5.   Organic snack foods
6.   Bottled water
7.   None of these **[ANCHOR; EXCLUSIVE]**
8.   Don't know / unsure **[ANCHOR; EXCLUSIVE; FLAG]**

S14.   Which of the following represents you?
*(Select all that apply)* **[RANDOMIZE 1 - 7]**
1.   White / Caucasian
2.   Black / African American
3.   Hispanic / Latino
4.   Asian / Pacific Islander
5.   Native American
6.   Middle Eastern / Arab
7.   Not Listed. Please Indicate: **[ANCHOR]**
8.   Prefer not to answer **[ANCHOR; EXCLUSIVE]**

**SURVEY CONCLUDES: FORWARD TO PANEL THANK YOU PAGE**