# Exhibit D

Cari Campen Laufenberg (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel: (206) 623-1900
claufenberg@kellerrohrback.com

Gayle M. Blatt (SBN 122048)
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
gmb@cglaw.com

Norman E. Siegel (*pro hac vice*)
STUEVE SIEGEL HANSON LLP
460 Nichols Road
Suite 200
Kansas City, MO 64112
Tel: 816 714-7100
siegel@stuevesiegel.com

*Interim Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: 23ANDME, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates to: ALL ACTIONS | No. 3:24-md-03098-EMC<br><br>**DECLARATION OF CARI CAMPEN LAUFENBERG, NORMAN E. SIEGEL AND GAYLE M. BLATT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. Edward M. Chen<br>Courtroom: 5, 17th Floor<br>Hearing Date: October 17, 2024<br>Hearing Time: 1:30 p.m. |

Cari Campen Laufenberg, Norman E. Siegel, and Gayle M. Blatt declare as follows:

1.    Cari Campen Laufenberg is a partner at Keller Rohrback L.L.P. Norman E. Siegel is a partner at Stueve Siegel Hanson LLP. Gayle M. Blatt is a partner at Casey Gerry Schenk Francavilla Blatt & Penfield, LLP. We are Interim Co-Lead Counsel for Plaintiffs in the above-captioned matter.

2.    This declaration is submitted in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement. We have personal knowledge of the information contained herein, and, if called as a witness, we could and would testify competently thereto. Where testimony or evidence is submitted by only one of the above declarants, this declaration so states.

## I. INTRODUCTION

3.    The Parties have reached a settlement that will create a non-revisionary Settlement Fund of $30 million and will provide meaningful relief to Settlement Class Members. Plaintiffs have achieved an outstanding result at an early juncture in the case and the Settlement maximizes the relief available from a Defendant in an objectively dire financial situation.

4.    We are experienced and highly qualified lawyers who have successfully prosecuted high-stakes complex cases and consumer class actions. The Court has previously reviewed our qualifications in connection with our leadership applications, [Dkts. 19, 20, 22] which are briefly summarized below.

5.     We have devoted the resources necessary to see this case through despite substantial risk. We began our work on this case months before appointment and it has included, since appointment as Interim Co-Lead Counsel, preparing a Consolidated Complaint, addressing issues of appropriate representative plaintiffs, consulting with experts, preparing case management related documents for the Court's consideration, analyzing ongoing informal discovery, preparing for and attending mediation, evaluating options for settlement benefits that would meet the needs of this Settlement Class, and negotiating the proposed Settlement. We have had the Settlement Class Members' interests as our guide throughout the management of this case and present this Settlement as in their best interests without reservation.

6.    As detailed in our leadership applications in this case, we have led some of the country's most complex civil litigation and are responsible for groundbreaking data breach settlements, including in *Equifax, Capital One, Home Depot, Anthem, Yahoo!, T-Mobile, Office of Personnel Management, and*

*Target*. For purposes of the Court's consideration of certifying the class for settlement purposes (the "Settlement Class") and appointing Class Counsel, we incorporate our leadership applications and briefly summarize our qualifications as part of this Declaration.

### *Norman E. Siegel*

7.     Since the revelation of the Target data breach in late 2013, Mr. Siegel has dedicated much of his practice to representing victims of data breaches. He co-founded the American Association for Justice's Consumer Privacy and Data Breach Litigation Group and previously served as the group's co-chair. He is a nationally published author on emerging issues impacting data breach cases, and he regularly speaks on data breach litigation issues. In recent years, *Law360* recognized Mr. Siegel as a "Cybersecurity and Privacy MVP of the Year" and a "Titan of the Plaintiff's Bar," and *Best Lawyers* named him "Lawyer of the Year" for his work in data breach litigation.

8.     Over the last ten years, Mr. Siegel has led or substantively participated in nearly every major consumer data breach case on record, including serving as court-appointed co-lead counsel in multi-district litigation involving mega-breach cases such as *Target* (110 million class members), *Home Depot* (56 million class members), *T-Mobile* (76 million class members); *Equifax* (149 million class members), *Capital One* (98 million class members), and *Quest Diagnostics* (11.5 million class members). In addition, Mr. Siegel has worked alongside leadership in several other large data breach MDLs, including serving as a member of the plaintiffs' steering committee leading the briefing committee in *Marriott* (383 million class members), in *Anthem* (80 million class members), and in *Office of Personnel Management* (21 million class members) where Stueve Siegel Hanson represented a significant percentage of the named plaintiffs and handled other critical components of the litigation, including drafting large portions of the successful standing appeal before the United States Court of Appeals for the D.C. Circuit.

9.     In *Equifax, Capital One, T-Mobile* and *Home Depot,* Mr. Siegel led the settlement negotiations, obtaining historic settlements including the settlement in *Equifax* which Judge Thrash endorsed as being "the direct result of all counsel's experience, reputation, and ability in complex class actions including the evolving field of privacy and data breach class actions." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *33 (N.D. Ga. Mar. 17, 2020). Mr. Siegel also negotiated the $190 million settlement in the *Capital One* litigation and has served as lead counsel

and crafted settlements in smaller data breach cases, including *Hutton v. National Board of Examiners in Optometry, Inc.*, No. 16-cv-03025-JKB, 2019 WL 3183651 (D. Md. July 15, 2019), where he resolved a data breach case impacting 60,000 eye doctors across the country, which the court found provided "multiple beneficial forms of relief [and] . . . reflects an outstanding result for the Class." *Id.* at \*6. This settlement occurred after the plaintiffs were successful on appeal to the Fourth Circuit in obtaining a reversal of the district court's order dismissing the case for lack of Article III standing.

