1   Rafey S. Balabanian (SBN 315962)
2   rbalabanian@edelson.com
    EDELSON PC
3   150 California Street, 18th Floor
    San Francisco, California 94111
4   Tel: 415.212.9300
    Fax: 415.373.9435
5
6   *Counsel for Plaintiffs David Melvin, J.L., and Putative Class*

7

8                    **UNITED STATES DISTRICT COURT**
9                    **NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
10

11  **IN RE 23ANDME, INC., CUSTOMER**         Case No. 24-md-03098-EMC
    **DATA SECURITY BREACH LITIG.**
12                                            **MOTION TO ENLARGE BRIEFING**
    This Document Relates to:                 **SCHEDULE PURSUANT TO CIVIL L.R. 6-3**
13                                            **REGARDING OBJECTIONS TO**
    *ALL ACTIONS*                             **PRELIMINARY APPROVAL**
14
                                              **Judge:** Hon. Edward M. Chen
15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

MOTION TO ENLARGE BRIEFING SCHEDULE                    CASE NO. 24-MD-03098-EMC

1    Since before Court appointed counsel, Interim Co-Lead Counsel and 23andMe have

2    been doing one thing: mediating the case and papering a settlement. The motion for preliminary

3    approval is the only material motion that has been filed across the more than 30 actions

4    underlying this MDL. Unaided by substantive progress in the case, a settlement presented at

5    this stage should be strong on the merits and accompanied by an exceptionally clear "why."

6    The Settlement now before the Court, however, is not just generally one-sided, but even

7    accepting it on its own terms—as an off-the-rack data breach settlement—it is internally

8    contradictory and poorly designed. It should not be approved.

9    Interim Co-Lead Counsel, moreover, have gone down exactly the path that Plaintiffs

10   J.L. and David Melvin (the "Melvin Plaintiffs") tried to prevent: engaging in remarkably

11   inefficient work (claiming $3.5 million in lodestar already) without an inch of substantive

12   movement in the case, putting together a stock settlement in this extraordinary case, and

13   missing the details. Even though Interim Co-Lead Counsel had the benefit of a survey of the

14   Class that was clear about what the Class wanted—which all seemed to agree was intuitive—

15   the results are the exact opposite. For that reason, the Melvin Plaintiffs also oppose Interim

16   Class Counsel's request that they be appointed permanent (rather than interim) Class Counsel.

17   The Melvin Plaintiffs suggest that the Court address these issues at the preliminary

18   approval stage, before costly notice goes out to the Class. The default briefing timeline set by

19   the local rules, however, constrains the Melvin Plaintiffs' ability to properly address these

20   issues for the Court. As a non-exhaustive list of the issues the Melvin Plaintiffs would brief at

21   this stage (and which are better addressed at preliminary approval):

22   - *Overbroad release.* The Settlement's Release is too broad and seemingly designed
       to obscure who it is releasing. Dkt. 103-2 ¶¶ 38, 39. That is particularly relevant in
23     light of the fact that the Settlement is entirely based on arguments about the low
       value of the company, but then potentially releases other claims (and payors) that are
24     well-financed. *See Melvin et al. v. 23andMe, Inc.*, No. 3:24-cv-00487, Dkt. 26 (N.D.
       Cal. Feb. 16, 2024) (raising claims with the third-party entities, like
25     GlaxoSmithKline, that Defendant has partnered with to share its users' sensitive
       data); *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 969 (N.D. Cal.
26     2019) (denying preliminary approval, raising concern that release extended to a
       party that was not included in the action); 4 Newberg and Rubenstein on Class
27     Actions § 13:15, at p. 326 (6th ed.) ("[C]ourts have rejected preliminary approval

28

when the proposed settlement contains obvious substantive defects such as... overly broad releases of liability.").

- *No exploration of alternative structures or estimated damages.* The Settlement accepts that 23andMe has limited resources. (Whether this is appropriate or not requires further exploration; the company is singularly focused on going private.[1]) But regardless, Interim Class Counsel makes no effort to explain why a mine-run settlement approach is the solution to that problem versus other options, like payment over time or the Class taking a forward-looking position in the company. *See* Dkt. 30 at 2-3 (identifying alternative settlement structures to provide additional value to the Class). Nor does Class Counsel make any serious effort to value what the Plaintiffs could obtain at trial, providing instead such a generic estimate as to be meaningless. *See* Dkt. 103-1 at 14 ("Plaintiffs assert that there is a relatively wide range of possible recoveries if their contract-based claims were successful at trial, ranging from a significant fraction of the settlement amount at the low end to several times the settlement amount at the high end."). But "damages calculations offered to demonstrate the fairness of a proposed settlement must be substantiated with detailed, reasoned analysis that explains how the defendant's maximum potential exposure has been calculated." *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1075 (C.D. Cal. 2023). "This Court has more than once denied motions for approval where the plaintiffs 'provide[d] no information about the maximum amount that the putative class members could have recovered if they ultimately prevailed on the merits of their claims.'" *Livingston v. MiTAC Digital Corp.*, No. 18-CV-05993-JST, 2019 WL 8504695, at *4 (N.D. Cal. Dec. 4, 2019) (quoting *Haralson*, 383 F. Supp. 3d at 969).

