Jay Edelson (admitted pro hac vice)
jedelson@edelson.com
Ari Scharg (admitted pro hac vice)
ascharg@edelson.com
J. Eli Wade-Scott (admitted pro hac vice)
ewadescott@edelson.com
Michael Ovca (admitted pro hac vice)
movca@edelson.com
Emily Penkowski Perez (admitted pro hac vice)
epenkowski@edelson.com
Hannah P. Hilligoss (admitted pro hac vice)
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs David Melvin, J.L., and Putative Class*

*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE 23ANDME, INC., CUSTOMER DATA SECURITY BREACH LITIG.**<br><br>This Document Relates to:<br><br>*ALL ACTIONS* | Case No. 24-md-03098-EMC<br><br>**RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**<br><br>**Judge:** Hon. Edward M. Chen |

# TABLE OF CONTENTS


**I. This is a stock data breach settlement in a case that demands more** .......... 2

**II. Accepting the Settlement on its own terms, it should be rejected as drafted** .......... 6

**A. The vast majority of Class Members will get no monetary benefit** .......... 6

**B. The settlement's class definitions include intra-class conflicts and dispense with the "Nationwide Ethnically Targeted Subclass" without discussion** .......... 7

**C. The proposed notice and claims procedures are flawed** .......... 9

**III. The presentation of the settlement is unacceptable, further calling into question Class Counsel's adequacy** .......... 10

**IV. The preliminary injunction demonstrates 23andMe's complete capture over the Settlement process** .......... 11

**V. Conclusion** .......... 12

## TABLE OF AUTHORITIES

**Cases**

*Figueroa, et al. v. Kronos*,
No. 1:19-cv-01306 (N.D. Ill. Nov. 22, 2022) ........ 5

*Fischer, et al. v. Instant Checkmate LLC, et al.*,
No. 1:19-cv-04892 (N.D. Ill. Nov. 17, 2023) ........ 5

*Grady v. RCM Techs., Inc.*,
671 F. Supp. 3d 1065 (C.D. Cal. 2023) ........ 7, 10

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ........ 11

*Haralson v. U.S. Aviation Servs. Corp.*,
383 F. Supp. 3d 959 (N.D. Cal. 2019) ........ 10

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ........ 3, 9

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. C 06-4333 PJH, 2013 WL 12333442 (N.D. Cal. Jan. 8, 2013) ........ 8

*In re Equifax Inc., Customer Data Security Breach Litigation*,
No. 17-md-02800-TWT (N.D. Ga.) ........ 3

*In re Myford Touch Consumer Litig*.,
No. 13-CV-03072-EMC, 2018 WL 10539266 (N.D. Cal. June 14, 2018) ........ 9

*In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Pracs. Litig.*,
282 F.R.D. 486 (C.D. Cal. 2012) ........ 13

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
No. 16-md-2752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) ........ 3, 10

*Livingston v. MiTAC Digital Corp.*,
No. 18-CV-05993-JST, 2019 WL 8504695 (N.D. Cal. Dec. 4, 2019) ........ 10

*Melvin, et al. v. 23andMe, Inc.*,
No. 3:24-cv-00487 (N.D. Cal.) ........ 4, 6

*Nacif v. Athira Pharma, Inc.*,
No. C21-0861 TSZ, 2024 WL 643513 (W.D. Wash. Feb. 15, 2024) ........ 8

*Rollins v. Dignity Health*, 336 F.R.D. 456 (N.D. Cal. 2020) ........ 8

**Rules and Statutes**

410 ILCS 513/40 ........ 7

Alaska Stat. § 18.13.020 ........ 7

Fed. R. Civ. P. 23 ........ 11, 13

Or. Rev. Stat. § 192.541 ........ 7

**Miscellaneous Authority**

23andMe Holding Co., (Schedule 13D), Exhibit 1 (July 31, 2024), https://investors.23andme.com/static-files/142c2fd7-b6fe-473c-a0a4-036ec0aab034 ........ 4

