Adam M. Apton (State Bar No. 316506)
**LEVI & KORSINSKY, LLP**
1160 Battery Street East, Suite 100 - #3425
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 415-484-1294
Email: aapton@zlk.com

*[Additional Counsel in Signature Block]*

*Counsel for Proposed Intervenors Laura Block, Joel Davne, Aaron Hodges, and Joseph Jarrell*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: 23ANDME, INC., CUSTOMER DATA SECURITY BREACH LITIGATION | Case No.: 3:24-md-3098<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE AND IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTIONSETTLEMENT**<br><br>Judge: Hon. Edward M. Chen<br>Date: November 14, 2024<br>Time: 1:30 p.m.<br>Courtroom: 5, 17th Floor |

1

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2

**PLEASE TAKE NOTICE** that on Thursday, November 14, 2024 at 1:30 p.m.., or as

3 soon thereafter as the matter may be heard, in the courtroom of the Honorable Judge Edward M.

4 Chen, located at 450 Golden Gate Avenue, 17th Floor, Courtroom 5, San Francisco, California

5 94102, proposed intervenors Laura Block, Joel Davne, Aaron Hodges, and Joseph Jarrell, on

6 behalf of themselves and all other arbitration claimants represented by Levi & Korsinsky, LLP

7 currently engaged with 23andMe (the "Intervening Claimants") will and hereby do move this

8 Court, pursuant to Federal Rule of Civil Procedure 24, to intervene in this action. Laura Block

9 and Joel Davne represent two of the JAMS claimants who initiated proceeding with arbitration

10 provider JAMS on December 29, 2023.  Aaron Hodges and Joseph Jarrell represent two of the

11 NAM claimants who initiated proceeding with arbitration provider NAM on January 12, 2024.

12 Intervening Claimants also will and hereby do ask this Court to modify the proposed class

13 definition to exclude all arbitration claimants or, alternatively, allow the Intervening Claimants

14 to opt-out through their counsel in the class settlement proposed by interim class counsel and

15 Defendant 23andMe, Inc.

16

23andMe required the Intervening Claimant to execute its Terms of Service before

17 creating a 23AndMe online account. These Terms of Service require its customers to individually

18 arbitrate the claims brought by Intervening Claimants. Each Intervening Claimant, alongside

19 thousands of 23andMe's customers, filed demands for individual arbitration against 23andMe.

20 But now, rather than proceed with its customers' individual arbitrations as its Terms of Service

21 require, 23andMe has entered into a proposed settlement agreement — who themselves were

22 required to arbitrate — which would enjoin Intervening Claimants' arbitrations. Unless

23 Intervening Claimants navigate a burdensome opt-out process without the assistance of their hired

24 counsel, their right to continue pursuing individual claims would be extinguished. Accordingly,

25 because the parties' Motion for preliminary settlement would immediately impair substantive

26 rights and because the proposed settlement opt-out process is unduly burdensome and was never

27

28

contracted to between the parties for Claimants to assert their individual claims in arbitration, the Intervening Claimants request that this Court issue an order:

1. Allowing them to intervene in this action under Federal Rule of Civil Procedure 24(a);

2. Modifying the proposed class definition to exclude all arbitration claimants or alternatively allowing the Intervening Claimants to opt-out through their retained counsel;

3. Allowing briefing on the issues of whether (i) this court has jurisdiction given the application of the FAA to 23andMe enforceable arbitration provision; and (ii) whether 23andMe should be compelled to immediately proceed to arbitration; and

4. Granting such other relief as the Court deems just and proper.

This Motion is based on this notice of Motion, the attached memorandum of points and authorities, the declaration of Eduard Korsinsky, all records on file with this Court, and such further oral and written arguments as may be presented at, or prior to, the hearing on this matter.

Dated: October 2, 2024

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ *Adam M. Apton*
Adam M. Apton (State Bar No. 316506)
1160 Battery Street East, Suite 100 - #3425
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 415-484-1294
Email: aapton@zlk.com

Nicholas I. Porritt*
**LEVI & KORSINSKY, LLP**
1101 Vermont Ave., NW
Suite 700
Washington, DC 20005
Telephone: 202-524-4290
Facsimile: 202-333-2121
Email: nporritt@zlk.com

Eduard Korsinsky*
Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall St., 17th Floor
New York, NY 10004
Telephone: (212) 363-7500

Facsimile: (212) 363-7171
Email   ek@zlk.com
          mreich@zlk.com

*Counsel for Proposed Intervenors Laura Block, Joel Davne, Aaron Hodges, and Joseph Jarrell*

*\*pro hac vice* forthcoming

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

   I.     The 23andMe Data Breach .................................................................... 2

   II.    23andMe Compels Arbitration to Prevent Consumer Class Actions ......................... 3

ARGUMENT ..................................................................................................................6

   I.     Intervening Claimants Have Standing to Intervene ...................................... 6

   II.    Intervening Claimants Intervene to Protect Their Contractual and Statutory Rights.. 8

      A.   The Proposed Settlement Violates Intervening Claimants' Rights Under the Terms of Service .................................................................................................... 9

      B.   Enjoining or Staying Ongoing Arbitration Proceedings Violates the FAA ............. 12

      C.   23andMe Deceived Intervening Claimants and Their Counsel By Concealing Its Financial Constraints That It Now Claims Prevents 23andMe from Participating in Arbitration. ........................................................................................ 14

      D.   Class Representatives Do Not Have Priority Over Intervening Claimants ............... 16

   III.   The Proposed Settlement's Opt-Out Process is Not Fair, Reasonable, nor Adequate to the Intervening Claimants ....................................................... 17

      A.   Intervening Claimants Have Already Opted Out of The Settlement Class and Should Not Be Forced to Re-Opt-Out .................................................... 17

      B.   The Proposed Settlement's Opt-Out Process is Unduly Burdensome for the Intervening Claimants ............................................................... 20

CONCLUSION ..................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Abernathy v. DoorDash, Inc.,* 438 F. Supp. 3d 1062 (N.D. Cal. 2020) .................................... 15, 22

*ALF Todd Creek Vill. N. LP v. Todd Creek Vill. Metro. Dist.,*
   No. 2013CV30665, 2014 Colo. Dist. LEXIS 2344 (Dist. Ct. Colo., Weld Cty. Jan. 6, 2014) . 13

*Arena v. Intuit*
   No. 19-CV-02546-CRB, 2021 WL 834253 (N.D. Cal. Mar. 5, 2021). ............................. passim

*Bushley v. Credit Suisse First Boston*, 360 F.3d 1149 (9th Cir. 2004) ........................................ 13

*Camping Constr. Co. v. Dist. Council of Iron Workers,*
   915 F.2d 1333 (9th Cir. 1990) ........................................................................................ 14

*Cicero v. DirecTV, Inc.,*
   2010 U.S. Dist. LEXIS 147921 (C.D. Cal. Mar. 2, 2010) ............................................... 7

*E. Bay Sanctuary Covenant v. Biden*,
   102 F.4th 996 (9th Cir. 2024) ........................................................................................ 7

*Garcia v. Stemilt AG Servs. LLC*,
   No. 2:20-cv-00254-SMJ, 2022 U.S. Dist. LEXIS 35460 (E.D. Wash. Jan. 11, 2022) .............. 7

*Gomes v. Eventbrite, Inc.,*
   No. 5:19-CV-02019-EJD, 2020 WL 6381343, (N.D. Cal. Oct. 30, 2020) ............................ 7, 8

*Hadley v. Kellogg Sales Co.,*
   No. 16-CV-04955-LHK, 2020 WL 836673, (N.D. Cal. Feb, 20, 2020); .................................. 20

*In re Cintas Corp. Overtime Pay Arb. Litig.*,
   No. 06-cv-1781, 2009 WL 1766595 (N.D. Cal. June 22, 2009) ................................................ 13

*In re Cmty. Bank of N. Va.*,
   418 F.3d 277 (3d Cir. 2005) ........................................................................................... 8