### *Cari Campen Laufenberg*

10.     Cari Campen Laufenberg has extensive experience in consumer class-action litigation and has dedicated much of her practice to data breach and data privacy litigation. For example, she currently serves as Co-Lead Counsel in several MDL data breach cases *In Re: T-Mobile Customer Data Security Breach Litigation*, No. 4:23-MD-03073-BCW, MDL No. 3073 (W.D. Mo.)—a case involving a November 2022 data breach impacting 37 million T-Mobile customers. She also serves as Co-Lead Counsel in the 2021 data breach involving T-Mobile, *In Re: T-Mobile Customer Data Security Breach Litigation*, No. 4:21-MD-03019-BCW, MDL No. 3019 (W.D. Mo.), in which she and other members of the leadership team worked to negotiate a ground-breaking $350 million settlement on behalf of 76 million class members.

11.     She has likewise served as Co-Lead or Class Counsel in a number of other successful data privacy class-action cases including on behalf of approximately 2.2 million data breach victims in the multidistrict litigation captioned *In Re: 21st Century Oncology Customer Data Security Breach Litigation*, MDL No. 2737 (M.D. Fla.), and on behalf of approximately 1.4 million data breach victims in *Fox v. Iowa Health System*, No. 18-00327 (W.D. Wis.).

12.     Ms. Laufenberg has served in leadership positions in other prominent consumer class-action cases as well, including as Interim Lead Class Counsel in *In re EpiPen ERISA Litigation*, No. 17-1884 (D. Minn.) and her current appointment to the Plaintiffs' Steering Committee in *In re Oral Phenylephrine Marketing and Sales Practice Litigation*, MDL No. 3089 (E.D.N.Y.).

13.     Ms. Laufenberg also played a fundamental role in the *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, MDL No. 2843 (N.D. Cal.), in which, together with co-lead counsel, Keller Rohrback achieved a $725 million settlement—the largest recovery ever achieved in a private data privacy class action and the most Meta has ever paid to resolve a private class action.

### Gayle M. Blatt

14.     Gayle M. Blatt, head of her firm's complex litigation team, has dedicated her career to vindicating the rights of consumers. She is routinely recognized as a leader within the legal community and has been the honored recipient of various accolades.

15.     Ms. Blatt has significant experience in privacy, data security and breach litigation. She has been appointed to numerous lead and executive positions. She was appointed to the five-member Plaintiffs' Executive Committee overseeing the litigation related to the massive *Yahoo!* data breaches, collectively at the time, the largest data breach in the world. (*In re: Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 16-MD-02752 (N.D. Cal.)). Settlement negotiations in that case resulted in a common fund settlement of $117,500.000.00.

16.     She has had numerous other appointments in data security cases as well, some of which include, *In re: Netgain Technology, LLC, Consumer Data Breach Litigation*, 21-cv-1210-SRN-LIB (D. Minn.); *DeSue v. 20/20 Eye Care Network, Inc. et al.*, Case No. 21-cv-61275-RAR (S.D. Fla.); *James v. Davaco, Inc. et al.*, Case No. 3:21-cv-02318-M (N.D. Tex.); *Pfeiffer et al. v. RadNet, Inc.*, Case No. 2:20-cv-09553-RGK-SK (C.D. Cal.); *Adkins v. Facebook, Inc.*, Case No. 18-05982-WHA (N.D. Cal.) (Law And Briefing Committee); *Tate v. EyeMed Vision Care, LLC*, Case No. 21-cv-00036-DRC (S.D. Ohio); *In re: Warner Music Group Data Breach*, Case No. 1:20-cv-07473-PGG (S.D.N.Y.); *In re: Citrix Data Breach Litigation*, Case No. 19-cv-61350-RKA (S.D. Fla.); *Madrid v. Golden Valley Health Centers, Merced Super. Ct.*, Case No. 20-cv-01484; *Sung et al., v. Schurman Fine Papers d/b/a Schurman Retail Group*, Case No. 17-cv-02760-LB (N.D. Cal.); *In re: Sony Gaming Networks and Customer Data Security Breach Litigation*, Case No. 11-md-02258-AJB (S.D. Cal.); and *In re: US Fertility LLC Data Security Litigation*, No. 8:21-cv-002 99 (D. Md.).

17.     In addition to her work on data privacy litigation, she has also held many other leadership roles, such as service on the Plaintiffs' Executive Committees in multidistrict litigation in *In re: ZF- TRW Airbag Control Units Products Liability Litigation*, MDL No. 2905 (C.D. Cal); *In re: Apple Inc. Device Performance Litigation*, MDL No. 2827 (N.D. Cal.); *In re: Intel Corp. CPU Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2828 (D. Or.); Liaison Counsel in *In re: Bank of America California Unemployment Benefits Litigation*, No. 21-md-02992-LAB (S.D. Cal.); Plaintiffs' Steering Committee in *In re: Chrysler Pacifica Fire Recall Products Liability Litigation*, No.2:22-cv-03040

DML-EAS (E.D. Mich.) and as interim co-lead counsel in *Cilluffo v. Subaru of America, Inc. et al.*, Case No. 23-cv-01897-RBK-MJS (D. N.J.) and *Burgos v. American Honda Motor Company*, No. 2:23-cv-02128-AB-SK (C.D. Cal.).

18.    It is our shared view that the Settlement presented here is an excellent result for the Settlement Class. We are confident that this Settlement is fair, reasonable, and adequate and in the best interests of the 6.4 million individuals who were impacted by the 23andMe Data Breach.