- *Overvalued data monitoring.* The Settlement touts its bespoke monitoring program as the central relief that all 6 million Settlement Class Members can benefit from (if they send in a claim form). But on closer inspection, the monitoring program is standard credit monitoring from other data breach settlements—which the members of the class likely already had countless opportunities to claim in other settlements, *see, e.g., In re Equifax Inc. Customer Data Security Breach Litig.*, No. 17-md-2800 (N.D. Ga.)—with immaterial expansions. *See* Dkt. 103-7 at 3. The "Genetic Monitoring" component, which should be the most important aspect of the program given the information at issue in this case, just tells class members something that they should already be learning about through the Notice: that as the Melvin Plaintiffs alleged in their Complaint, that class members' genetic information has already appeared on the Dark Web. *See* Complt., *Melvin*, No. 3:24-cv-00487, Dkt. 1 (N.D. Cal. Jan. 26, 2024). When it comes to relief for that, the program offers nothing but a phone call to discuss "potential mitigation efforts." Dkt. 103-7 at 3. This is plainly a dead end, as even Class Counsel—who had significant leverage against 23andMe—were not able to secure any mitigation for Class Member's information being posted on the Dark Web. An individual caller will not be able to achieve more than a represented, litigating party.

---

[1]    Sarah Fortinsky, *23andMe board quits over plans to take DNA testing company private*, THE HILL (Sept. 18, 2024), https://thehill.com/homenews/4887201-entire-board-resigns-23andme/.

- And even accepting the Settlement's general structure:

  - *Intra-class conflicts.* The bulk of the actual monetary relief appears to go to claimants in states with relevant genetic information privacy laws, but Class Counsel creates (and makes no effort to resolve) the intra-class conflicts between these Settlement Class Members who are entitled to damages ranging $100 (Oregon) to $5,000 (Alaska) but receive the same amount from the fund. *See Grady*, 671 F. Supp. 3d at 1082 (denying preliminary approval when, *inter alia*, "[t]he Court has concerns about whether the proposed distribution formula adequately compensates participating class members for their injuries, as it may overlook significant differences between class members").

  - *No assessment of relief to particularly vulnerable populations.* Even though the Consolidated Class Action Complaint (Dkt. 78) proposes the creation of a separate "Nationwide Ethnically Targeted Persons Class" with unique claims, the Settlement abandons that distinction and makes no effort to explain how these individuals are protected. *See Grady*, 671 F. Supp. 3d at 1082.

  - *Unnecessary claims.* The Settlement requires a claims process for Settlement Class Members who (i) were residents of states with genetic privacy statutes or (ii) had their health information compromised, notwithstanding these are static populations that the Defendant knows or should know, and thus eligible Settlement Class Members could be sent cash payments directly. *See In re Myford Touch Consumer Litig.*, 13-CV-03072-EMC, 2018 WL 10539266, at *2 (N.D. Cal. June 14, 2018) (Chen, J.) (issuing show cause order as to why preliminary approval should not be denied, noting that "a claims-made distribution does not appear necessary . . . for the most part" when defendant knew and could verify class membership).

  - *Minimizing claims rates.* Doubling down on the issue above, the Settlement is structured to minimize claims rates by failing to provide separate or unique notice to individuals who are eligible for a cash payment as part of the statutory damages or compromised health information groups, and Settlement Class Members are left to guess as to whether they qualify for such additional relief, or remember if they received a particular email from 23andMe sometime last year. In many weak settlements, driving down claims rates is name of the game: it inflates the per-person numbers to make the settlement look stronger than it is. If claims are necessary at all, the claims rate should be as high as possible (both to provide the greatest number of people possible monetary relief, and for complete transparency on the settlement).

- The presentation of the Settlement also suffers from some basic failures, including:

  - Interim Co-Class Counsel reports a lodestar of $3.56 million with costs of nearly $183,000 for a case in which Defendant hasn't even responded to the pleadings, the Parties have conducted no discovery or formal motion practice. *See Grady*, 671 F. Supp. 3d at 1078 (denying preliminary approval, noting the requested

amount was "shockingly high given that counsel have failed to demonstrate that they investigated the class's claims and there has been no significant discovery or motions practice in the case"). Relatedly, the Notice should include the fact that other firms were willing to cap fees at 20% of the Settlement. *See* Melvin Plfs.' Lead Brief, Dkt. 9-1 at 11.

o   Despite purportedly spending more than $3 million in time, movants do not include relevant considerations required by the Northern District of California's *Procedural Guidance for Class Action Settlements*, https://www.cand.uscourts.gov/ClassActionSettlementGuidance, including explaining the differences between classes proposed in the operative complaint and the settlement. *See Becker v. LISI, LLC*, No. 21-CV-03295-JST, 2023 WL 3668526, at *3 (N.D. Cal. May 25, 2023) ("[F]ailure to address the issues discussed in the Guidelines is a proper ground for denying a motion for preliminary approval.").

o   Nor do movants address the factors for approval of class action settlements and notice plans as enumerated in the 2018 amendments to Federal Rule of Civil Procedure 23, instead referencing only the considerations in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

o   The amounts of the prospective Service Awards differ between the Settlement Agreement (Dkt. 103-2 ¶ 98 (providing for Service Awards of up to $1,000 per Class Representative) and the notice (Dkt. 103-6 at 20 (providing for Service Awards of up to $500 per Class Representative)) and the motion for preliminary approval (Dkt. 103-1 at 9 (providing for Service Awards of up to $500 per Class Representative)).