23andMe, *23andMe Announces CEO's Take-Private Proposal*, 23ANDME (Aug. 1, 2024), https://investors.23andme.com/news-releases/news-release-details/23andme-announces-ceos-take-private-proposal ........ 5

*Procedural Guidance for Class Action Settlements*, https://www.cand.uscourts.gov/ClassActionSettlementGuidance ........ 11

Shahar Ziv, *I Got A Measly $14.90 From Equifax's Data Breach Settlement*, FORBES (Feb. 22, 2023), https://www.forbes.com/sites/shaharziv/2023/02/22/i-got-a-measly-1490-payment-from-equifaxs-data-breach-settlement ........ 3

We asked the Class in this case what they wanted. The Class wanted their claims fleshed out in litigation, they wanted a cash settlement that would benefit a large number of people, and they didn't want credit monitoring. The Court suggested those desires were intuitive. (*See* dkt. 77, June 3, 2024 H'rg Tr. at 35:8–9 ("What would you say you learned from that survey that one wouldn't have guessed? What was the surprise?").) The vast majority of the firms seeking lead took the contrary position: settle quickly with no promises about how it would get done, though their track records in data breach settlements—puffed up with credit monitoring and minute cash returns—were certainly a hint. The Court, in an abbreviated order, appointed firms from the main "settle-quickly" slates as lead. (Dkt. 62.)

The result is as expected. This is a stock data breach settlement in a case that—everyone vociferously argued, for a while at least—required an extraordinary approach. For most Class Members, the only relief being offered is credit monitoring with a slick gloss of "Genetic Information" monitoring, which helps Class Members not one bit if the worst happens and they are, once again, targeted on the Dark Web. There is no unique relief contemplated (nor its exclusion even discussed), for the vulnerable populations that everyone paid so much lip service to in seeking lead. And the presentation is amateurish. Interim Co-Lead Class Counsel ("Class Counsel") appear to be working from a template brief prior to the amendments to Rule 23 in 2018, there are basic intra-class conflicts even accepting the poor framework that Class Counsel propose, and the notice program is designed to keep claims rates as low as possible.

Moreover, 23andMe's complete capture over the settlement process (again, an issue about which the Melvin Plaintiffs have been vocal) is evident in the result. There is much "tell" and little "show" when it comes to connecting the company's financial strain to the result here. Basic facts, like the amount that insurance is covering for this deal versus 23andMe's out-of-pocket expense, go undisclosed. And 23andMe and Class Counsel agreed to a preliminary injunction to halt separate arbitrations initiated by separately represented claimants and an onerous opt-out process that is candid in its aims to push arbitrating class members into this

deal.

The only surprising part of this settlement is Class Counsel's supposed lodestar of $3.56 million in lodestar to date, with another $1.5 million to come. Some lawyers are known to bill with a heavy pen, but this is another level. In any event, at that cost, the settlement that the Class should be receiving ought to be creative, sensitive to the stated preferences of the class, and impeccably presented. The Class got none of that.

Class Counsel had their opportunity to prove the Melvin Plaintiffs wrong: that our concerns about the settle-quickly crowd were unfounded and that our criticisms of their track records were unfair. Instead, they took their mandate and came back with exactly the expected, inadequate result. The Class deserves better than this. For all of the reasons below, the Melvin Plaintiffs oppose not only preliminary approval but also the further appointment of Class Counsel to represent the Class. The Court has asked some important questions on problematic components of the proposed settlement.[1] (*See* dkt. 111.) The Melvin Plaintiffs are, however, skeptical that more information will resolve its fundamental flaws.

## I. This is a stock data breach settlement in a case that demands more.

Settlements in standard data breach cases flow through a well-worn groove: almost everyone gets credit monitoring, with a subset of Class Members able to claim small sums of money. These settlements focus on the "retail value" of the credit monitoring to the consumer—as the Court made clear it knows, (*see* dkt. 111 at 3)—to beef up an otherwise thin monetary result. The stock settlement is not acceptable in this case.