*In Re MyFord Touch Consumer Litig.*,
   No. 13-cv-03072-EMC, 2018 WL 10539267 (N.D. Cal. June 7, 2018) .................................. 22

*In re Piper Funds, Inc., Inst. Gov't Income Portfolio Litig.,*
   71 F.3d 298, (8th Cir. 1995) ....................................................................................... 12, 13

*In re T-Mobile Customer Data Sec. Breach Litig.,*
   No. 4:21-MD-03019-BCW, 2023 WL 11878508 (W.D. Mo. June 29, 2023), <u>rev'd</u> 111 F.4th
   849 (8th Cir. 2024) ................................................................................................. 18, 19

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ........................................................................................................ 13

*Newman v. AmeriCredit Fin. Servs., Inc.,*
   No. 11cv3041 DMS (BLM), 2014 WL 12789177, (S.D. Cal. Feb, 3, 2014). ............................ 21

*O'Connor v. Uber Techs., Inc.,*
  201 F. Supp. 3d 1110 (N.D. Cal. 2016) .......................................................................... 22

*Pearson v. NBTY, Inc.,*
  772 F.3d 778 (7th Cir. 2014) ......................................................................................... 22

*Peruta v. Cnty. of San Diego,*
  824 F.3d 919 (9th Cir. 2016) ........................................................................................... 7

*Prete v. Bradbury,*
  438 F.3d 949 (9th Cir. 2006). .......................................................................................... 7

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
  388 U.S. 395, 87 S. Ct. (1967) ...................................................................................... 11

*Rimler v. Postmates, Inc.,*
  No. CGC-18-567868 (S.F. Super. Ct. Nov. 26, 2019), .................................................. 23

*Smothers v. NorthStar Alarm Servs., LLC,*
  No. 2:17-cv-00548-KJM-KJN, 2019 WL 3080822, (C.D. Cal. July 15, 2019; ....................... 21

*Spangler v. Pasadena City Bd. of Educ.,*
  552 F.2d 1326 (9th Cir. 1977) .......................................................................................... 8

*Trauth v. Spearmint Rhino Companies Worldwide, Inc.,*
  No. EDCV 09-1316-VAP-DTBX, 2010 WL 11468628, (C.D. Cal. July 26, 2010) ................ 23

*True v. Am. Honda Motor Co.,*
  No. EDCV07-287-VAPOPX, 2009 WL 838284 (C.D. Cal. Mar. 25, 2009) .......................... 21

*United States v. Oregon,*
  839 F.2d 635 (9th Cir. 1988) ........................................................................................... 7

*Zepeda v. U.S.I.N.S.,*
  753 F.2d 719 (9th Cir. 1983) ........................................................................................... 7

**Statutes**

9 U.S.C. § 2 .................................................................................................................... 11

**Rules**

F.R.C.P. 24(a)(2) ......................................................................................................... 6, 7

1

## <u>INTRODUCTION</u>

2       23andMe has been steadfast in its desire to arbitrate claims with its customers.  Using a

3  clickwrap agreement, as of the announcement of the Data Breach on October 10, 2023, 23andMe's

4  Terms contained an arbitration provision directing disputes to JAMS.  On November 30, 2023,

5  *after* 23andMe began facing potential liability arising from the Data Breach, 23andMe changed its

6  Terms.  Rather than remove its arbitration provision, 23andMe kept its preference for

7  arbitration.  23andMe switched providers from JAMS to NAM.  More recently, as late as

8  September 24, 2024, 23andMe updated its Terms again, still mandating arbitration.

9       In breach of its Terms of Service which boldly state "YOU AND WE AGREE THAT

10  EACH PARTY MAY BRING DISPUTES AGAINST THE OTHER PARTY ONLY IN AN

11  INDIVIDUAL CAPACITY, AND NOT AS A CLASS ACTION"[1] 23andMe asks this Court to

12  approve the proposed class settlement and essentially freeze out claimants seeking arbitration from

13  a limited pot of money.  23andMehas stated that it is in a dire financial condition and there will be

14  no funds available to pay even the filing fees – let alone the judgements – from the ongoing

15  arbitration proceedings.[2]  23andMe has failed to provide  any information to substantiate its true

16  financial condition and has not disclosed whether insurance coverage or other third-party liability

17  may be at issue.  Worse, 23andMe engaged the Intervening Claimants in the pre-dispute resolution

18  process it imposed on them, concealing that it (i) did not truly intend to willingly participate in its

19  own arbitration process, and (ii) was negotiating settlement with class litigants to freeze out those

20  who adhered to 23andMe's Terms of Service and proceeded to arbitration.  Now, despite 23andMe

21  repeatedly reinforcing arbitration for customer disputes and engaging with individuals in the pre-

22  arbitration process for months, it seeks to *prevent* Intervening Claimants and others from pursuing

23  arbitration by entering into a class settlement which, on its face, is designed to infringe on the

24  Intervenor Claimants' contractual right – *contractual obligation* – to arbitrate.

25

26

---

27  [1] *Terms of Service*, 23ANDME, https://www.23andme.com/legal/terms-of-service/ (last visited
October 2, 2024).

28  [2] *See* 23andMe's Memorandum in Support of Preliminary Approval, ECF No. 105 ("23andMe
Memo") at 2, 9, 11.

The opt-out process proposed in the Motion for Preliminary Approval only serves to reinforce the questions surrounding this class settlement.[3]  The opt-out requirements, including wet signature and multi-step authentication processes, particularly when considered in the context of the thousands of ongoing proceedings outside of the class litigation, are unduly burdensome.  The Intervening Claimants noticed their claims to 23andMe and, in doing so, provided more substance and information than the data points required in the opt-out proposal.  The-Intervening Claimants should not be required to opt-out, *again*.

# BACKGROUND

## I.   The 23andMe Data Breach

On or around October 1, 2023, 23andMe was subject to a credential stuffing attack that allowed unauthorized third-party hackers to access user account and data (referred to as the "Data Breach").[4] The Data Breach compromised highly sensitive PII of 23andMe customers - including, their names, birth year, relationship labels, percentage of DNA shared with relatives, locations, ancestry information, family tree information, and some health information based on user genetics.[5]

23andMe acknowledged that the personal data from nearly 6.9 million users had been impacted.[6] 23andMe has since stated that the threat actor used their attack to access roughly 14,000 user profiles, revealing information from approximately 5.5 million DNA Relatives' profiles and Family feature profiles for approximately 1.4 million individuals, each of which were connected

---

[3] *See* generally Order re Supplemental Briefing and/or Evidence. ECF No. 111.
[4] *Form 8-K/A (Amendment No. 1)*, UNITED STATED SECURITIES AND EXCHANGE COMMISSION (Oct. 10, 2023) https://www.sec.gov/ix?doc=/Archives/edgar/data/1804591/000119312523287449/d242666d8ka.htm (last visited September 30, 2024); Zeba Siddiqui, *23andMe notifies customers of data breach into its 'DNA Relatives' feature*, REUTERS (Oct. 25, 2023) https://www.reuters.com/world/us/23andme-notifies-customers-data-breach-into-its-dna-relatives-feature-2023-10-24/ (last visited October 1, 2024).
[5] *Id.* (Reuters)
[6] Lily Hay Newman & Andy Greenberg, *Security News This Week: 23andMe Blames Users for Recent Data Breach as It's Hit With Lawsuits*, WIRED (Jan. 6, 2024) https://www.wired.com/story/23andme-blames-users-data-breach-security-roundup/ (last visited October 1, 2024).

to the compromised accounts.[7] The hackers subsequently advertised millions of pieces of stolen data from 23andMe on an online forum, publishing as proof the alleged data of one million users of "Jewish Ashkenazi descent and 100,000 Chinese users, asking would-be buyers for $1 to $10 for the data per individual account."[8]

23andMe has since reported that it did "not have any indication that there was a data security incident within our systems, or that 23andMe was the source of the account credentials used in these attacks."[9] 23andMe has, in effect, blamed the Data Breach on users not being cautious enough in changing their passwords, asserting that "the incident was not a result of 23andMe's alleged failure to maintain reasonable security measures."[10]