## II.    PROCEDURAL BACKGROUND

### A.    Investigation, Filing, and Consolidation

19.    On August 11, 2023, a threat actor began selling samples of 23andMe genetic user data on the dark web. Consolidated Class Action Complaint ("Compl.") ¶¶ 418-19. In early October 2023, the stolen data again appeared for sale, this time containing the genetic data of one million 23andMe users of Jewish Ashkenazi descent, 100,000 users with Chinese DNA, and another 300,000 users with Chinese heritage. *Id*. ¶¶ 420-21. On October 6, 2023, 23andMe confirmed it was the source of the stolen genetic data, and after an investigation, determined the threat actor downloaded Personal Information without authorization relating to approximately 6.6 million natural persons in the United States.[1] *Id*. ¶¶ 422-439. For most of the impacted customers, the Personal Information accessed by the threat actor included the Personal Information from a customer's DNA Relatives profile and/or Family Tree Profile within 23andMe's DNA Relatives feature, which may have included their name, sex, birth year, information about the customer's ancestry based on their genetic information, self-reported location (city/zip code), ancestor birth locations, family names and family tree information. For a small number of customers, the threat actor also accessed Personal Information about the customer's present or future health based on the analysis of their genetic data, their self-reported health information, and/or their uninterpreted genotype data. *Id*. ¶ 1. In addition, 23andMe confirmed during negotiations that approximately 7,500 customers had some form of health information compromised in the Security Incident.

20.    After announcement of the Security Incident, over 40 putative class action lawsuits were filed against 23andMe asserting claims for a raft of common law torts and various statutory claims—including several that provide statutory damages for the disclosure of genetic information.

_____

[1] This number was confirmed by 23andMe during Settlement negotiations to be 6.4 million natural persons. Ex. A to Motion for Preliminary Approval, Settlement Agreement ¶ 3.

21.     On December 21, 2023, 23andMe filed a Motion to Transfer Actions to the Northern District of California Pursuant to 18 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings with the Judicial Panel on Multidistrict Litigation, MDL No. 3098. On April 11, 2024, the Judicial Panel on Multidistrict Litigation centralized the litigation before this Court, where nearly all the putative class action lawsuits were pending.

22.     The Court considered applications for appointment of Interim Co-Lead Counsel under Fed. R. Civ. P. 23(g) and held a hearing on the motions on June 3, 2024. On June 5, 2024, the Court appointed the undersigned as Interim Co-Lead Counsel. Dkt. 62. Upon appointment, Interim Co-Lead Counsel thoroughly researched the facts and applicable claims, vetted scores of plaintiffs, and filed a 186-page consolidated complaint, alleging 40 causes of action. Dkt. 78. The operative complaint in this action is a superseding operative complaint that aggregated claims brought by litigants around the country.

**B.     Mediation Efforts and Agreement to Settle**

23.     Prior to the appointment of Interim Co-Lead Counsel, starting in January 2024, a small group of Plaintiffs' counsel and 23andMe scheduled an early mediation for January 31, 2024, with Mr. Randall Wulff. Other Plaintiffs' lawyers—including Interim Co-Lead Counsel—learned of the mediation and participated either in person or by Zoom. Likewise, Plaintiffs' lawyers representing nearly every case filed against 23andMe participated in the mediation, which although productive, did not result in a settlement.

24.     Subsequently, a smaller group of Plaintiffs' counsel, including Interim Co-Lead Counsel Norman E. Siegel and Gayle M. Blatt, agreed to participate in a second mediation with 23andMe before Mr. Wulff, with a commitment to keep all Plaintiffs' counsel informed as to the progress of the negotiations. The mediation took place on March 20, 2024. Prior to this mediation, the group engaged an independent forensic accounting firm to advise it with respect to 23andMe's financial condition, and continued their work with an expert to, among other things, develop business practice commitments designed to protect Settlement Class Members' sensitive data. On March 20, 2023, the parties engaged in a second day-long mediation under the direction of Mr. Wulff. Like the first mediation, the process was productive but did not result in a settlement.

25.     On June 5, 2024, the Court appointed Mr. Siegel, Ms. Blatt and Cari C. Laufenberg to serve as Interim Co-Lead Counsel, authorizing them to pursue the Litigation on behalf of the Plaintiffs. The

Court also directed the Parties to coordinate with Mr. Wulff for further attempts at resolution. Dkt. 62 ¶ 9.

26.    On June 26, 2024, a third mediation session was held. The Parties were unable to reach an agreement and the mediation resulted in a mediator's proposal for resolution of Plaintiffs' claims against Defendant. On July 12, 2024, all Parties accepted the mediator's proposal, reaching agreement in principle to resolve this Litigation.

27.    Prior to each mediation, 23andMe provided information that informed the ongoing negotiations. In all, 23andMe provided detailed information sufficient for Interim Co-Lead Counsel to be fully informed regarding the facts of the Security Incident, 23andMe's financial position, the scope of the class, and appropriate remedial efforts. We were well informed in agreeing to the mediator's proposal and finalizing the Settlement now before the Court.

28.    On July 16, 2024, the Parties informed the Court that they had reached a settlement in principle. Dkt. 85. The Parties continued addressing the details of the agreement which resulted in the July 29, 2024, execution of a term sheet containing the material terms of the Settlement. Further ongoing efforts to memorialize all terms of the Settlement lead to the September 5, 2024, execution of the Settlement Agreement presented to this Court for approval as fair, reasonable and adequate.

## C.    23andMe's Financial Condition

29.    23andMe's financial challenges have been well-documented. Even prior to the Security Incident and the resulting wave of lawsuits now centralized in this Court, 23andMe's financial condition was dire. Revenue and earnings were in steep decline, and by September 2023 (a month before the Security Incident) its stock started trading below $1.00. 23andMe's financial troubles were exacerbated by revelation of the Security Incident, and by November 2023, 23andMe's stock was no longer in compliance with exchange regulations that require listed stocks maintain a minimum bid price of $1 per share. At the time, 23andMe had recently reported a staggering loss in the first half of its fiscal year on declining revenue. In January 2024, the Wall Street Journal published an article documenting the company's distress and predicting further trouble ahead.[2]

---

[2] *See* Rolfe Winkler, *23andMe's Fall From $6 Billion to Nearly $0*,
THE WALL ST. J. (Jan. 31, 2024), https://www.wsj.com/health/healthcare/23andme-anne-wojcicki-healthcare-stock-913468f4.