•   Finally, 23andMe's control over the settlement process is evident in Interim Class Counsel's agreement to an injunction halting arbitrations. Dkts. 103-1 at 39-40; 103-5 ¶ 70. Class Members who have initiated arbitrations under 23andMe's own terms have a right to proceed with those arbitrations. That 23andMe finds those arbitrations inconvenient is insufficient cause to strong-arm class members out of their choice.

Some of these issues, such as disputes regarding Interim Co-Class Counsel's fees, could be dealt with as objections in the normal course of a settlement approval timeline. But those issues that stem from the basic structure of the settlement and that directly bear on the form and content of the notice Settlement Class Members would receive and the mechanisms that they could use to claim relief are best addressed at the outset. While Plaintiffs could reraise these arguments later, if the Court required any changes to the Settlement in response, then subsequent notice would almost certainly be required, at significant expense to the Settlement Class. *See, e.g.*, *Alfred v. Pepperidge Farm, Inc.*, CV14-07086 JAK, 2020 WL 13587900, at

1    *14 (C.D. Cal. Apr. 14, 2020) (ordering corrective notice following objection to class action

2    settlement).

3           For these reasons, and pursuant to Civil L.R. 6-3, Plaintiffs request that the default

4    briefing schedule in Civil L.R. 7-3(a) be amended such that any objections to preliminary

5    approval of the Settlement are due on October 10, and replies are due on October 21. This does

6    not necessarily require resetting the preliminary approval hearing currently set for October 29,

7    2024, depending on the Court's availability. Even if the date must be pushed back slightly,

8    however, the Melvin Plaintiffs submit that allowing fulsome briefing regarding these threshold

9    items before preliminary approval will allow the Court to make a well-informed decision that

10   protects the Settlement Class from potentially unnecessary and/or duplicative notice costs. *See*

11   Declaration of J. Eli Wade-Scott, attached as Exhibit 1. There is no emergent need for this

12   decision to be rushed, particularly in light of the significant structural problems above.

13          While the Melvin Plaintiffs were finalizing this Motion, the Court issued additional

14   questions about the Settlement to be answered by Interim Class Counsel by October 2. Dkt.

15   111.[2] The Melvin Plaintiffs submit that briefing on the Melvin Plaintiffs' suggested schedule is

16   all the more appropriate, as objections to the preliminary approval motion can be responsive to

17   any additional argument from Class Counsel.

18          **WHEREFORE**, Plaintiffs J.L. and David Melvin respectfully request that the Court

19   enter an Order (i) adopting the briefing schedule for objections to preliminary approval as set

20   forth herein; (ii) resetting the preliminary approval hearing to a date following the completion

21   of such briefing; and (iii) awarding such further and additional relief as the Court deems

22   reasonable and just.

23                                         Respectfully Submitted,

24                                         **DAVID MELVIN and J.L.**, individually and on
                                           behalf of all others similarly situated,
25

26   _____

27   [2]      Interim Class Counsel should also explain the extent to which it knew the answers to these
     questions before reaching the terms of the agreement. 23andMe, similarly, should respond as to whether
28   it provided the answers to the Court's questions to Interim Class Counsel before the term sheet was
     executed.

1    Dated: September 25, 2024                By: */s/ J. Eli Wade-Scott*
                                             *One of Plaintiffs' Attorneys*
2
                                             Rafey S. Balabanian (SBN 315962)
3                                            rbalabanian@edelson.com
                                             EDELSON PC
4                                            150 California Street, 18th Floor
                                             San Francisco, California 94111
5                                            Tel: 415.212.9300
                                             Fax: 415.373.9435
6
                                             Jay Edelson (admitted *pro hac vice*)
7                                            jedelson@edelson.com
                                             Ari Scharg (admitted *pro hac vice*)
8                                            ascharg@edelson.com
                                             J. Eli Wade-Scott (admitted *pro hac vice*)
9                                            ewadescott@edelson.com
                                             Michael Ovca (admitted *pro hac vice*)
10                                           movca@edelson.com
                                             Emily Penkowski Perez (admitted *pro hac vice*)
11                                           epenkowski@edelson.com
                                             Hannah P. Hilligoss (admitted *pro hac vice*)
12                                           hhilligoss@edelson.com
                                             EDELSON PC
13                                           350 North LaSalle Street, 14th Floor
                                             Chicago, Illinois 60654
14                                           Tel: 312.589.6370
                                             Fax: 312.589.6378
15
16
                                             *Counsel for Plaintiffs and the Putative Class*
17

18

19

20

21

22

23

24

25

26

27

28