Start with the credit-monitoring-first approach. People have had enough opportunities to take credit monitoring and are, frankly, fed up with it. We know this from the class survey. (*See* Tabular Results, dkt. 36-2 at 8 (class members rank settlements that prioritize cash relief over credit monitoring at 6.17 on a 7-point importance scale).) We also know this because the

[1] The Melvin Plaintiffs sought leave for an additional week after this filing deadline so that they could assess Class Counsel's responses to the Court's questions—also ordered to be produced today. The Court denied that request, setting the Melvin Plaintiffs' response for today, and accordingly the Melvin Plaintiffs have not been able to review Class Counsel's response.

class action bar has run this experiment time and time again. Take, for example, the *In re Equifax Inc., Customer Data Security Breach Litigation* settlement, which offered half the population of the United States the option to take credit monitoring. No. 17-md-02800-TWT, dkt. 903 at 3 (N.D. Ga. Dec. 5, 2019) (noting 147 million class members). About 2% of people were interested in it. *Id.*, dkt. 956 at 10 (noting 3.3 million claims for credit monitoring). Instead, the *Equifax* class members far preferred to gamble on an unknown sum of money from an "alternative relief" pot, which wound up being about $15.[2] *Id.* (almost 12 million claims for alternative relief). Consumer *disinterest* is the defining message that comes out of every large data breach settlement that runs this same experiment. *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 321 (N.D. Cal. 2018) (noting 1.8% claims rate); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-2752-LHK, 2020 WL 4212811, at *20 (N.D. Cal. July 22, 2020) (noting 0.6% claims rate). Those people that are interested in credit monitoring likely have it, several times over, from having been repeatedly offered it as the primary relief in the resolution of large data breaches. (Indeed, class members have been making this objection since the *Anthem* settlement six years ago. *See In re Anthem*, 327 F.R.D. at 323.) The Melvin Plaintiffs discuss the particulars of the credit monitoring offered here below, but the concept is a misfire from the jump.

All counsel at least gestured to the idea, in wrangling for lead, that this extraordinary case required better than run-of-the-mill solutions. And yet the same old ideas appear. Class Counsel premise the propriety of this settlement on one argument: "the overarching consideration that weighs in favor of preliminary approval is 23andMe's financial condition." (Dkt. 103-1 at 11.)[3] But the Melvin Plaintiffs presented a number of different models for resolving the limited-resources problem that didn't rely on taking a rock-bottom deal. For

---

[2] Shahar Ziv, *I Got A Measly $14.90 From Equifax's Data Breach Settlement*, FORBES (Feb. 22, 2023), https://www.forbes.com/sites/shaharziv/2023/02/22/i-got-a-measly-1490-payment-from-equifaxs-data-breach-settlement.

[3] This seems to have been a foregone conclusion even before the "forensic accounting" was performed, with Class Counsel reporting—before their appointment—"23andMe has represented that its total available insurance is limited compared the breadth and strength of the class members' claims, particularly the statutory claims…" (Dkt. 24 at 2.)

instance, the Parties could propose payment over time. (Dkt. 30 at 3.) Or the Class could effectively take a position in the company via a number of different mechanisms, sometimes called a "future-stakes settlement," which would provide the Class the same upside the CEO expects to see when she takes the company private at a more than $229,000,000 valuation. *See* 23andMe Holding Co., (Schedule 13D), Exhibit 1 (July 31, 2024), https://investors.23andme.com/static-files/142c2fd7-b6fe-473c-a0a4-036ec0aab034 (offering $0.40 per 574,455,442 common stock shares).