## II.    23andMe Compels Arbitration to Prevent Consumer Class Actions

When the Data Breach occurred, 23andMe had a mandatory arbitration agreement in its Terms of Service. At the time, the arbitration agreement compelled customers to arbitrate their claims through JAMS as an arbitration provider.[11] On November 30, 2023, within weeks of announcing the Data Breach, and after it knew it would be subjected to liability in connection with the Data Breach, 23andMe modified its arbitration provision to change arbitration providers from JAMS to NAM.[12]

---

[7]    *Addressing Data Security Concerns*, 23ANDME BLOG (Oct. 6, 2023) https://blog.23andme.com/articles/addressing-data-security-concerns?utm_medium=search_brand&utm_source=google&gad_source=1&gclid=CjwKCAiA-vOsBhAAEiwAIWR0TfcP34SR3mQC_yRCoC4yJfgb6SitdSNkWm7cNGHBFFeSXrVeezSfdBoCW_YQAvD_BwE&gclsrc=aw.ds (last visited October 1, 2024).
[8]    Lorenzo Franceschi-Bicchierai, *23andMe confirms hackers stole ancestry data on 6.9 million users*, TECHCRUNCH (Dec. 4, 2023) https://techcrunch.com/2023/12/04/23andme-confirms-hackers-stole-ancestry-data-on-6-9-million-users/ (last visited October 1, 2024).
[9]    *Id.*
[10]   *Id.*
[11]   See *JAMS Comprehensive Arbitration Rules, & Procedures*, JAMS (June 1, 2021) https://www.jamsadr.com/rules-comprehensive-arbitration/ (last visited September 30, 2024)
[12]   See *Mass Filing Supplemental Dispute Resolution Rules and Procedures*, NATIONAL ARBITRATION, AND MEDIATION (December 21, 2021) https://www.namadr.com/resources/rules-fees-forms/ (last visited September 30, 2024).

Following the announcement and notices disclosing the Data Breach, 23andMe was formally questioned by state attorney generals.[13] At this point, 23andMe knew it was likely to face liability, including being served with demands for arbitration. Beginning on December 29, 2023, 1,481 consumers (the "JAMS Claimants") initiated the pre-arbitration process with 23andMe in response to the Data Breach, required under 23andMe's then current Terms of Service (effective as of October 3, 2023, "JAMS Terms"). *See* Affidavit of Eduard Korsinsky, attached hereto ("Korsinsky Aff."), ¶¶ 4, 9. Each of the Intervening Claimants individually retained Levi & Korsinsky, LLP ("Levi & Korsinsky"). On November 30, 2023, 23andMe made changes to its Terms of Service (the "NAM Terms"). Korsinsky Aff., ¶ 7.  After this change from the JAMS Terms to the NAM Terms, 23andMe notified its customers, by email, of the changes and of their opportunity to opt-out of the NAM Terms, providing:

> On November 30, 2023, we launched updates to our Terms of Service. Important updates were made to the Dispute Resolution and Arbitration section to include procedures that will encourage a prompt resolution of any disputes and to streamline arbitration proceedings where multiple similar claims are filed. These updates will go into effect for customers 30 days from the date this email is received. We encourage you to read the new terms in full. Please notify us within 30 days of receiving this email if you do not agree to the terms, in which *case you will remain subject to the current Terms of Service*. If you do not notify us within 30 days, you will be deemed to have agreed to the new terms. If you have any questions, please contact us at customercare@23andme.com.

*See* Korsinsky Aff. ¶¶ 8-9.  (emphasis added). Pursuant to this notification, the JAMS Claimants opted out of changes to 23andMe's NAM Terms. *See* Korsinsky Aff. ¶ 9.

This reinforced 23andMe's requirement on its customers that they must arbitrate disputes. It also forced customers, at least those who were aware of the change, to opt-out of the changes. 23andMe, in its presentment of the facts to the Court in its Motion, did not mention that it changed its Terms of Service, that it restated its preference for arbitration, and that it received opt-outs to

---

[13] *See Attorney General Tong Issues Inquiry Letter to 23andMe Following Data Breach Targeting Users with Jewish and Chinese Heritage*, OFFICE OF THE ATTORNEY GENERAL CONNECTICUT (Oct. 31, 2023) https://portal.ct.gov/ag/press-releases/2023-press-releases/attorney-general-tong-issues-inquiry-letter-to-23andme-following-data-breach (last visited October 1, 2024); *See also Attorney General Mayes Demands Answers from 23andMe on Data Breach*, OFFICE OF ARIZONA ATTORNEY GENERAL, KRIS MAYES (Jan. 11, 2024) https://www.azag.gov/press-release/attorney-general-mayes-demands-answers-23andme-data-breach (last visited October 1, 2024).

those changes.  The Motion also failed to mention the 1,481 Intervening Claimants who opted out in December 2023 and initiated proceedings under the JAMS Terms. The JAMS Terms provided the following with respect to dispute resolution:

> Initial Dispute Resolution. We are available by email at customercare@23andme.com to address any concerns you may have regarding your use of the Service. Most concerns may be quickly resolved in this manner. You agree to use best efforts to settle any dispute, claim, question, or disagreement directly through consultation and good faith negotiations which shall be a precondition to either party initiating a lawsuit or arbitration.

The JAMS Terms further provided that after issuing notice, the parties should engage in informal dispute resolution prior to initiating arbitration.  *See* Korsinsky Aff. ¶ 3, n. 2.

On January 11, 2024, 1,481 JAMS Claimants provided a notice of dispute ("Notice of Dispute") to 23andMe (via email at customercare@23andme.com) under the JAMS Terms. *See* Korsinsky Aff. ¶ 11.. The JAMS Claimants' notices set forth the JAMS Claimants' claims related to the Data Breach, provided a detailed factual background of the Data Breach, set forth the relief sought by each JAMS Claimant, and asserted JAMS Claimant's willingness to engage with 23andMe in working to resolve each of the JAM Claimant's claims. *Id.*  . Also in January 2024, 414 Intervening Claimants provided notice to 23andMe under the NAM Terms ("NAM Claimants") under the NAM Terms. *id.*. There was no mention of this in 23andMe's Motion.

On February 10, 2024, 23andMe responded to Levi & Korsinsky' s Notice of Dispute. Included in its response, 23andMe maintained that no data breach had occurred, but blamed the unauthorized actors instead accessing accounts through recycled login credentials for certain customers. *See* Korsinsky Aff. ¶ 12.. 23andMe further stated that the information accessed by the unauthorized third-party could not be used for any harm, and that any violations had been remediated by "end[ing] all active logged-in user sessions and requiring that all of its customers use 2-step verification as an added layer of protection on their accounts" – a security measure that ought to have been mandatory but was made optional, exposing  consumers to significant risk. *Id.*

Overall, beginning January 2024, more than 10,000 individuals provided notice under 23andMe's NAM Terms. *See* Korsinsky Aff. ¶¶ 15, 19. These Intervening Claimants, and those

MOTION TO INTERVENE AND IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No.: 3:24-md-3098

who provided notice before them, sought to engage 23andMe in the pre-arbitration process outlined in the NAM Terms. *Id.*. 23andMe ignored Claimant's request to provide availability for individual conferences, despite 23andMe requiring them under its own Terms of Service. *See* Korsinsky Aff. ¶¶ 17 and 21.

23andMe's communications with the Intervening Claimants provided no indication that 23andMe had no intention of arbitrating their claims, would not pay the arbitration fees in accordance with its own Terms of Service, or that 23andMe had financial hardship which would prevent it from paying its share of arbitration fees. *Id.* These issues were not conveyed – certainly not in the fashion it was in the Motion – to Intervening Claimants during any of the communications, written or otherwise, between 23andMe and Intervening Claimants. *Id.*

23andMe did not challenge the adequacy of JAMS Claimants opt-outs and did not indicate that it did not intend to proceed in arbitration – nor did it mention financial constraints that would preclude it from doing so. Rather than forcing its customers, including Intervening Claimants, from one arbitration provider to another, 23andMe could have removed the arbitration requirement entirely. Instead, 23andMe engaged with Levi & Korsinsky and its Intervening Claimants without expressing that it would be unable and/or unwilling to pay the arbitration filing for arbitration proceedings brought on behalf of its own customers, including Intervening Claimants. Even today, 23andMe maintains an arbitration clause in its Terms of Service, binding each of its customers to arbitrate their claims despite having no intention of participating in the proceedings. Korsinsky Aff. ¶ 25.