30.     One news outlet recently noted that "[s]ince it was established in 2006 and until today, the company has raised $1.8 billion, while it has never recorded a profit. 2023 was a particularly terrible year and included three rounds of layoffs, with sales of approximately $300 million—a 32% drop compared to 2019—and a record loss of $31 million."[3] The latest quarterly report revealed losses of $69.4 million on revenue of only $40.4 million.[4]

31.     As of September 10, 2024, 23andMe's stock was trading at an all-time low below $0.30 a share and the company had a market capitalization of roughly $150 million, having suffered a year over year loss of almost 33%. In addition, CEO Anne Wojcicki recently proposed to take the company private by purchasing all the outstanding shares at $0.40/share, but a Special Committee of the Board of Directors recently rejected that proposal. The company continues to explore options, including expressing interest in third-party takeover proposals.[5]

32.     23andMe's financial struggles reveal that absent a significant change in circumstances, the company could not withstand a litigated judgment in this case. Indeed, 23andMe has extremely limited resources and its future business prospects are uncertain at best. The Settlement obtained here is therefore not only prudent but likely the only path forward for the Settlement Class Members to recover anything from 23andMe.

### III.     SETTLEMENT

**A.     Settlement Negotiations**

33.     The severity of this Security Incident combined with 23andMe's challenging financial position presented extraordinary challenges to achieving the Settlement, beyond those in a typical data breach MDL.

34.     Given 23andMe's financial position, litigation exposure in this and other cases, and limited funds available, continuing attempts at early resolution was a rational path forward for the proposed Class. The Court recognized the precariousness of the situation for the Class given 23andMe's financial

---

[3] *See* Viki Auslender, *23andMe's promise of genetic testing has been shattered*, CTECH (June 6, 2024), https://www.calcalistech.com/ctechnews/article/ry4u00uhv0.

[4] 23andMe Holding Co., *Form 8-K* (Aug. 5, 2024), https://www.sec.gov/Archives/edgar/data/1804591/000180459124000045/me-20240808x8kxexx991.htm.

[5] *See 23andMe CEO 'open to consider 3rd party takeover proposals'*, TIPRANKS (Sept. 11, 2024), https://www.tipranks.com/news/the-fly/23andme-ceo-open-to-consider-3rd-party-takeover-proposals.

condition and ordered Interim Co-Lead Counsel to "immediately upon appointment" arrange "for further mediation with Randy Wulff who is designated as mediator in this case[.]" Dkt. 62.

35.   As described above, after a lengthy arms-length session on June 26, 2024, with Mr. Wulff, the Parties were at an impasse. Mr. Wulff then presented a mediator's proposal that was eventually accepted by both Parties. The Parties then turned to documenting the agreement under the terms and conditions set forth in the Settlement Agreement. As a condition of the Settlement, and in exchange for payment of the Settlement Fund, the Settlement Class Representatives, on behalf of the proposed Settlement Class, agreed to release their claims and all potential claims that could have been brought based on the identical factual predicate as those alleged in the Complaint. Exhibit A to Motion for Preliminary Approval, Settlement Agreement ("SA") ¶ 37.

**B.   Benefits Obtained for Settlement Class Members**

36.   The Settlement Agreement provides monetary benefits in the form of a non-reversionary Settlement Fund of $30,000,000, which shall be used to pay for: (1) benefits to the Settlement Class as outlined below; (2) Notice and Claims Administrative Costs; (3) attorneys' fees and expenses awarded by the Court; and (4) Service Awards awarded by the Court. SA ¶ 59.

37.   The benefits provided by the Settlement Fund are carefully tailored to redress the harms faced by the victims of the 23andMe Security Incident announced by 23andMe in October 2023, which involved the release of Personal Information, including genetic information, onto the dark web. *See* Dkt. 78. In short, the Settlement addresses the central allegation of this litigation and achieves key relief sought by Plaintiffs.

38.   Upon approval, the benefits available to Settlement Class Members are as follows:[6]

• *First*, Settlement Class Members may make an Extraordinary Claim for verifiable unreimbursed costs or expenditures up to $10,000 related to the Security Incident. Extraordinary Claims provide reimbursement for: (1) unreimbursed costs incurred as a direct result of identity fraud or falsified tax returns that the Settlement Class Member establishes were the result of the Security Incident; (2) unreimbursed costs associated with the purchase of a physical security or monitoring system that a Settlement Class Member establishes was purchased in response to the Security Incident; and (3)

---

[6] *See* Exhibit B to Motion for Preliminary Approval, Settlement Benefits Plan ("SBP").

DEC OF LAUFENBERG, SIEGEL, AND BLATT ISO
MOTION FOR PRELIM. APPROVAL OF CLASS ACTION SETTLEMENT – 3:24-md-03098-EMC

unreimbursed costs associated with seeking professional mental health counseling or treatment that a Settlement Class Member establishes were the result of the Security Incident. SBP ¶ 4.

• *Second*, Settlement Class Members who, as of August 11, 2023, were residents of Alaska, California, Illinois or Oregon—states which have genetic privacy laws with statutory damages provisions—may make a Statutory Cash Claim. *Id*. Interim Co-Lead Counsel anticipates that, depending on the claims rate, the Statutory Cash Claims will result in payments of approximately $100 for eligible claimants. By way of example, Interim Co-Lead Counsel estimates that a 10% claims rate for Statutory Cash Claims will result in payments of at least $100—and up to 35% more if the Extraordinary Claims Fund is not exhausted. SBP ¶ 6.