The Melvin Plaintiffs also pointed out that there might be other payors. *See Melvin, et al. v. 23andMe, Inc.*, No. 3:24-cv-00487, dkt. 26 (N.D. Cal. Feb. 16, 2024). 23andMe's existing research partnership with GlaxoSmithKline appeared to violate state genetic information privacy laws by giving genetic information to a third party without informed consent. *Id.* And 23andMe's CEO had been vocal, just after the lawsuit was filed, that the company planned to expand those efforts to unnamed third parties. *Id.* at 1. 23andMe, however, refused to answer any of the Melvin Plaintiffs' questions about this, and the Court denied discovery. *Melvin*, No. 3:24-cv-00487, dkts. 27-4, 29 (N.D. Cal. Feb. 16, 2024). Despite the question of other payors being crisply teed up, the settlement presented to the Court likely releases any company that 23andMe gave the class's genetic information to under its ambiguous definitions of "Released Entities," (dkt. 103-2 at ¶ 38 (releasing any "related or affiliated entities of any nature whatsoever, whether direct or indirect," including "any Person related to any such entity who is or was named as a defendant in any of the actions")), and "Released Persons," (*id.* at ¶ 39 (including any "related or affiliated entities of any nature whatsoever")).

Finally, the central premise—that 23andMe can't fund more in a settlement—remains unproven. That premise is summarized in a single sentence in Class Counsel's preliminary approval brief:

> Plaintiffs' counsel engaged an independent forensic accounting firm that confirmed what is apparent in 23andMe's publicly-filed reports—the company has limited funds, no reliable access to new capital, and mounting litigation exposure in other proceedings and investigations, meaning that any litigated judgment significantly

more than the Settlement is likely to be uncollectable.

(Dkt. 103-1 at 11.) 23andMe says that "[t]he financial condition of 23andMe is well documented," citing to Plaintiffs' preliminary approval brief. (Dkt. 105 at 1.) But, as the Court rightly pointed out, (dkt. 111 at 1), there is actually no detail presented from Class Counsel's examination of 23andMe's finances. Nor are even the basic questions answered: how much of this money was insurance, and how much is 23andMe *actually* paying? Meanwhile, though, the company's CEO is focused on taking the company private rather than sending it into bankruptcy, expecting future growth out of the public eye.[4]

Last but not least, Class Counsel's supposed $3.56 million in lodestar to bring this settlement to fruition is monumentally out of whack. The Class wanted the case to be efficiently litigated by a streamlined leadership slate of one or two firms. (Dkt. 36-2 at 6 (49.6% preferring smaller slate for efficiency reasons).) While Class Counsel don't provide the records to meaningfully assess this (the number of billers and detail on the work purportedly done), there can be no straight-faced claim that this was efficient. Nor is the assertion that it will take another $1.5 million to take a settlement through approval reality based. Even when litigation has gone well past the motion to dismiss stage, including through comprehensive discovery and class certification, reasonable lodestars are well below Class Counsel's inflated price point. *See Fischer, et al. v. Instant Checkmate LLC, et al.*, No. 1:19-cv-04892, dkt. 278 at 3 (N.D. Ill. Nov. 17, 2023) (Edelson PC reporting $1,960,080 lodestar in seven-state right of publicity class action with motion to dismiss and reconsider denied, all discovery completed (including depositions), a class adversarially certified, and summary judgment briefed); *Figueroa, et al. v. Kronos*, No. 1:19-cv-01306, dkt. 374 at 24 (N.D. Ill. Nov. 22, 2022) (reporting lodestar of $1,362,670 in Illinois Biometric Information Privacy Act ("BIPA") settlement reached after nearly four years of litigation, including defeating motion to dismiss and strike, seven depositions, and multiple discovery disputes).

---

4 23andMe, *23andMe Announces CEO's Take-Private Proposal*, 23ANDME (Aug. 1, 2024), https://investors.23andme.com/news-releases/news-release-details/23andme-announces-ceos-take-private-proposal.

Regardless, at that price point, one would expect an immaculate settlement and well-supported papers. The Class got neither.