## ARGUMENT

### I.  Intervening Claimants Have Standing to Intervene

Intervening Claimants are 23andMe consumers. Each retained Levi & Korsinsky to pursue individual arbitrations against 23andMe. The Intervening Claimants oppose the proposed settlement, specifically the preliminary injunction enjoining the Intervening Claimants proceedings. The appropriateness of the Intervening Claimants intervening is apparent: the motion for preliminary approval seeks an injunction against Intervening Claimants. As a basic

principle of due process, any party should be heard before being subjected to an injunction. *See Zepeda v. U.S.I.N.S.,* 753 F.2d 719, 727–29 & n.1 (9th Cir. 1983) (explaining that the scope of an injunction is limited to the parties in the action).

The standard for intervention under Federal Rule of Civil Procedure 24(a)(2) is met, and a non-party has an absolute right to intervene  where: (1) the intervening parties have a "significant protectable interest" relating to the subject of the action; (2) actions taken by the court may "impair or impede" the ability to protect that interest; (3) the motion to intervene is timely; and (4) the parties to the action have interest unaligned with intervenors and might not fully or adequately represent the intervening parties' interests. *United States v. Oregon*, 839 F.2d 635, 637 (9th Cir. 1988); *Peruta v. Cnty. of San Diego,* 824 F.3d 919, 940 (9th Cir. 2016); *see also E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024) (listing the Fed. R. Civ. P. 24(a)(2) requirements); *Garcia v. Stemilt AG Servs. LLC*, No. 2:20-cv-00254-SMJ, 2022 U.S. Dist. LEXIS 35460 (E.D. Wash. Jan. 11, 2022). (same). Moreover, courts interpret the requirements for intervention broadly, favoring intervention where possible. *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006).

*First,* the motion for preliminary approval seeks an injunction which would interfere with Intervening Claimants' contractual right to arbitration.  The motion further outlines a settlement process that calls for the release of Intervening Claimants' right to arbitration. Intervening Claimants have a "significantly protectable" legal interest at issue in this litigation. *See Gomes v. Eventbrite, Inc.,* No. 5:19-CV-02019-EJD, 2020 WL 6381343, at *3 (N.D. Cal. Oct. 30, 2020.

*Second*, the relief sought in the motion for preliminary approval, if granted, would "impair or impede" the ability of the arbitration claimants to prosecute their own claims in the forum of their choosing.  The motion seeks to enjoin the arbitrations, release Intervening Claimants' claims, which are at issue in the arbitrations, and impose another, burdensome opt-out process on the Intervening Claimants who already opted out of these specific claims. *See Cicero v. DirecTV, Inc.,* No. EDCV 07-1182, 2010 U.S. Dist. LEXIS 147921, at *5 (C.D. Cal. Mar. 2, 2010) (citing *In re*

*Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005) (noting that the first two prongs of Fed. R. Civ. P. 24(a)(2) are satisfied by the very nature of Rule 23 litigation)).

*Third*, Intervening Claimants' motion to intervene is timely. The proposed settlement would threaten the Intervening Claimants rights. They, in turn, acted promptly and filed this motion to intervene within the deadline set by the Court, *i.e.,* October 2, 2024. *Finally,* Intervening Claimants' interests are not protected by or aligned with the existing parties. In fact, the interests are adverse in that the parties to this action seek an injunction specifically aimed to impede Intervening Claimants' from prosecuting their claim through arbitration with their own choice of counsel. *See Gomes*, 2020 WL 6381343, at *4.

Alternatively, to the extent the Court finds that intervention as a matter of right is not warranted, the Intervening Claimants seek permissive intervention under Federal Rule of Civil Procedure Rule 24(b). Permissive intervention is warranted when the applicant's claim shares a common legal or factual question with the main action and does not unduly delay or prejudice the rights of the original parties. *Id*. Permissive intervention is favored when the intervenor provides a unique perspective not fully represented by existing parties. *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977). Here, the Intervening Claimants not only share common questions of law and fact concerning the continued exposure of their genetic, genealogical, and personally identifiable information but also provide a unique perspective due to their affirmative choice to arbitrate claims.

**II.      Intervening Claimants Intervene to Protect Their Contractual and Statutory Rights**

The relief sought in the motion for preliminary approval violates both the contractual and statutory rights of the Intervening Claimants.

### A.  The Proposed Settlement Violates Intervening Claimants' Rights Under the Terms of Service

The Terms of Service are unequivocal that "all disputes……. shall be finally settled by binding arbitration".[14]. Despite 23andMe's decision to include an arbitration clause in its Terms of Service and then present it to customers using a clickwrap agreement, it now seeks to resolve disputes currently being arbitrated through a class-wide settlement of claims in connection with its October 2023 Data Breach.

23andMe's Arbitration Contract provides for a multi-tiered dispute settlement mechanism – initial dispute resolution mechanism, and arbitration. Yet, based on Defendant's Motion, it seems it had no intention of providing the Intervening Claimants with a meaningful opportunity to engage in the multi-tiered dispute resolution process. Rather, it sought the benefit of the arbitral process – in fact, only recently changing its Terms of Service, where it reiterated the requirement to arbitrate —yet now seeks to subsume those with legitimate arbitrate claims into the Proposed Settlement. Contrary to its Terms of Service, which elects arbitration to the exclusion of litigation through courts, 23andMe's conduct demonstrates an intent to pursue the benefits of litigation of arbitrable claims – inconsistent with its purported intent to arbitrate.

23andMe grappled with the Intervening Claimants over purported noncompliance with the Terms of Service associated with pre-dispute resolution process, since December 2023. Now, 23andMe claims the Intervening Claimants raced to file arbitrations?[15] Korsinsky Aff. ¶ 25. Rather than immediately filing arbitration with JAMS for the JAMS Claimants or NAM for the remaining Claimants, Levi & Korsinsky, on behalf of its clients, furnished the requisite notice.  Intervening Claimants further engaged with 23andMe to substantiate information underpinning the claims and providing information specifically requested by Defendant as part of the pre-dispute resolution

---

[14] *Terms of Service,* 23ANDME, https://www.23andme.com/legal/terms-of-service/ (last visited October 1, 2024).

[15] *See* 23andMe Memo at 2  ("[T]hese mass arbitrations were filed directly in response to learning that the MDL was on the verge of being, or had been, settled. These arbitrations are intended to and would undermine the Settlement Agreement by threatening 23andMe with filing fees that will nearly eclipse the Qualified Settlement Fund").

process. Korsinsky Aff. ¶¶ 17- 18.  Now, by all accounts, 23andMe's refusal to participate in pre-arbitration conferences – and its requests for clarity as though it was legitimately working to validate the Intervening Claimants account information – served to stall or delay Intervening Claimants from moving forward.

The Intervening Claimants did not file arbitrations in response to an MDL or to undermine an impending settlement, as Defendant claims;[16] rather, they were only formally filed with the provider after (i) providing the requisite Notice and (ii) engaging in pre-arbitration dispute resolution process, per 23andMe's own Terms of Service. The filing of these arbitrations required coordination and engagement with thousands of claimants.  Now, with the filing of the motion for preliminary approval and its corresponding request to subsume the Intervening Claimants into its envisioned class, it appears that the Intervening Claimants were misled by 23andMe's engagement and promise of pre-settlement dispute resolution. If 23andMe believes that either pre-arbitration negotiations or arbitration itself may overwhelm its capabilities, it could have removed the arbitration clause in its clickwrap contract – rather than changing from one arbitration provider to another, especially one that's reputed to be corporate-friendly. Instead, 23andMe continues to use the arbitration contracts, and pre-arbitration procedure to facilitate engagement and resolve disputes without confronting litigation.[17]  The relief now sought by Intervening Claimants is consistent with the Terms of Service that 23andMe continues to maintain.