• *Third,* the small number of Settlement Class Members that had health information compromised in the Security Incident may submit a Health Information Claim. Health Information Claims will be paid a fixed $100 cash payment. SBP ¶ 5.

• *Fourth,* all Settlement Class Members will be entitled to enroll in Privacy & Medical Shield + Genetic Monitoring ("Privacy Shield"), which will be available for three years. SBP ¶ 12(d). This customized monitoring program was developed by experts in the field specifically for this case and provides substantial web and dark web monitoring for Settlement Class Members. Privacy Shield will also aid in reducing the Settlement Class Members' digital footprint. The extensive benefits are listed below and described more fully in the Declaration of Gerald Thompson, ("CyEx Decl.").

39.    To take advantage of the cash payments and to enroll in Privacy Shield, Settlement Class Members will submit Claim Forms to the Notice and Claims Administrator online or will download a form for mailing from the Settlement Website. SBP ¶ 12(d). Settlement Class Members will be able to receive their payments by an electronic payment option or can opt for a mailed check. SBP ¶ 13. Activation codes for Privacy Shield will be automatically sent after the Effective Date to Settlement Cass Members who submitted a claim within the Claims Period. However, *even if they do not make a claim for Privacy Shield prior to the Claims Deadline,* Settlement Class Members will be entitled to enroll at any point during the three-year period that Privacy Shield is active and will be able to take advantage of the remaining time available on the three-year term of the program.

40.    Should any funds remain from the failure of Settlement Class Members to timely negotiate a settlement check or to timely provide required tax information such that a settlement check could issue,

they will be used to extend the active period for Privacy Shield. No funds may revert to 23andMe. SBP ¶ 8.

**C.     Business Practice Commitments**

41.     Further, as part of the Settlement, 23andMe agreed to implement and maintain—at its own expense—important Business Practice Commitments, which will strengthen the security and protections of the Personal Information in its possession. SA ¶ 70. 23andMe commits to adopting, paying for, implementing and maintaining the following Business Practices Commitments related to information security to safeguard Settlement Class Members' Personal Information, and that of its other users. Each Business Practice Commitment is described in detail in the Settlement Agreement. *Id.* These commitments include: (1) enhanced password protection; (2) mandated multi-factor authentication; (3) annual security awareness training; (4) annual computer scans and cybersecurity audits; (5) information security program; (6) maintenance of data breach incidents response plan and threat management; and (7) limited retention of inactive Personal Information. *Id.*

42.     Moreover, the Class Notice will provide a link where a Settlement Class Member can have their information deleted by 23andMe, subject to certain conditions such as legal record retention requirements. SA ¶ 71. And at least 14 days in advance of the Final Approval Hearing, 23andMe will file a report with the Court, with a copy to Class Counsel, detailing the status of its compliance with the Business Practice Commitments identified above. SA ¶ 72. The report is to be certified by the most senior 23andMe employee with responsibility for overseeing the Business Practice Commitments. *Id.*

43.     The Settlement Agreement also provides for a preliminary injunction to enjoin ongoing litigation and arbitrations against 23andMe until such time as the Settlement Class Member opts-out of the Settlement. *See* SA ¶ 73(h). The injunction tracks similar preliminary injunctions approved by this Court in granting preliminary approval of class action settlements. *See, e.g., Roberts v. AT&T Mobility LLC*, No. 3:15-cv-03418-EMC (N.D. Cal. Mar. 31, 2021). Given 23andMe's financial position, we are supportive of the entry of the preliminary injunction, but note that the provision is severable from the remainder of the Settlement Agreement. *See* SA ¶ 105.

**D.     Settlement Class Definition and Class Size**

44.     The Settlement Class includes: "all natural persons who were residents of the United States on August 11, 2023 and whose Personal Information was compromised in the Security Incident." SA ¶ 44.

The Statutory Subclass is defined to include Settlement Class Members who were residents of Alaska, Oregon, California or Illinois on August 11, 2023. SA ¶ 51. The Settlement Class and Statutory Subclass specifically exclude: (i) 23andMe and its officers and directors; (ii) all Settlement Class Members who timely and validly request to opt-out from the Settlement Class; (iii) the Judge assigned to evaluate the fairness of this settlement; and (iv) potential class members who have provided 23andMe with an express release of claims arising out of or related to the Security Incident prior to the Effective Date of this Settlement. SA ¶ 44.[7] 23andMe's investigation determined the threat actor downloaded Personal Information without authorization relating to approximately 6.4 million natural persons in the United States. SA ¶ 3. 23andMe provided information confirming the Statutory Subclass includes approximately 1.4 million natural persons in the United States.

### E.   Cases Pending Outside MDL 3098

45.   In accordance with the Procedural Guidance for Class Action Settlements ¶ 1d, we identify the currently pending cases outside of this MDL. There are four cases in the Superior Court of the State of California for the County of Santa Clara. Two are class action cases and two are multi-plaintiff lawsuits without any class allegations. A petition is pending before the Judicial Council for a JCCP. (23andMe Data Breach Case Judicial Council Coordination Proceedings (JCCP 5315).) These actions are: (1) *Morgenstern v. 23andMe Holding Co*., *et. al*., Superior Court of California, County of San Francisco, Case No. CGC-23-610816; (2) *Vasquez v. 23andMe, Inc*., Superior Court of California, County of Santa Clara, Case No. 23CV424996; (3) *Wilkus, et. al. v 23andMe, Inc*., Superior Court of California, County of Santa Clara, Case No. 24CV429673 and *Shaw et al v. 23andMe, Inc*. Superior Court of California, County of Santa Clara, Case No TC24-2263.