**II. Accepting the Settlement on its own terms, it should be rejected as drafted.**

**A. The vast majority of Class Members will get no monetary benefit.**

The flagship component of the settlement is a credit monitoring program dubbed "Privacy Shield." That is the only benefit that approximately 80% of the Settlement Class can claim (if they send in a form). (Dkts. 103-1 at 6, 8; 103-3 at 3 (out of 6.4 million class members, only 1.4 million individuals are eligible to claim a statutory damages settlement and a "small number" are entitled to fixed payment because of compromised health information).) But the one additional layer of protection that Class Counsel seek to hang their hat on to differentiate this credit monitoring from a standard service is the "Genetic Monitoring" component. (*See* dkts. 103-1 at 1, 6–7; 103-7 at 3.)

This service purports to notify Class Members if their data appears somewhere on the Dark Web. But even if the Genetic Monitoring function of the credit monitoring manages to detect something, the most it can do is offer Class Members a phone call to discuss "potential mitigation efforts," on that Class Member's own dime. (Dkt. 103-7 at 3.) The reality, as the Melvin Plaintiffs detailed at length in their complaint, is that numerous Class Members' information has *already* appeared on the Dark Web, which are records that 23andMe should have access to. *See Melvin*, No. 3:24-cv-00487, dkt. 1 (N.D. Cal. Jan. 26, 2024) (the "Compl."). Class Counsel do not tell affected Class Members this fact in the Notice, however, which betrays just how valuable it is to Class Members—absent other relief—to simply be notified of the fact that their data has been posted. Indeed, failing to tell Class Members that their data has already been posted on the Dark Web while presenting a future-looking protection has the effect of lulling people into a false sense of security. Individuals whose data was on the Dark Web should be particularly notified of that fact, both to avoid a false impression about Class Members' safety and which the Parties *must* do if they have any belief in the value of the "Genetic Monitoring" component at all.

In the end, a Class Member who later gets this notification is not going to be in a better position than Class Counsel is in now to remediate the effects of their information being posted on the Dark Web. Class Counsel benefit from litigation leverage and (should have) better access to the facts, whereas Class Members are giving a release for all of this conduct in exchange for the notification. Individual Class Members are not getting valuable relief from the Genetic Monitoring component.

**B. The settlement's class definitions include intra-class conflicts and dispense with the "Nationwide Ethnically Targeted Subclass" without discussion.**

A few subsets of the Class are able to claim from a monetary component of the Fund. The largest is the 1.4 million members (of 6.4 million total class members) that fall into the Statutory Subclass, who are residents of states with either genetic-privacy laws (Illinois, Alaska, and Oregon) or other potentially applicable statutory claims (California), who are entitled to *pro rata* claims from a $14 million fund. (Dkt. 103-1 at 8.) With a real claims rate, payments should range somewhere between $40 (25%) to $65 (15%).

But the damages between the genetic-privacy states, however, differ widely: Oregon's damages are $100, Or. Rev. Stat. § 192.541; Illinois, $2,500 (or $15,000 if the conduct is intentional or reckless), 410 ILCS 513/40(a); and Alaska, $5,000 (or $100,000 if the violation resulted in monetary gain), Alaska Stat. § 18.13.020. Which of the five California claims in the Complaint is driving these members' inclusion in the subclass goes undiscussed. (*See* dkt. 103-1 at 22 n.16 (promising discussion of Californian's "applicable statutory claims" in Section 10), 24 (Section 10).) Even more troubling, however, is that there is no explanation for why all of these Class Members are claiming equal shares of the Statutory Subclass pot, and no analysis of how these claims are the same or different. *See Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1082 (C.D. Cal. 2023) (denying preliminary approval when, *inter alia*, "[t]he Court has concerns about whether the proposed distribution formula adequately compensates participating class members for their injuries, as it may overlook significant differences between class members"). Paying a class member with a statutory claim $40 is very different

depending on whether statutory claim is worth $5,000 or $100. And despite spending more than $3.5 million in lodestar, Class Counsel could not be bothered to understand and articulate whether the strengths of those claims even differ—with respect to sticker price of the claim or the merits of those claims.