Faced with the question as to whether arbitration claimants should be subject to an immediate injunction and must opt-out of the settlement to continue to pursue their arbitration claims, the court in *Arena v. Intuit* held that it would be economically irrational for arbitration claimants with legitimate claims to participate in the proposed settlement.[18] The *Intuit* court specifically stated "although courts sometimes 'simply sign the moving parties' proposed

---

[16] *Id.*

[17] *See Terms of Service, Dispute Resolution and Arbitration*, 23ANDME (Nov. 30, 2023) https://www.23andme.com/legal/terms-of-service/ (last visited: October 1, 2024).

[18] See, *Arena v. Intuit Inc.*, No. 19-CV-02546-CRB, 2021 WL 834253, at *5 (N.D. Cal. Mar. 5, 2021)

preliminary approval order without focusing on the fact that they are thereby enjoining parallel litigation," issuing such an injunction at the preliminary approval stage "would be an extraordinary measure best reserved for extraordinary circumstances." *Arena v. Intuit,* No. 19-CV-02546-CRB, 2021 WL 834253, at *11 (N.D. Cal. Mar. 5, 2021).  The *Intuit* Court further held that the primary effect of the settlement terms on the arbitration claimants was to stall their arbitration until they were forced to comply with the proposed opt-out procedures. *Id*.

The Intervening Claimants sought to engage in the required pre-dispute resolution process within the period required under 23andMe's Terms of Service.  23andMe used this time to lodge defenses and call into question to information provided to them by the individual Intervening Claimants.  While the Intervening Claimants pressed for conferences and offered an exchange of information to substantiate their details, including account information, 23andMe was engaged in settling Intervening Claimants' claims and drafting its Motion, leaving Intervening Claimants without a clear pathway to resolution.[19] 23andMe's lack of cooperation or, worse, ploy contravenes the spirit and actual terms of its own procedures.

23andMe's own Terms of Service, before allowing a formal arbitration hearing to be held, requires the parties to engage in a resolution process. The Intervening Claimants engaged in that process.  Korsinsky Aff. ¶¶ 3, 7.  Now, however, 23andMe suggests that the Intervening Claimants filed arbitrations in reaction to or in connection with the proposed class settlement.  To the extent 23andMe blames delays in the arbitration process as a means to subsume the Intervening Claimants into the proposed settlement, this would ignore that the Intervening Claimants followed 23andMe's own Terms of Service and that any purported delay was either to adhere to the process or provide 23andMe with the additional facts or data points associated with Intervening Claimants.  *See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404, 87 S. Ct. 1801, 1806 (1967)*

---

[19] See, e.g., <u>Roach v. BM Motoring, LLC</u>, 155 A.3d 985, 995 (N.J. 2017) ("defendants' knowing refusal to cooperate with plaintiffs' arbitration demands [by failing to pay the AAA fees or respond to the plaintiffs' arbitration demands], filed in reasonable compliance with the parties' agreement, amounts to a material breach"). *Id*.

1    (the unmistakably clear congressional purpose that the arbitration procedure, when selected by the

2    parties to a contract, be speedy and not subject to delay and obstruction in the courts.)

3        **B.  Enjoining or Staying Ongoing Arbitration Proceedings Violates the FAA**

4        Agreements to arbitrate are regarded as "valid, irrevocable, and enforceable." 9 U.S.C. §

5    2. 23andMe, in contravention with the FAA, in support of the Motion for Preliminary Approval of

6    the Settlement, asks this Court to enjoin the pending arbitrations, effectively rendering the

7    arbitration agreement with the Intervening Claimants unenforceable by enjoining the arbitrations

8    pending judicial proceedings. 23andMe Memo at 7-11. The Intervening Claimants have not

9    waived their right to arbitrate.  To the contrary, as detailed *supra Background,* § II, Intervening

10   Claimants adhered with the Terms of Service and pre-dispute arbitration requirements.  Enjoining

11   Intervening Claimants' arbitration would, thereby, violate the FAA.

12       The FAA's enforcement of arbitration agreements does not provide for a stay of

13   proceedings in deference to class matters, or to any form of delay to the enforcement of the

14   arbitration agreement. Courts have, in fact, rejected the enjoinment of arbitrations in deference to

15   the administration of a class-action settlement. *In re Piper Funds, Inc., Inst. Gov't Income Portfolio

16   Litig.,* 71 F.3d 298, 302-303 (8th Cir. 1995) (reversing injunction a pending arbitration, finding

17   that claimant's "contractual and statutory right to arbitrate may not be sacrificed on the altar of

18   efficient class action management").  The Eighth Circuit in *Piper* acknowledged that "[m]any

19   cases have enforced agreements to arbitrate by staying contemporaneous litigation," but pointed

20   out that "the FAA does not authorize a district court to enjoin arbitration."  *Id*. at 302.   It found

21   claimant had a contractual right to submit to arbitration and that "the district court's injunction

22   significantly frustrated [claimant's] contractual rights, as protected by the FAA" that "prior cases

23   make clear that [claimant's] contractual and statutory right to arbitrate may not be sacrificed on

24   the altar of efficient class action management," and rejected the "conclusory assertion that

25   immediate arbitration by [claimant] (and perhaps others) will frustrate their class action

26   settlement." *Id*. at 303.

27

28

1    Intervening Claimants right to arbitrate is not in question here. Neither is there any question

2    that 23andMe promised to arbitrate its disputes with customers outside of any class action

3    proceeding. In *Piper*, the Circuit Court recognized that once a right to arbitrate was established,

4    the District Court abused its discretion by not allowing the arbitration to proceed. *Id*. As in *Piper*,

5    granting the Motion here would "significantly frustrate" Intervening Claimants contractual right

6    to arbitrate – in direct violation of the FAA.  Intervening Claimants' contractual and statutory right

7    to arbitrate may not be infringed on the basis of "efficient class action management" and an

8    unwilling class member's right to arbitrate may not be "held hostage [] to the class action

9    settlement process." *Id*. at 304.

10    Moreover, Courts disfavor enjoining pending arbitration proceedings. "The [FAA]

11    represents Congress's intent 'to move the parties to an arbitrable dispute out of court and into

12    arbitration as quickly and easily as possible.' It is for these reasons that stays of arbitration are

13    disfavored." *In re Cintas Corp. Overtime Pay Arb. Litig*., No. 06-cv-1781, 2009 WL 1766595, at

14    *5 (N.D. Cal. June 22, 2009) (emphasis added) (citing *Bushley v. Credit Suisse First Boston*, 360

15    F.3d 1149, 1153 (9th Cir. 2004)).

16    "The [FAA creates] a body of federal substantive law of arbitrability . . . ." *See Moses H.*

17    *Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The Federal Rules of Civil

18    Procedure (including Rule 23) may not "abridge, enlarge, or modify any substantive right." 28

19    U.S.C. § 2072(b). Here, the Intervening Claimants' contractual and statutory rights are substantive

20    in nature. To the extent a conflict exists between Rule 23 and contractually protected rights under

21    the FAA, the FAA must prevail. Accordingly, this Court should reject 23andMe's request to stay

22    the arbitrations.  Given 23andMe promised to not engage in class action proceedings that underlies

23    this Proposed Settlement, Intervening Claimants should, at the very least, be afforded a stay of the

24    class proceedings pending their arbitrations, or outright dismissal.[20]  Indeed, 23andMe has failed

25

26    _____

27    [20] *See ALF Todd Creek Vill. N. LP v. Todd Creek Vill. Metro. Dist.,* No. 2013CV30665, 2014 Colo.
      Dist. LEXIS 2344, at **4-5 (Dist. Ct. Colo., Weld Cty. Jan. 6, 2014) (stayed action pending
28    resolution of clams that were subject to an arbitration agreement).