46.   *Morgenstern v. 23andMe Holding Co., et al*, and *Vasquez v. 23andMe, Inc*. are class action lawsuits.[8] The class definition in *Morgenstern is* "all citizens of the State of California whose PII and PGI were compromised in the data breach of 23andMe's systems." The claims asserted in the

---

[7] The Settlement Class definition encompasses the same persons as the Nationwide Class in the Complaint. The "Nationwide Ethnically Targeted Persons Class" is subsumed within the Settlement Class definition. The proposed Statutory Subclass definition applies only to residents of the four states with genetic privacy statutes that provide statutory damages, as alleged in the Complaint, and here, the eligibility is defined as of August 11, 2023, the date the initial data appeared on the dark web.

[8] Counsel in both the *Morgenstern* and *Vasquez* cases are aware of the Settlement and its terms and have expressed support of it.

*Morgenstern* Complaint are: 1) Negligence, 2) Negligence *Per Se*, 3) Breach of Implied Contract, 4) Invasion of Privacy, 5) Conversion, 6) Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, 7) Violation of the California Consumer Privacy Act, Cal. Civ. Code §§1798.100. 1798.150, and 8) Unjust Enrichment.

47.    The class definition in *Vasquez v. 23andMe, Inc*. is "All citizens of the State of California whose personal information was compromised in or as a result of the data breach Defendant announced on or around October 6, 2023." The claims asserted in the Vasquez Complaint are: 1) Negligence, 2) Breach of Implied Contract, 3) Breach of the Covenant of Good Faith & Fair Dealing, 4) Unjust Enrichment, 5) Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq*., 6) Violation of the California Consumer Privacy Act Cal. Civ. Code §§1798.100 *et seq*., §1798.150 (a), 7) Violation of the California Customer Records Act, Cal. Civ. Code §§1798.80 *et seq*.

48.    *Wilkus, et al. v. 23andMe, Inc*., Superior Court of California, County of Santa Clara, Case No. 24CV429673, and *Shaw et al. v. 23andMe, Inc*., Superior Court of California, County of Santa Clara, are multi-plaintiff cases brought by residents of the state of Illinois on behalf of Illinois plaintiff. The following claims are asserted in *Wilkus* and *Shaw* cases: 1) Violation of Illinois Genetic Information Privacy Act 410 Ill. Comp. Stat. Ann. 513 *et seq*., 2) Negligence, 3) Breach of Actual and Implied Contract, 4) Invasion of Privacy and Intrusion upon Seclusion, 5) Unjust Enrichment. A Case Management Conference is scheduled to be held on October 31, 2024.

**F.    Attorneys' Fees, Reimbursement of Costs and Service Awards for Settlement Class Representatives**

49.    Plaintiffs intend to seek fees representing a percentage of the common fund. Based on Interim Co-Lead Counsel's analysis to date, Plaintiffs anticipate seeking fees of 25% of the $30,000,000 fund, plus reasonable litigation costs and expenses.

50.    On June 14, 2024, the Court entered the Protocol for Common Benefit Work and Expenses ("Protocol"). Dkt. 72. Pursuant to the Protocol, Interim Co-Lead Counsel has collected time and expense records from all Plaintiffs' counsel participating in the litigation, reflecting time and expenses incurred from the start of the case. The Protocol required that all counsel record and categorize time designated by certain categories including among others, Litigation Strategy & Analysis, Pleadings, Experts, and

Settlement. Interim Co-Lead Counsel has assembled and analyzed the time submitted pursuant to the Protocol for purposes of providing the following information as part of preliminary approval.

51.     The total time submitted to date is $5,023,030, with approximately $2,666,482 of the lodestar incurred by the three firms acting as Interim Co-Lead Counsel through filing of Plaintiffs' Motion for Preliminary Approval, and approximately $2,356,548 of the lodestar incurred by non-Co-Lead Counsel firms through July 31, 2024.

52.     Among other provisions, the Protocol limited compensable time and cost reimbursement to "Participating Counsel." Participating Counsel is defined as "Co-Lead Counsel (along with members and staff of their respective firms), any other counsel authorized by Co-Lead Counsel to perform work that may be considered for common benefit compensation, and/or counsel who have been specifically approved by this Court as Participating Counsel prior to incurring any such cost or expense." Dkt. 72, at 2. Based on the plain language of the Protocol, pre-appointment time and expenses incurred by firms other than Interim Co-Lead Counsel are not compensable, because that work could not have been authorized by Interim Co-Lead Counsel. Of the $2,356,548 of time reported by non-Co-Lead Counsel through July 31, 2024, $2,099,514 was performed prior to the appointment of Interim Co-Lead Counsel and $257,035 was performed after the appointment of Interim Co-Lead Counsel.

53.     Given the unique procedural posture of this case at the time of Settlement—including the fact that all Plaintiffs' counsel were invited to participate in mediation prior to the appointment of Interim Co-Lead Counsel, and that those mediations were productive early sessions that provided some foundation to the Settlement before the Court—Interim Co-Lead Counsel believes certain pre-appointment time and costs incurred by non-Co-Lead Counsel should be compensable. Specifically, time associated with Settlement, Experts, and Discovery (Billing Codes 7, 12, and 13) should be compensable because that time contributed to the Settlement. The time Interim Co-Lead Counsel intend to advocate be compensated relate to the mediation process, including the expert work examining 23andMe's financial condition and consideration of 23andMe's Business Practice Commitments, and discovery requested and provided under Fed. R. Evid. 408 in advance of the mediations. The total pre-appointment non-Co-Lead Counsel time allocated to Settlement, Experts, and Discovery is $637,817.