This appears to be a clear case of intra-class conflicts that requires (at least) class members who have those claims to represent a further-divided subclass. *Rollins v. Dignity Health*, 336 F.R.D. 456, 467 (N.D. Cal. 2020) (denying preliminary approval where the court found "a fundamental conflict of interest between the vesting subgroup and the rest of the class that must be addressed by subclass certification"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 06-4333 PJH, 2013 WL 12333442, at *13 (N.D. Cal. Jan. 8, 2013) ("Subclasses within a settlement class become necessary when there are conflicts between class members arising from the distribution of the benefits and/or burdens of the settlement."); *Nacif v. Athira Pharma, Inc*., No. C21-0861 TSZ, 2024 WL 643513, at *1 (W.D. Wash. Feb. 15, 2024) (after denying preliminary approval to settlement with intra-class conflicts, approving subsequent attempt with additional classes and named plaintiffs).

The Melvin Plaintiffs identified in their complaint, and argued in seeking lead, that the litigation and resolution of this case had to account for the fact that certain ethnic groups—Chinese and Jewish Class Members, so far—had been targeted on the Dark Web. (*See* Compl. at § 3, dkt. 36 at 7.) The Class plainly expressed a desire that these groups be provided with some relief, and preventing harassment based on this data was the single most important issue to Class Members. (Dkt. 36-2 at 7 (survey results reflecting that highest average importance rating assigned to "[r]epresentation by a firm that focuses on measures preventing others from using data to harass, intimidate, harm, or discriminate against them").) Numerous Class Members who fell into these groups contacted the Melvin Plaintiffs' counsel with serious concerns. This unprecedented harm was core to the case.

Each firm appointed Class Counsel agreed, following suit in their lead papers by discussing the unique harms posed to these groups, and the Consolidated Class Action

Complaint includes a proposed class for "Nationwide Ethnically Targeted Persons" with unique claims. (Dkt. 78 at ¶ 511.) But these commitments were all hollow: the Settlement provides no particular relief for these individuals. One would expect that the omission of these Class Members would merit some discussion. But the only mention is a footnote, stating that the "Nationwide Ethnically Targeted Persons Class" is subsumed within the Settlement Class definition—meaning that there is an 80% chance that person's relief is limited only to credit monitoring. (*See* dkt. 103-1 at 8 n.7.) To be sure, Class Counsel may be able to justify abandoning a central issue and uniquely harmed people in this case, but they would have to actually try.[5] Hand-waving these Class Members away is not tenable.

**C. The proposed notice and claims procedures are flawed.**

For the Class Members that are entitled to some form of cash relief, the Settlement is structured to ensure that as few of them claim it as possible. First off, there is no need for a claims process at all. 23andMe has records identifying every Class Member and should be able to produce a list of (1) individuals residing in Alaska, Illinois, Oregon or California, and (2) individuals who had their health information compromised. (If it doesn't, it should have explained how that is possible.) *See In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2018 WL 10539266, at *2 (N.D. Cal. June 14, 2018) (Chen, J.) (issuing show cause order as to why preliminary approval should not be denied, noting that "a claims-made distribution does not appear necessary . . . for the most part" when defendant knew and could verify class membership). If there must be a claims process, however, individuals who have valuable claims should at least be *notified* that they have those claims. Given the complete absence of interest in credit monitoring discussed above, a generic notice to individuals of the relief provided by the Settlement will not move the needle, producing the single-digit claims rates we have seen in settlements of this type. *See In re Anthem*, 327 F.R.D. at 321; *In re*

[5] The Court asked questions about this, too. The Melvin Plaintiffs expect the answer will be that the credit monitoring is valuable relief (it's not, as discussed above). To the extent that Class Counsel attempt to minimize what the Melvin Plaintiffs found on the Dark Web, however, that should be well-supported by *actual evidence*, in the form of declarations or other discovery, about what was posted on the Dark Web and what 23andMe knows about that.