MOTION TO INTERVENE AND IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT
Case No.: 3:24-md-3098

1    to demonstrate this Court has jurisdiction under the FAA to administer this proposed class

2    settlement given 23andMe's contractual obligation to arbitrate.

3    **C. 23andMe Deceived Intervening Claimants and Their Counsel By Concealing Its**

4    **Financial Constraints That It Now Claims Prevents 23andMe from Participating**

5    **in Arbitration.**

6            In accordance with 23andMe's Terms of Service, consumers that signed up with 23andMe

7    were subject to 23andMe's arbitration agreement. Consumers were required to pursue any claims

8    against 23andMe in arbitration; not, specifically, as class action litigation. Intervening Claimants

9    adhered with the Terms of Service, and 23andMe engaged in an elongated process that required

10   many hours of communication and fact gathering by Intervening Claimants' Counsel, only to then

11   inform Intervening Claimants that 23andMe had no intention of paying the arbitration provider's

12   fees or that it would seek resolution of disputes with regard to pre-arbitration procedures through

13   litigation after itself failed to comply with pre-arbitration procedures.

14           The Motion does not address how procedural rights under Rule 23 could override the

15   substantive rights afforded by the FAA, and fails to recognize that the first 1,481 of the overall

16   approximately 11,000 Intervening Claimants began their formal engagement with 23andMe on

17   December 29, 2023. Instead, 23andMe in its support of the motion for preliminary approval,

18   appeals to a policy argument: that it would be unfair to let the arbitrations proceed because

19   23andMe would have to pay fees and expenses for the arbitrations which would threaten the Class

20   Settlement, as it would impede its ability to pay the Qualified Settlement Fund. 23andMe Memo

21   at 9. 23andMe proffers nothing to support the notion that it would suffer irreparable harm, as a

22   matter of law, just by paying fees. See *Camping Constr. Co. v. Dist. Council of Iron Workers*, 915

23   F.2d 1333, 1349 (9th Cir. 1990) ("The district court's principal error lies in its assumption that

24   unnecessarily undergoing arbitration proceedings constitutes irreparable injury. That is simply not

25   the case."). 23andMe knew of these fees when it drafted the arbitration clause in its Terms of

26   Service and forced its customers to agree to them; it is not irreparably injured by the need to comply

27   with its own contract. 23andMe chose the fee structure it now claims it cannot afford to pay.

28

23andMe has not provided the Intervening Claimants or this court with information demonstrating that it does not possess the ability or economic means to engage in timely pre-arbitration dispute resolution proceedings with the Intervening Claimants. 23andMe, despite communication with the Intervening Claimant's Counsel since December 2023, concealed its supposed financial constraints it now claims precludes it from engaging in arbitrations.

23andMe now claims these financial constraints limit its resources and that it only has the means to settle the class case.  In a similar setting, where arbitration claimants would have been subsumed by a class-wide settlement, the court in *Abernathy v. DoorDash, Inc.* addressed this tactic, stating:

> For decades, the employer-side bar and their employer clients have forced arbitration clauses upon workers, thus taking away their right to go to court, and forced class-action waivers upon them too, thus taking away their ability to join collectively to vindicate common rights. The employer-side bar has succeeded in the United States Supreme Court to sustain such provisions. The irony, in this case, is that the workers wish to enforce the very provisions forced on them by seeking, even if by the thousands, individual arbitrations, the remnant of procedural rights left to them. The employer here, DoorDash, faced with having to actually honor its side of the bargain, now blanches at the cost of the filing fees it agreed to pay in the arbitration clause. No doubt, DoorDash never expected that so many would actually seek arbitration. Instead, in irony upon irony, DoorDash now wishes to resort to a class-wide lawsuit, the very device it denied to the workers, to avoid its duty to arbitrate. This hypocrisy will not be blessed, at least by this order.

*Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067–68 (N.D. Cal. 2020). DoorDash could not choose to escape its own arbitration requirements.

23andMe has demonstrated inconsistent positions with respect to its claimed inability to afford the fees associated with arbitrating with Intervening Claimants.  On the one hand, it claims to have financial constraints which precludes from paying the fees that it set and imposed on its own Terms of Service.  On the other hand, after the Data Breach occurred and after 23andMe was aware of the liability it will face for its failure to adequately protect Intervening Claimants' genetic, genealogical, and personally identifiable data, 23andMe changed its Terms of Service, leaving the binding arbitration agreement unchanged.  Rather than change its Terms of Service to remove the

arbitration requirement and remove the fees it now claims it cannot pay, 23andMe changed its Terms of Service to switch from one arbitration provider to yet another arbitration provider.

Despite 23andMe's purported financial burden, the company continues to mandate arbitration, presented as a clickwrap, for new and prospective consumers. 23andMe maintains this arbitration clause in its Terms of Service, despite having no intention of ultimately arbitrating with its customers. In fact, 23andMe delayed or ignored the scheduling of even pre-arbitration conferences. Korsinsky Aff. ¶¶ 17 and 21. Through its retention of its Terms of Service, 23andMe forces the Intervening Claimants and their counsel to navigate a time-consuming process of communication and fact-gathering, only to be informed (after the fact) that pursuing arbitration would jeopardize 23andMe's ability to meet financial obligations. Through its retention of its arbitration clause in its Terms of Service, 23andMe forces the arbitration process while simultaneously claiming that the process is financially untenable when claimants exercise their rights.

If 23andMe did not intend to arbitrate these claims due to financial constraints, that should have been communicated before the Intervening Claimants expended time and resources noticing, adhering with pre-dispute processes, and drafting petitions. Instead, taking the facts and circumstances on face value, the arbitration clause was a deterrent to Intervening Claimants to litigate in court, while 23andMe had no intention of adhering to its own Terms of Service. The disconnect between 23andMe's legal obligations under its arbitration agreement and its actual practices creates an inequitable dynamic with its customers, whose rights to arbitrate become effectively meaningless due to the company's unwillingness or inability to participate in good faith.

**D. Class Representatives Do Not Have Priority Over Intervening Claimants**

23andMe found a willing partner in the class representatives and their counsel in its effort to escape further liability for the Data Breach. To accomplish that, 23andMe first had to breach its agreement with customers to arbitrate and instead agree to litigate in court. 23andMe then stalled the individuals who complied with the Terms of Service and who commenced arbitration proceedings, while 23andMe entering into a class settlement agreement which, as written,

subsumes the arbitrations and fashions hurdles for those who already made clear through Notice to 23andMe of their intent to arbitrate.  Now 23andMe wants to force these individuals to restate their intent to arbitrate, *again*, and to do so using a method that appears designed to be difficult.

This sequence, 23andMe claims, is tied to financial constraints.  *See supra* § II.(C). While this Court has asked pointed and clear questions to the settling parties, ECF No. 111, the Proposed Settlement further raises the question as to the appropriateness of earmarking what 23andMe purports to be its remaining funds for one group of customers (litigants and absent class members) over another (arbitration claimants).  In fact, the individuals who complied with the Terms of Service and properly commenced arbitration proceedings pursuant to those Terms of Service should be granted priority over those who brought litigation.  23andMe maintains, however, that it controls the forum in which these claims will be litigated and resolved, and with which litigants. *See supra* § II.(A). 23andMe maintains this now, in direct contravention of its Terms of Service and contrary to its engagement with the Intervening Claimants in the pre-dispute resolution process.

If, in fact, financial constraints are at issue, details as to the company's true financial condition and ability to pay should be furnished to the Court, plaintiffs, and noticed arbitration claimants.  This would provide equal footing and access to information so that a determination can be made to ensure that the individuals who appropriately commenced individual arbitration proceedings receive their individual relief.

Priority of available funds should, in effect, go to arbitration claimants.

**III.    The Proposed Settlement's Opt-Out Process is Not Fair, Reasonable, nor Adequate to the Intervening Claimants**

**A.  Intervening Claimants Have Already Opted Out of The Settlement Class and Should Not Be Forced to Re-Opt-Out**

Intervening Claimants began the arbitration claims process in December 2023 pursuant to 23andMe's own Terms of Service, which forbid a class action route. Rather than proceed with its own choice of dispute resolution, it not only acquiesced and allowed a class action to proceed, but

now seeks to enjoin all of its customers who properly followed the contract they were bound by when they filed arbitration claims.