54.     Interim Co-Lead Counsel has also analyzed the time submitted by non-Co-Lead Counsel that was incurred after the appointment of Interim Co-Lead Counsel. That time consists of work performed

at the direction of Interim Co-Lead Counsel, including vetting plaintiffs for the Consolidated Complaint and keeping those plaintiffs informed as to the progress of the settlement negotiations and the Settlement. The permissible post-appointment time incurred by non-Co-Lead Counsel after the appointment of Interim Co-Lead Counsel and as of July 31, 2024, is $257,035 for 22 firms, representing approximately 14% of the total post-appointment time reported before the filing of this motion (including estimated Interim Co-Lead Counsel's time through this filing).

55.    In light of the foregoing and based on Interim Co-Lead Counsel's analysis of the time records submitted pursuant to the Protocol, Interim Co-Lead Counsel believes a total of $3,561,333, is compensable time based on records submitted to date.

56.    In addition to the time incurred to date, Interim Co-Lead Counsel anticipates incurring thousands of hours of future work on the Settlement. That work includes briefing Plaintiffs' Motion for Final Approval of the Settlement and Motion for Attorneys' Fees, responding to any objections, appearing at the Final Approval Hearing, handling any appeals, and assisting Settlement Class Members in securing benefits available under the Settlement. The estimate is further informed by considering the time incurred after the submission of preliminary approval in similar cases, which typically exceeds 2,000 hours, and is often substantially more. Therefore, based on the average hourly rate on the time incurred to date, Interim Co-Lead Counsel expects to incur approximately $1,500,000 in additional lodestar.

57.    The total compensable lodestar incurred plus the expected future lodestar is approximately $5,060,000. Based on a fee request of 25%, the multiplier on such lodestar is just over 1.48.

58.    As part of Plaintiffs' Motion for Attorneys' Fees, Co-Lead Counsel intends to undertake a more detailed review of all time entries and provide additional detail on the lodestar as well as resulting multiplier.

59.    With respect to reimbursable costs and expenses, Interim Co-Lead Counsel undertook a similar analysis—permitting non-Co-Lead Counsel time associated with Settlement, Experts, and Discovery incurred in connection with the mediations. In addition, Interim Co-Lead Counsel believes that filing fees, pro hac fees, travel expenses to the mediation(s) are appropriate for reimbursement. The total estimated expenses incurred to date reimbursable under this analysis is $182,900.66.

60.    As part of Plaintiffs' Motion for Attorneys' Fees, Interim Co-Lead Counsel intend to undertake

a more detailed review of all expense entries and provide additional detail on the submitted total.

61.     The Settlement Class and the Court will have a full opportunity to consider the appropriate fees as part of the final approval process. There is no "clear sailing" agreement regarding fees in the Settlement Agreement, and final approval is not contingent upon approval of the requested attorneys' fees, costs and expenses. SA ¶¶ 97, 99.

62.     In accordance with the Settlement Agreement, we will seek approval of Settlement Awards of $500 for each Settlement Class Representative, which 23andMe will not oppose. SA ¶¶ 98, 99. The Settlement is not contingent upon approval of the Service Awards to the Settlement Class Representatives, and the Settlement Class and the Court will have a full opportunity to evaluate the request for such awards as part of the final approval process. *Id*. ¶ 99.

## IV.     SETTLEMENT ADMINISTRATION

### A.     Settlement Administrator Selection Process

63.     We propose Verita (formally KCC) as the Notice and Claims Administrator. We do so after evaluating bids from nine prospective settlement administrators. Interim Co-Lead Counsel discussed and received bids from these nine prospective highly qualified administrators for the methods of notice contemplated in this case based on the Settlement Class Member data available, including email, mail, mobile application, and media notice. Only after receiving and evaluating the bids was Verita selected.

64.     Collectively, Interim Co-Lead Counsel have used Verita as a settlement administrator on 2 occasions in the past two years. Admin. Decl. ¶ 9. Verita has considerable experience as the appointed settlement administrator in large data breach class action settlements. *Id*. ¶¶ 8, 10. Verita has extensive data security measures established to securely handle Settlement Class Members' data. *Id*. ¶¶ 41-45. It also maintains comprehensive insurance coverage, including sufficient Errors & Omissions coverage for this case. *Id*. ¶ 46. The Parties would not have selected Verita absent their comfort with its procedures for securely and appropriately handling class member data and administering a Settlement to a class of this size.

65.     Verita has estimated the anticipated costs of issuing notice and administering the Settlement at a 10% claims rate at a capped amount of $1,038,000 rate, Admin. Decl. ¶ 49. The costs will be paid out of the Settlement Fund. SA ¶ 58. The estimated costs are reasonable when compared to the value of the

Settlement and in light of the nature of the services requested, the size of the Settlement Class, and including the anticipated engagement by the Settlement Class Members as set forth below.

**B.      The Settlement Administrator's Estimated Claims Rate**

66.    The task of estimating a claims rate is complex. However, the Settlement Administrator has estimated that there will be between a 5-10% claims rate based on its experiences in other data breach cases. Admin. Decl. ¶ 37. The Notice Plan proposed here provides direct notice to the Settlement Class Members, is intended to maximize the claims rate and encourage as much Settlement Class Member participation as possible.

**C.      Opt-outs and objections: timeline, instructions, and forms**

67.    The proposed Class Notice advises Settlement Class Members of their right (i) to opt out of the Settlement or (ii) to object to the Settlement, to Class Counsel's Motion for Attorneys' Fees, or to Service Awards to the Class Representatives, and (iii) of the associated deadlines. The proposed schedule ensures that Settlement Class Members have at least 95 days from the to opt out or object to the Settlement, with at least 35 days to opt out or object to the motion for attorneys' fees and expenses. N.D. Cal. Procedural Guidance ¶ 9.