*Yahoo!*, 2020 WL 4212811, at *20. Because that drives up the "take-home" amount of each claiming Class Member, poor notice like this is endemic in settlements where counsel want a better number on paper. But Class Members, in the survey, expressed that they care that the firm representing them is able to get a higher *percentage* of those class members paid. (Dkt. 36-2 at 7 (ranking this 6.10 out of 7 in importance).) The Court should require that unique notice be issued: both for the benefit of those Class Members and for a transparent result.

**III. The presentation of the settlement is unacceptable, further calling into question Class Counsel's adequacy.**

Co-Class Counsel's presentation of the settlement misses many factors that the Court needs evaluate the settlement. The most jarring is that Counsel makes no meaningful effort to value what the Plaintiffs could obtain at trial—the entire analysis, "Section 10" of the brief, takes up half a page. (*See* dkt. 103-1 at 14 ("Plaintiffs assert that there is a relatively wide range of possible recoveries if their contract-based claims were successful at trial, ranging from a significant fraction of the settlement amount at the low end to several times the settlement amount at the high end.").) As discussed above, there are intra-class conflicts in what those recoveries at trial could be. And "damages calculations offered to demonstrate the fairness of a proposed settlement must be substantiated with detailed, reasoned analysis that explains how the defendant's maximum potential exposure has been calculated." *Grady*, 671 F. Supp. 3d at 1075. "This Court has more than once denied motions for approval where the plaintiffs 'provide[d] no information about the maximum amount that the putative class members could have recovered if they ultimately prevailed on the merits of their claims.'" *Livingston v. MiTAC Digital Corp.*, No. 18-CV-05993-JST, 2019 WL 8504695, at *4 (N.D. Cal. Dec. 4, 2019) (quoting *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 969 (N.D. Cal. 2019)).

Nor do Counsel address many requirements in this District's "Procedural Guidance for Class Action Settlements." Had they done so, it would have answered many of the questions that the Melvin Plaintiffs and the Court are asking after the fact. For instance, Counsel were obliged to state "[a]ny differences between the settlement class and the class proposed in the

operative complaint (or, if a class has been certified, the certified class) and an explanation as to why the differences are appropriate."[6] The explanation for why the Nationwide Ethnically Targeted Persons Class has been abandoned should have been included from the start. Similarly, the Melvin Plaintiffs' questions about the Release should have been answered when addressing "[a]ny differences between the claims to be released and the claims in the operative complaint . . . and an explanation as to why the differences are appropriate." *Id.* The failure to follow this guidance is evidence throughout the brief. *See also id.* ("The class recovery under the settlement (including details about and the value of injunctive relief), the potential class recovery if plaintiffs had fully prevailed on each of their claims, claim by claim, and a justification of the discount applied to the claims."). To the extent that Class Counsel come up with answers to the fact-based questions from the Court and from the Melvin Plaintiffs now, they should specify when they learned the key information: before or after they decided to settle the case.

Finally, as most experienced counsel know, Rule 23 was amended in 2018 to set out factors for settlement approval. Fed. R. Civ. P. 23(e). Before that, approval was done based on Circuit law and, in this Circuit, citations to the leading case *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Class Counsel never expressly address the factors set out in Rule 23(e) and just cite to *Hanlon*. (*See generally* dkt. 103-1.) No doubt, Class Counsel will argue that they presented everything the Court needs to approve under 23(e), but it is part of counsel's job to give the Court the right framework.

This last component might not merit comment in the normal course, but again, Class Counsel claims to have expended *thousands* of attorney hours and $3.56 million so far in attorney time on this case. A presentation that is responsive to the Federal Rules and District guidance is not too much to ask.

## IV. The preliminary injunction demonstrates 23andMe's complete capture over the Settlement process.

---

6 *Procedural Guidance for Class Action Settlements*, https://www.cand.uscourts.gov/ClassActionSettlementGuidance.