Through the motion for preliminary approval, 23andMe seeks to enjoin Intervening Claimants subsumed by the settlement and prevent them from pursuing arbitration, and disincentivize opt-out through a cumbersome opt-out procedure.  The preliminary approval motion forces claimants to go through the time and expense to re-opt-out from the class. Intervening Claimants have already effectively opted out for the settlement class when they filed arbitration claims and should not be forced to opt-out again in a class action process that squarely contradicts the contractual terms between the parties.

The underlying principle of an opt-out procedure is to ensure that claimants have received notice, and an opportunity to be heard.[21]  With regard to electing a mode of dispute resolution, Intervening Claimants were ***not*** provided with an opportunity to pursue any other particular mode of dispute resolution aside from arbitration.  Pursuant to the Terms of Service, 23andMe cannot coerce Intervening Claimants into a class action litigation either.

In *In re T-Mobile Customer Data Security Breach Litigation,* class cases and arbitrations were filed in connection with a data breach in which sensitive personal information of millions of individuals was breached. *In re T-Mobile Customer Data Sec. Breach Litig.,* No. 4:21-MD-03019-BCW, 2023 WL 11878508, at *4 (W.D. Mo. June 29, 2023), rev'd 111 F.4th 849 (8th Cir. 2024). In *In re T-Mobile*, the class settlement excluded individuals who pursued arbitration. *Id*. The Court specifically ordered that anyone who "provided written notice to T-Mobile of their intent to pursue arbitration against T-Mobile relating the [d]ata [b]reach with a description of claims to the address provided in T-Mobile's Terms and Conditions or to T-Mobile's Counsel was not included as part of the Settlement Class." *Id*.  Moreover, claimants that had opted to arbitrate their claims, were not

---

[21] *See Chaffee v. A&P Tea Co.,* No. 79 C 2735, 1991 WL 5859, at *2 (N.D. Ill. Jan. 16, 1991) The notice requirement of Rule 23 is designed to guaranty that those bound by the ruling in a class action were accorded their due process rights to notice and an opportunity to be heard. The notice requirement attached to each type of class action is central to the protection of these due process rights.

included in the stay, *i.e.,* the stay did *not* apply to arbitration proceedings against T-Mobile, thus ensuring that the rights of individual consumers were preserved. *Id.*

Here, 23andMe has been engaging with thousands of individual arbitration claimants outside of the class context – the Intervening Claimants, as well as claimants represented by other law firms. The preliminary approval motion asks this Court to force all of these claimants to *re*-opt out or be enjoined. In *Arena v. Intuit Inc.*, highlighting the harm to arbitration claimants, the court found that a proposed settlement stalled the arbitrations of those claimants that had already began to pursue arbitration claims and imposed undue burdens through the opt-out procedures. *Arena v. Intuit Inc.*, No. 19-CV-02546-CRB, 2021 WL 834253, at *5 (N.D. Cal. Mar. 5, 2021).

Intervening Claimants face the same harm, and burden, here.  They, therefore, seek relief to: (i) exclude all arbitration claimants from the class definition; (ii) defer to arbitration claimants contractual obligations to arbitrate their claims; and (iii) avoid conflict between the class members' settlement terms and all arbitration claimants individual arbitrations. In the end, while 23andMe engaged with Intervening Claimants in its own pre-arbitration process (*see supra* Background, § II), it now asks this Court to prevent Intervening Claimants from exercising their contractual rights to arbitrate that 23andMe forced them to agree to in the first place. Additionally, 23andMe's failure to engage in its own multi-tiered dispute resolution procedure, despite the good faith efforts by Intervening Claimants, suggests a deliberate effort to forestall Intervening Claimants from opting out of a settlement from which they should be excluded from. Intervening Claimants, and all other consumers who have already exercised their right to arbitrate against 23andMe should not be included in the definition of the settlement class. These individuals made the affirmative decision to resolve their disputes through arbitration and should not be forced into – or be forced to re-opt out of – the proposed class action settlement.

### B.  The Proposed Settlement's Opt-Out Process is Unduly Burdensome for the Intervening Claimants

23andMe's proposed opt-out process, particularly when viewed in the context of thousands of pending claims outside of the class case, is unduly burdensome, improper, and does not align with the guidance provided by the Northern District of California regarding class action opt-outs.[22] 23andMe's proposed opt out process provides:

> Settlement Class Members who request to opt-out and exclude themselves from the Settlement Class must do so by notifying the Notice and Claims Administrator in writing. To be valid, each Person wishing to opt-out of the Settlement Class shall: (i) include the case name of the Litigation: In Re: 23andMe, Inc., Customer Data Security Breach Litigation, Case No. 24-md-03098-EMC; (ii) identify the name and current address of the Person seeking exclusion from the Settlement; (iii) be individually signed by the Person seeking exclusion using wet-ink signature, DocuSign, or other similar process for transmitting authenticated digital signatures; (iv) include an attestation clearly indicating the Person's intent (to be determined by the Settlement Administrator) to be excluded from the Settlement; and (v) attest that the Person seeking exclusion had a 23andMe user account as of August 11, 2023. To be effective, written Opt-Out requests must be postmarked by the Opt-Out Deadline. Online Opt-Out requests must be submitted through the claims portal by the Opt-Out Deadline and must verify the Opt-Out request within three (3) business days following the Opt-Out Deadline using the link sent to the email address of the Settlement Class Member.[23]

As written, the proposed settlement contains unnecessary hurdles to opting out, as they are notably complicated, involve multiple steps that could confuse, burden, leave room for considerable error, and ultimately deter those looking to opt-out, specifically for those who already opted out of the class by means of filing an arbitration claim, *i.e.* the Intervening Claimants. Courts deny class settlements that impede class members' ability to opt out. *See*, *e.g., Arena v. Intuit Inc.,* No. 19-CV-02546-CRB, 2021 WL 834253, at *5 (N.D. Cal. Mar. 5, 2021), *Hadley v. Kellogg Sales Co.,* No. 16-CV-04955-LHK, 2020 WL 836673, at *8 (N.D. Cal. Feb, 20, 2020); *Smothers v. NorthStar Alarm Servs., LLC*, No. 2:17-cv-00548-KJM-KJN, 2019 WL 3080822, at *8 (C.D.

---

[22] See Procedural Guidance for Class Action Settlements, U.S. Dist. Ct. N. Dist. Cal., https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (last visited October 1, 2024).

[23] In Re: 23andMe Inc., Customer Data Security Breach Litigation, United States District Court Northern District of California, Defendant 23andMe, Inc.'s Memorandum in Support of Plaintiffs' Motion For Preliminary Approval of Class Action Settlement, Case No. 24-md-03098-EMC.

Cal. July 15, 2019; *Newman v. AmeriCredit Fin. Servs., Inc.,* No. 11cv3041 DMS (BLM), 2014 WL 12789177, at *6 (S.D. Cal. Feb, 3, 2014). In *Arena v. Intuit Inc.*, the court held that pre-class certification settlements are subject to heightened scrutiny, where Courts must be wary of unequal treatment amongst class members, especially when there is good reason to think that the proposed settlement will seriously burden many arbitration claimants. *Intuit,* 2021 WL 834253, at *5. The *Intuit* court specifically held:

> [f]or tens of thousands of class members who are arbitrating claims against Intuit, opting out is the obvious financial choice. For everyone else, missing out on an expected $28 will not materially change their lives. That does not mean class members should be encouraged to opt out without deliberation. But it does mean that class members should not face onerous burdens that, in this context, appear designed to suppress opt outs.