68.    The opt-out and objection instructions are in plain language and clearly prompt those who wish to opt-out or to object to provide the specific information each action requires. Ex. 4 to Admin. Decl., Class Notice (referred to in the Settlement Agreement as the "Long Notice"). The Class Notice clearly informs Settlement Class Members of the Opt-Out Deadline, how to opt-out, the consequences of opting out, and requires that they supply only the information needed to opt out of the Settlement. *Id.* at Questions 2-3, 26-30.

69.    Similarly, the Class Notice informs Settlement Class Members about how to send their written objections to the Court or file in person with the Court (or if represented by counsel to have counsel e-file), what information is required to be included in the objection, tells them that the Court can only approve or deny the Settlement and cannot change its terms, and clearly identifies the Objection Deadline. *Id*. at Questions 2-3, 31-34.

70.    The Settlement Agreement also provides for a preliminary injunction to enjoin ongoing litigation and arbitrations against 23andMe until such time as the Settlement Class Member opts-out of the Settlement. *See* SA ¶ 73(h). The injunction tracks similar preliminary injunctions approved by this

17

Court in granting preliminary approval of class action settlements. *See, e.g., Roberts v. AT&T Mobility LLC*, No. 3:15-cv-03418-EMC (N.D. Cal. Mar. 31, 2021). Given 23andMe's financial position, Plaintiffs support the entry of the preliminary injunction, but note that the provision is severable from the remainder of the Settlement Agreement. SA ¶ 105.

## V.      THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

71.    We believe Plaintiffs' claims are meritorious, and the strength of Plaintiffs' claims was one of the critical factors leading to the Settlement. However, in evaluating the adequacy of the Settlement, Defendant's financial condition looms large, and must be part of the analysis. There remains the very real risk that the Defendant would not be able to withstand years of litigation or a judgment of the magnitude which might result if Plaintiffs were victorious on one or more of many claims at trial, which is an overriding factor in the achievement of this Settlement. At the same time, Plaintiffs do face other substantial risks that could decrease the amount of recovery—or even defeat class wide recovery altogether. There was a risk that Plaintiffs' claims would not have survived, or survived in full, on a class-wide basis after rulings on the anticipated motion to dismiss, motion to compel arbitration, motion for class certification, motions for summary judgment, Daubert motions, trial, and appeal.

72.    This Settlement is the product of careful deliberation and meets the objectives of tailoring the remedy to the harm suffered by the Settlement Class Members. Settlement Class Members who suffered distress are compensated for professional mental health care. Settlement Class Members who were concerned about their safety and purchased security or home monitoring services to advance their personal security will be reimbursed. To the extent Settlement Class Members suffered identity fraud from the Security Incident, they will be compensated by way of reimbursement.

73.    Settlement Class Members who were residing in states with statutes providing for statutory damages for exposure of genetic information, can claim compensation for those claims.

74.    The small number of Settlement Class Members whose health information was compromised will receive payment upon making a timely and valid claim.

75.    The entire Settlement Class will have the opportunity to enroll in the unique monitoring service, created as a custom package for this Settlement Class, which will provide them with the following benefits, described more fully in the Declaration of Gerald Thompson (CyEx Decl.) filed herewith:

      1.      Dark Web Monitoring;

2.      Stolen Data Sites Monitoring;

3.      Genetic Monitoring;

4.      Virtual Private Network;

5.      Digital Vault;

6.      Data Broker Opt Out;

7.      Password Manager

8.      Private Browsing

9.      Breach Scan Tool

10.     Anti Phishing

11.     Real Time Authentication Alerts

12.     High Risk Transaction Monitoring

13.     Health Insurance Plan ID Monitoring

14.     Medical Beneficiary Identifier Monitoring

15.     Medical Record Monitoring

16.     International Classification of Disease Monitoring

17.     National Provider Identifier Monitoring

18.     Security Freeze with all Credit Bureaus

19.     $1,000,000 Identity Theft and Fraud Insurance (with no deductible)

20.     Customer Support and Victim Assistance

76.     These combined benefits provide the most comprehensive set of features ever to be provided in a data breach case. CyEx Decl. ¶ 7. Privacy Shield provides meaningful benefit to this Settlement Class whose privacy concerns have been broadcast and heard. Not only are these services available to all Settlement Class Members who claim them, but any Settlement Class Member who does not make a claim for them during the Claims Period, can enroll at any time during the three-year period and receive the services for the remainder of the three-year period.

77.     Another important benefit of the Settlement is it delivers substantial relief to Settlement Class Members now, and eliminates their risk of not receiving any benefit for years, or even not receiving

anything at all. Settlement Class Members can enroll in the Privacy Shield and start receiving and using its services in the near term to protect themselves from the improper use of their personal information and to enhance their valuable privacy. This is a substantial benefit with a reported retail value of $375 per year. CyEx Decl. at ¶ 8. And it is without doubt an appropriate remedy to address the harm the Settlement Class suffered as a result of the Security Incident. The reimbursement and cash payments also will be placed in the hands of the victims of this Security Incident now, and eliminates the risk of non-recovery due to the factors set forth in Plaintiffs' accompanying motion and herein.

78.   The Settlement Class Representatives do not have any conflicts with the Settlement Class Members. To the contrary, they have participated in the case on the Settlement Class Members' behalf and support the Settlement as in their best interests. The fact that some Settlement Class Members are eligible for certain benefits for which others will not qualify, does not create any conflict. All Settlement Class Members are given the same opportunity to claim all benefits for which they do qualify. And those Settlement Class Members eligible for cash payments in recognition of the statutory scheme in their states of residence on August 11, 2023, may claim their cash payment and any other benefits for which they qualify.

79.   In light of the foregoing, we believe the Settlement merits preliminary approval and request the Court enter an Order granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on Thursday, September 12, 2024.

_____
Cari Campen Laufenberg

At: Seattle, WA_____

_____
Norman E. Siegel

At: Kansas City, MO_____

_____
Gayle M. Blatt

At: San Diego, CA_____