There are approximately 5,000 Class Members who have decided to arbitrate their claims against 23andMe, as reported by their counsel. (*See* dkt. 114.) 23andMe and Class Counsel agreed to seek an injunction against those arbitrations and a difficult, multi-layered opt-out process without so much as consulting with those counsel first. (*Id.*) The arbitration claimants have set forth the reasons that this is improper on the merits in their filing, (*id.*), with which the Melvin Plaintiffs largely agree: the opt-out provisions should be no more onerous in this case than any other the Court would approve and shouldn't have been crafted to target these claimants.

But for purposes of this brief, this provision demonstrates one of the primary concerns that have animated the Melvin Plaintiffs from the beginning. 23andMe made absolutely clear that it stood ready to settle this case, on terms favorable to it, with any counsel willing to sign off on the deal. (*See* dkt. 30 at 2–3 (Melvin Plaintiffs' argument on this point).) While it is theoretically possible that Class Counsel mounted a meaningful opposition in those negotiations, there is nothing to suggest that occurred: there has been, all admit, no litigation progress; this is a low-end data breach settlement with no clarity on how much 23andMe actually paid above insurance; and that does everything in the Parties' power to shut down 23andMe's biggest outside opposition (the arbitrations). 23andMe's strategy has been to capture the entire process to the greatest extent possible, and largely appears to have succeeded in doing so.

Finally, 23andMe's motion to seal their response to their motion should be denied. 23andMe's finances are, according to both 23andMe and Class Counsel, *the* primary factor driving settlement. 23andMe nevertheless wishes to hide the detail on that as much as possible, including the cost of these arbitrations. Other Class Members have a right to know that information in deciding whether to object to the Settlement.

## V. Conclusion.

The Settlement should be rejected as inadequate for the foregoing reasons.

Similarly, when it comes to the appointment of Interim Co-Lead Class Counsel,

"interim" means "interim." *See, e.g.*, *In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Pracs. Litig*., 282 F.R.D. 486, 491 (C.D. Cal. 2012) (vacating interim appointment upon consolidation, appointing new interim counsel); Fed. R. Civ. P. 23(g)(1)(E) (providing that the Court "may make further orders in connection with the appointment"). Class Counsel knew that this would be a highly scrutinized settlement in an extraordinary case. We have now seen the work: this is not a settlement that needs to be buffed and shined but thrown out. No doubt counsel will argue that the Settlement can be fixed—with better notice, narrowing the release, dealing with the conflicts—and that the lodestar is irrelevant because the Court maintains discretion on fees. But Interim Co-Lead Class Counsel presenting the settlement to the Court in this shape, and claiming this amount in fees, irrevocably affects how the Court should view this appointment.

Last, if the Court does issue Notice, it should be amended in a number of ways (most of which were identified by the Court in its own questions). First, Class Members with monetary claims must be separately and uniquely notified that they have a monetary claim. Second, all Class Members' whose data appeared on the Dark Web should be notified of that fact. Finally, the Class should be informed that there were counsel willing to take a 20% fee. (Dkt. 36 at 11.) The Class should have the facts in determining whether to object to this deal.

Respectfully Submitted,

**DAVID MELVIN and J.L.**, individually and on behalf of all others similarly situated,

Dated: October 2, 2024

By: */s/ J. Eli Wade-Scott*
*One of Plaintiffs' Attorneys*

Jay Edelson (admitted pro hac vice)
jedelson@edelson.com
Ari Scharg (admitted pro hac vice)
ascharg@edelson.com
J. Eli Wade-Scott (admitted pro hac vice)
ewadescott@edelson.com
Michael Ovca (admitted pro hac vice)

movca@edelson.com
Emily Penkowski Perez (admitted pro hac vice)
epenkowski@edelson.com
Hannah P. Hilligoss (admitted pro hac vice)
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Putative Class*