*Id* at 7. Here, Intervening Claimants are ongoing arbitration claimants. What's more, the JAMS Claimants already provided the detail now requested in the opt-out procedure in connection with their initial Notice of Arbitration and Petitions to arbitrate. Korsinsky Aff. ¶ 11,

The purpose of the opt-out process is to accurately determine the intent of the class member requesting exclusion. Opting out of a settlement should not be more burdensome than participating in it. *True v. Am. Honda Motor Co.*, No. EDCV07-287-VAPOPX, 2009 WL 838284, at *9 (C.D. Cal. Mar. 25, 2009) (denying settlement approval because "[o]pting out should be as convenient as remaining a part of the class"). Yet, the requirements to opt-out of the proposed Settlement Terms here will undoubtedly reduce the number of opt-out submissions.

*The proposed agreement requires a physical "wet ink" signature or an "authenticated digital signature" with a secondary verification process*: Although on its face, the settlement agreement allows for "online" opting-out, the online process is extremely onerous, and the only other way to opt out would be via hard-copy using a "wet ink" signature. To opt out, a putative class member must draft a request for exclusion and sign it with a physical "wet ink" signature or a "DocuSign, or other similar process for transmitting **authenticated** digital signatures." (emphasis added). *See* ECF No. 103-2, Settlement Agreement at 23. If an opt-out request is submitted online, ***after requiring an authenticated digital signature,*** the opt-out will ***still not be effective nor valid***,

unless the opt-out request is then secondarily verified using a link sent to email address of the Settlement Class Member, no later than three days after the opt-out deadline. *Id.*[24]

Requiring an authenticated digital signature for online opt-outs is questionable when other means of online opting-out are available. *See, O'Connor v. Uber Techs., Inc.,* 201 F. Supp. 3d 1110 (N.D. Cal. 2016) (questioning "the parties' refusal to provide for an easier Rule 23 opt-out mechanism (*e.g.* using e-mail, opt out forms, or hyperlinks). Using DocuSign or other "similar process[es]" require those seeking to opt out to download and even possibly pay for services that provide authenticated signatures, learn how to use the services, or spend time obtaining the authenticated signature. Furthermore, it is unclear why a document someone had to onerously sign via authenticated signature would then require secondary verification via an email. An email that is likely to be blocked and deleted by spam folders. In fact, a recent study by the FTC found that emails sent by settlement administrators are opened by only 14% of recipients. *See* FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* at 30 (September 2019), available at https://kl.link/3lnghg2.

23andMe was, and remains, willing to force consumers to arbitrate their claims based on electronic assent (through a simple mouse click) to its Terms of Service. *See* Korsinsky Aff. ¶¶ 5-6 (Figures 1 and 2). Yet the multistep, time consuming online opt-out process, however, requires a physical "wet-ink" signature, which, especially as applied to those participating in ongoing arbitration proceedings, is unreasonably burdensome.  *See Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067 (N.D. Cal. 2020) (noting that the wet-ink requirement was "an obvious attempt to make it as hard as possible for petitioners to opt out, thus binding them to the [class] settlement"); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 783–84 (7th Cir. 2014) (noting that it was "hard to resist the inference that [the Defendant] was trying to minimize" submissions); *In Re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2018 WL 10539267, at *1 (N.D. Cal. June 7, 2018) (denying preliminary approval where proposed settlement "require[d] a claimant seeking

---

[24] This issue was flagged by the Court in its Order re Supplemental Briefing and/or Evidence ("Supplemental Briefing Order") (Sept. 25, 2024), ECF No. 111 at 5 ("For opt outs, why is an electronic opt out not recognized unless there is an additional verification?").

MOTION TO INTERVENE AND IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No.: 3:24-md-3098

[to file a claim] to submit a physical signature rather than an electronic attestation"); *Trauth v. Spearmint Rhino Companies Worldwide, Inc.*, No. EDCV 09-1316-VAP-DTBX, 2010 WL 11468628, at *16 (C.D. Cal. July 26, 2010). ("Plaintiffs fail to provide a request for exclusion or an opt-out form.").

*The proposed agreement forbids opting out efficiently through counsel*: The opt-out requirements are also unreasonable because it prohibits class members from protecting their right to continue arbitration by opting out through their retained counsel. Settlement Agreement at 23 ("Opt-Out requests seeking exclusion on behalf of more than one individual shall be deemed invalid by the Notice and Claims Administrator."). Doing so would require each Intervening Claimant to individually provide "wet-ink" or "electronically authenticated signatures" after they already retained counsel, noticed their claims to 23andMe, and already provided all of the detail (plus more) called for by the proposed opt-out.

23andMe knows that the Intervening Claimants each have individually signed engagement agreements retaining Levi & Korsinsky. 23andMe may speak through its directly retained counsel in this Court. Where an Arbitration Claimant has individually decided that she wants to pursue arbitration and does not want to participate in the settlement, she should have the same right as *Intuit* to have directly retained counsel speak for her in this proceeding. That the proposed agreement strips a member's right to respond through counsel is alone a sufficient reason to find the agreement unfair and inadequate. *See* Order Re Mot. For Prelim. Approval of Class Settlement at 4, 8, *Rimler v. Postmates, Inc.,* No. CGC-18-567868 (S.F. Super. Ct. Nov. 26, 2019),  Korsinsky Aff. Ex. B. (denying preliminary approval of a class settlement that prohibited, without explanation, class members' counsel from directly opting out class members who wished to opt out).

Accordingly, the Intervening Claimants submit the additional requirements in the 23andMe opt-out process should be subject to a higher level of scrutiny in light of the thousands of individuals that have already commenced separate proceedings outside of this Class Action.[25] The

---

[25] See *Intuit,* 2021 WL 834253, at *5.

added hurdles in the opt-out process here complicate the process and diverge from the guidance for a straightforward opt-out. Simplification is especially important when managing large numbers of potential opt-outs, as will be the case here should separate arbitration proceedings be enjoined and all arbitration claimants be included in the "settlement Class" definition.

In light of the above, 23andMe's preliminary approval motion effectively forces Intervening Claimants who have already exercised their right to opt out and chosen arbitration to re-opt out from a class they have affirmatively opted out of. These Intervening Claimants timely elected to arbitrate, relying on the dispute resolution mechanisms outlined in 23andMe's own Terms of Service. Despite multiple opportunities to clarify any misguidance, 23andMe had Intervening Claimants operate under the impression that the initial dispute resolution period and/or arbitration would adequately address their grievances.

## CONCLUSION

For the foregoing reasons the Intervening Claimants respectfully request that the Court grant their Motion and enter an order: (1) naming them as Intervenors; (2) modifying the proposed class definition to exclude all arbitration claimants or alternatively allow the Intervening Claimants to opt-out through their retained counsel; (3) for briefing on the issues of whether (i) this court has jurisdiction given the application of the FAA to 23andMe enforceable arbitration provision; and (ii) whether 23andMe should be compelled to immediately proceed to arbitration; and (4) granting such other relief as the Court deems just and proper.

Dated: October 2, 2024             Respectfully submitted,

                                   **LEVI & KORSINSKY, LLP**

                                   /s/ *Adam M. Apton*
                                   Adam M. Apton (State Bar No. 316506)
                                   1160 Battery Street East, Suite 100 - #3425
                                   San Francisco, CA 94111
                                   Telephone: 415-373-1671
                                   Facsimile: 415-484-1294
                                   Email: aapton@zlk.com

                                   Nicholas I. Porritt*
                                   **LEVI & KORSINSKY, LLP**
                                   1101 Vermont Ave., NW

Suite 700
Washington, DC 20005
Tel: 202-524-4290
Fax: 202-333-2121
Email: nporritt@zlk.com

Eduard Korsinsky*
Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall St., 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email  ek@zlk.com
          mreich@zlk.com

*Counsel for Proposed Intervenors Laura Block, Joel Davne, Aaron Hodges, and Joseph Jarrell*

*\*pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

I, Adam M. Apton, an attorney, hereby certify that on October 2, 2024, I caused a true and correct copy of the foregoing document to be filed and served electronically via the Court's CM/ECF system.

/s/ Adam M. Apton
Adam M. Apton

MOTION TO INTERVENE AND IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT
Case No.: 3:24-md-3098