Cari Campen Laufenberg (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel: (206) 623-1900
claufenberg@kellerrohrback.com

Gayle M. Blatt (SBN 122048)
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
gmb@cglaw.com

Norman E. Siegel (*pro hac vice*)
STUEVE SIEGEL HANSON LLP
460 Nichols Road
Suite 200
Kansas City, MO 64112
Tel: 816 714-7100
siegel@stuevesiegel.com

*Interim Co-Lead Counsel*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: 23ANDME, INC. CUSTOMER DATA
SECURITY BREACH LITIGATION

This Document Relates to: ALL ACTIONS

No. 3:24-md-03098-EMC

**PLAINTIFFS' RESPONSE TO
MOTIONS TO INTERVENE AND
OBJECTIONS TO PRELIMINARY
APPROVAL OF SETTLEMENT (DKTS.
117, 118, 119 AND 120)**

## TABLE OF CONTENTS

I.    INTERVENTION IS PROCEDURALLY UNNECESSARY ........................................ 1

    A.    Intervention Is Unnecessary Because Rule 23 Permits the Relief Requested: Objecting to Preliminary Approval of Proposed Settlement. ............................. 1

    B.    Movants Fail to Establish Intervention as a Matter of Right Under Rule 24(a), and Permissive Intervention Under Rule 24(b) Is Not Justified. ............... 3

II.    THE OBJECTIONS TO THE MOTION FOR PRELIMINARY APPROVAL SHOULD BE OVERRULED. ........................................................................................ 7

    A.    The Objections to the Preliminary Injunction Should Be Overruled. ................. 7

    B.    The Objections to the Opt-Out Procedures Should Be Overruled. .................... 11

    C.    The Melvin Plaintiffs' Objections Should Be Overruled. ................................. 15

        1.    The Proposed Settlement Class and Statutory Subclass Are Well Defined and Do Not Create Intra Class Conflicts, and Additional Subclasses Are Neither Necessary Nor Advisable ............................... 15

        2.    This is Not a "Stock Data Breach Settlement" ...................................... 19

        3.    Privacy & Medical Shield + Genetic Monitoring Is Not "Credit Monitoring". ......................................................................................... 20

        4.    The Notice and Claims Process are Reasonable and Designed to Encourage Claims. ............................................................................... 23

III.    CONCLUSION ........................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abernathy v. DoorDash, Inc.*,
   438 F. Supp. 3d 1062 (N.D. Cal. 2020)..................................................................... 2

*Allstate Ins. Co. v. Elzanaty*,
   929 F. Supp. 2d 199 (E.D.N.Y. 2013) ................................................................... 10

*Arakaki v. Cayetano*,
   324 F.3d 1078 (9th Cir. 2003) ............................................................................... 4

*Arena v. Intuit Inc.*,
   2020 WL 7342716 (N.D. Cal. Dec. 14, 2020) ................................... 3, 8, 12, 13

*Arena v. Intuit Inc.*,
   2021 WL 834253 (N.D. Cal. Mar. 5, 2021) .................................... 8, 11, 12, 13

*Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc.*,
   309 F.3d 1113 (9th Cir. 2002) ............................................................................... 4

*Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*,
   54 F.4th 1078 (9th Cir. 2022) ............................................................................... 4

*In re CenturyLink Sales Practices & Sec. Litig.*,
   2020 WL 3512807 (D. Minn. June 29, 2020)............................................... 11, 12

*Cicero v. Directv, Inc.*,
   2010 WL 11463634 (C.D. Cal. Mar. 2, 2010) ...................................................... 3

*In re Cintas Corp. Overtime Pay Arb Litig.*,
   No. C 06-1781 SBA, 2009 WL 1766595 (N.D. Cal. June 22, 2009)................................ 10

*Cochran v. Kroger Co.*,
   2021 WL 8824962 (N.D. Cal. Nov. 5, 2021) ............................................... 12, 14

*Cody v. SoulCycle, Inc.*,
   2017 WL 8811114 (C.D. Cal. Sept. 20, 2017) .................................................... 7

*Cohorst v. BRE Properties, Inc.*,
   2011 WL 3475274 (S.D. Cal. Aug. 5, 2011) ...................................................... 6

*Dohrmann v. Intuit, Inc.*,
   823 F. App'x 482 (9th Cir. 2020) ........................................................................ 8

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. C 06-4333 PJH, 2013 WL 12333442 (N.D. Cal. Jan. 8, 2013).................................16, 19

*In re Facebook Biometric Info. Priv. Litig.*,
No. 15-cv-03747-JD (N.D. Cal. July 22, 2020) ................................................................. 14

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
No. 18-md-2843-VC, 2023 WL 8443230 (N.D. Cal. Oct. 10, 2023) ................................. 19

*In Re: Facebook, Inc. Consumer Privacy User Profile Litigation*,
No. 18-md-2843-VC (N.D. Cal. Mar. 29, 2023) ................................................................ 14

*Freedom from Religion Found., Inc. v. Geithner*,
644 F.3d 836 (9th Cir. 2011) .............................................................................................. 4

*Glass v. UBS Fin. Servs., Inc.*,
2007 WL 474936 (N.D. Cal. Jan. 17, 2007) ....................................................................... 3

*Gomes v. Eventbrite, Inc.*,
2020 WL 6381343 (N.D. Cal. Oct. 30, 2020) ..................................................................... 3

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
21 F.4th 1102 (9th Cir. 2021) ........................................................................................... 22

*Grady v. RCM Techs., Inc.*,
671 F. Supp. 3d 1065 (C.D. Cal. May 2, 2023) ................................................................ 17

*Hadley v. Kellogg Sales Co.*,
2020 WL 836673 (N.D. Cal. Feb. 20, 2020) .................................................................... 13

*Hanlon v. Chrysler Corp.*,
150 F. 3d 1011 (9th Cir. 1998) ........................................................................................... 9

*Hawaii-Pac. Venture Cap. Corp. v. Rothbard*,
564 F.2d 1343 (9th Cir. 1977) ........................................................................................... 6

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
2015 WL 1153864 (N.D. Cal. Mar. 13, 2015).................................................................... 8

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
No. 19-MD-02913-WHO, 2023 WL 6205473 (N.D. Cal. Sept. 19, 2023) ....................... 12

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
2015 WL 1926312 (N.D. Cal. Apr. 27, 2015) .................................................................... 3

*Keirsey v. eBay, Inc*,
2013 WL 5755047 (N.D. Cal. Oct. 23, 2013) ..................................................................... 8

*Klay v. United Healthgroup, Inc.*,
376 F.3d 1092 (11th Cir. 2004)........................................................................................ 10

*Lane v. Facebook, Inc.*,
    2009 WL 3458198 (N.D. Cal. Oct. 23, 2009) ................................................................2, 5

*League of United Latin Am. Citizens v. Wilson*,
    131 F.3d 1297 (9th Cir. 1997) ..................................................................................... 7

*Lundy et al. v Meta Platforms, Inc.*,
    No. 3:18-cv-06793-JD, Dkt. 199 (N.D. Cal. April 26, 2023)........................................... 14

*Nacif v. Athira Pharma, Inc.*,
    No. C21-0861 TSZ, 2023 WL 6290582 (W.D. Wash. Sept. 27, 2023) ........................... 17

*In re Netflix Priv. Litig.*,
    No. 5:11-CV-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ......................... 22

*Newman v. AmeriCredit Fin. Servs., Inc.*,
    2014 WL 12789177 (S.D. Cal. Feb. 3, 2014) ............................................................ 13

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. Jan. 9, 2008) ......................................................... 18

*In re Oracle Sec. Litig.*,
    No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) ............................... 18

*Perkins v. Ryder Integrated Logistics, Inc.*,
    2023 WL 8481817 (N.D. Cal. Dec. 7, 2023)............................................................... 2

*In re Piper Funds, Inc. Inst. Gov't Income Portfolio Litig.*,
    71 F. 3d 298 (8th Cir. 1995) ....................................................................................... 9

*Rieckborn v. Velti PLC*,
    No. 13-CV-03889-WHO, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015).............................. 18

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ....................................................................................... 23

*Rollins v. Dignity Health*,
    336 F.R.D. 456 (N.D. Cal. June 12, 2020) ................................................................. 17

*Santana v. 23andMe, Inc.*,
    No. 3:23-cv-05147-EMC (Feb. 22, 2024) .................................................................. 24

*Shuman v. SquareTrade, Inc.*,
    2022 WL 10177658 (N.D. Cal. Oct. 17, 2022)...........................................................12, 14

*Smith v. Los Angeles Unified Sch. Dist.*,
    830 F.3d 843 (9th Cir. 2016) ....................................................................................... 3

*Smothers v. NorthStar Alarm Servs., LLC*,
    2019 WL 3080822 (E.D. Cal. July 15, 2019) ............................................................. 13

*In re T-Mobile Customer Data Sec. Breach Litig.*,
   No. 4:21-MD-03019-BCW, 2023 WL 11878508 (W.D. Mo. June 29, 2023) ...................7, 8

*Zakikhani v. Hyundai Motor Co.*,
   2022 WL 17224701 (C.D. Cal. Oct. 20, 2022) .................................................................... 8

*Zepeda v. PayPal, Inc.*,
   2014 WL 1653246 (N.D. Cal. Apr. 23, 2014) ..................................................................2, 6

**Other Authorities**

Fed. R. Civ. P. 23 ..........................................................................................................*passim*

Fed. R. Civ. P. 23(c)(2) ............................................................................................................ 6

Fed. R. Civ. P. 23(d) ................................................................................................................ 9

Fed. R. Civ. P. 23(e) ...................................................................................................1, 6, 23

Fed. R. Civ. P. 24(a) .................................................................................................1, 3, 4, 6

Fed. R. Civ. P. 24(b) .................................................................................................1, 3, 6, 7

Fed. R. Civ. P. 24(c) ................................................................................................................ 7

Per Dkt. 121, Plaintiffs file this consolidated response to Vivian Gonczi, Howard Packer, and Lance Alligood's ("Gonczi Movants") Corrected Motion to Intervene (Dkt. 117); Laura Block, Joel Davne, Aaron Hodges, and Joseph Jarrell's ("Block Movants") Motion to Intervene (Dkt. 119); Nancy Adame, Rebecca Adams, Josh Ades, Heather Appleman, and Michael Atkinson-Leon's ("Adame Movants") Motion to Intervene (Dkt. 120) (collectively, "Movants"); and David Melvin's Response to Plaintiffs' Motion for Preliminary Approval ("Melvin Response") (Dkt. 118).[1]

## I.   INTERVENTION IS PROCEDURALLY UNNECESSARY.

The three motions to intervene, Dkts. 117, 119, 120, should be denied because intervention is unnecessary to assert the Movants' objections to the Settlement. Plaintiffs do not dispute that putative class members, like Movants, can object to and oppose preliminary approval of the Settlement. Indeed, although Plaintiffs dispute Movants' objections to preliminary approval, Plaintiffs agree that the Court may fully consider these arguments now under Rule 23(e)(1)(B). However, even if intervention were required, none of the intervention motions meet the necessary requirements under Rule 24(a), and permissive intervention under Rule 24(b) is not justified.

**A.   Intervention Is Unnecessary Because Rule 23 Permits the Relief Requested: Objecting to Preliminary Approval of Proposed Settlement.**

The relief requested by the Gonczi and Adame Movants is that the Court grant them leave to file their oppositions to the Motion for Preliminary Approval, which they attach as exhibits to their Motions to Intervene. Dkt. 117 at 22; 120 at 1. The Gonczi Movants specifically state that they seek only to protect their right to pursue individual arbitration (a right that is already protected here) "without derailing the settlement for other class members." Dkt. 117 at 21. The Block Movants seek similar relief, requesting that the Court consider their objections to the

---

[1] Plaintiffs and 23andMe acknowledge the Court's request for a single consolidated response (Dkt. 121); however, while we agree on the ultimate outcome of these issues, there are nuances in the Parties' respective positions which necessitated separate briefing.

Motion for Preliminary Approval, which are detailed in, their Motion to Intervene.[2] Dkt. 119 at 3. But the intervention motions are unnecessary. Movants are permitted under Rule 23 to oppose Plaintiffs' Motion for Preliminary Approval (Dkt. 103) and have their objections heard by this Court *without* intervention.

Plaintiffs do not dispute the Movants' right to lodge oppositions to the Motion for Preliminary Approval; however, as with the Melvin Response, the Movants could have simply filed oppositions to the Motion for Preliminary Approval. Courts routinely deny intervention where putative class members can adequately protect their interests through the Rule 23 mechanisms, explaining that "intervention is not appropriate where the ability of the proposed intervenor can be protected by the options to opt-out of or object to the proposed settlement." *Perkins v. Ryder Integrated Logistics, Inc.,* 2023 WL 8481817, at *1-2 (N.D. Cal. Dec. 7, 2023) (denying motion to intervene at preliminary approval of settlement because "numerous recent cases from this District [] have denied intervention, as a right or permissive, in similar circumstances") (collecting cases); *see also Zepeda v. PayPal, Inc.*, 2014 WL 1653246, at *4 (N.D. Cal. Apr. 23, 2014) (denying motion to intervene and stating "courts have frequently denied intervention in the class action settlement context, citing concerns about prejudice, as well as putative interveners' ability to protect their interests by less disruptive means, such as opting out of the settlement class or participating in the fairness hearing process."); *Lane v. Facebook, Inc.*, 2009 WL 3458198, at *4-5 (N.D. Cal. Oct. 23, 2009) (denying motion to intervene at preliminary approval because proposed intervenors' rights were "adequately protected" through the process for submitting objections).

The cases cited by Movants for the proposition that intervention at preliminary approval of a class action settlement is proper for the purpose of objecting are either inapposite or

---

[2] In addition to their motion to intervene, the Block Movants also specifically seek to brief the issue of whether 23andMe should be compelled to immediately proceed to arbitration. Dkt. 119 at 3. However, they have filed no such motion nor any proposed motion. The Block Movants rely on *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1066 (N.D. Cal. 2020); however, there, defendant was compelled to arbitration only as to "petitioners who submitted declarations" and not as to the "petitioners who submitted mere witness statements." Here, no arbitration claimant declarations have been submitted.

supportive of Plaintiffs' position. *See Cicero v. Directv, Inc.*, 2010 WL 11463634, at *2 (C.D. Cal. Mar. 2, 2010) (denying motion to intervene at preliminary approval where proposed intervenors could object to or opt out of settlement); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 474936, at *6 (N.D. Cal. Jan. 17, 2007) (denying motion to intervene in proposed settlement by putative class member where intervention was untimely, as class member failed to lodge objection by the objection deadline), *aff'd*, 331 F. App'x 452 (9th Cir. 2009); *Gomes v. Eventbrite, Inc.*, 2020 WL 6381343, at *3 (N.D. Cal. Oct. 30, 2020) (granting motion to intervene where proposed intervenors' state court case was imminently issuing a ruling on a pending demurrer to their complaint so that class members would know outcome when deciding whether to object or opt-out to federal court settlement); *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 846–47 (9th Cir. 2016) (granting intervention of sub-class of disabled children who objected to policy change forcing integration of classrooms, which had been implemented according to settlement with separate set of plaintiffs); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 2015 WL 1926312, at *1 (N.D. Cal. Apr. 27, 2015) (granting intervention after class certification where injunctive relief had been denied due to standing of named plaintiffs and where intervenors had standing to assert the injunctive relief sought); *Arena v. Intuit Inc.*, 2020 WL 7342716, at *1 (N.D. Cal. Dec. 14, 2020) (granting permissive intervention to intervenors who requested to object at preliminary approval hearing without addressing whether intervention was necessary given the protections of Rule 23).

Because Rule 23's opt-out and objection procedures provide the appropriate process to address Movants' concerns, and because Movants' concerns are before the Court and addressed substantively by Plaintiffs below, intervention is neither necessary nor proper, and the analysis need not go further. The Court can deny the requests to intervene and consider Movants' substantive objections to the Motion for Preliminary Approval.

**B.     Movants Fail to Establish Intervention as a Matter of Right Under Rule 24(a), and Permissive Intervention Under Rule 24(b) Is Not Justified.**

Although the intervention motions should be denied as procedurally unnecessary, Movants are also not able to establish intervention by right on the merits of their motions because

they cannot show timeliness, impairment of rights, or inadequate representation. And Movants fail to provide sufficient justification for permissive intervention.

In the Ninth Circuit, "[a] party seeking to intervene as of right must meet four requirements: (1) the applicant must timely move to intervene; (2) the applicant must have a significantly protectable interest relating to the property or transaction that is the subject of the action; (3) the applicant must be situated such that the disposition of the action may impair or impede the party's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties." *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003); Fed. R. Civ. P. 24(a). "A putative intervenor has the burden of establishing all four requirements." *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1086 (9th Cir. 2022). "Failure to satisfy any one of the requirements is fatal to the application." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011) (quoting *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 950 (9th Cir. 2009)). Here, Movants fail to establish three of the four necessary elements: timeliness, impairment of rights, and inadequate representation (as putative class members, the Movants inherently have an interest in this action).

*First*, all three sets of Movants fail to establish timeliness. In assessing this element, courts generally consider the following factors in determining whether a motion to intervene is timely: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc.,* 309 F.3d 1113, 1119 (9th Cir. 2002) *(quoting United States v. Wash.*, 86 F.3d 1499, 1503 (9th Cir. 1996)). All three sets of Movants were either aware or should have been aware of the class action proceedings, which were first filed in October 2023. In fact, as revealed in their corrected Motion to Intervene, the Gonczi Movants' counsel, Milberg, filed three of the class actions pending here in October 2023 and were counsel of record for a Settlement Class Representative who approved the Settlement terms—and thus were privy to information about the Settlement prior to the Motion for Preliminary Approval. Dkt. 117 at 9 (correcting false statements regarding Interim Co-Lead

Counsel's communications with other Plaintiffs' counsel regarding the challenged injunction, and disclosing at least constructive knowledge of the Settlement terms). Milberg later sought to withdraw as counsel for the Settlement Class Representative, but not until *after* its lawyers were made aware of the details of the Settlement, their client agreed to its terms, and it was filed with the Court. *See* Dkt. 108 (September 20, 2024, withdrawal of counsel).

In addition, there have been multiple public case filings and hearings since early June stating that a Settlement was in progress, including the Court's Order on June 5, 2024, directing the parties to engage in further mediation. *See* Dkts. 62, 79, 81, 86, 89, 99, 101. And, on August 8, 2024, 23andMe detailed that a Settlement had been reached in the class action for $30 million in its publicly-filed Form 10-Q.[3] The Parties further stated in a September 5, 2024 filing to the Court that a preliminary injunction would be requested as part of the Settlement. Dkt. 101 at 2. As such, all three sets of Movants have been on notice about the class action proceedings since at least October 2023 and were put on notice about the Settlement proceedings as of June 2024. Yet, all three sat on their rights for months, filing to intervene only after the Motion for Preliminary Approval was filed. This is untimely. *See Lane*, 2009 WL 3458198, at *3 (finding motion to intervene filed two weeks after preliminary approval motion to be untimely where proposed intervenors had been aware of the case for approximately one year and on notice of the possible settlement for several months).

*Second*, even if the intervention motions were timely, they should still be denied because intervention is not necessary to protect Movants' interests, which is fatal to their intervention claim. As an initial matter, the asserted interest by all three is that their opposition to the Motion for Preliminary Approval be considered by the Court; that right is adequately protected here because their oppositions can be heard under Rule 23 without intervention. Further, even if the Movants' objections are ultimately overruled, Movants have two additional options under Rule 23 that adequately protect their interests: (1) they can stay in the Settlement Class and voice their

---

[3] 23andMe Holding Co., Quarterly Report (Form 10-Q) at 22 (filed Aug. 8, 2024), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001804591/000180459124000047/me-20240630.htm (last visited Oct. 8, 2024).

concerns again prior to final Settlement approval through the objection process; or (2) opt-out of the Settlement and continue to arbitrate their claims separately through arbitration. Fed. R. Civ. P. 23(c)(2), (e)(2). Courts regularly find that the ability to object or opt out of a proposed settlement means a proposed intervenor's interests are adequately protected. *See Zepeda*, 2014 WL 1653246, at *6 (finding proposed intervenors could not satisfy "impairment" of interest factor: "If the class is certified . . . then Putative Interveners [sic] do have means to protect their interests. That is, they may object to the settlement during the hearings on motions for preliminary or final approval, or they may opt out of the class and pursue their claims separately."); *Cohorst v. BRE Properties, Inc.*, 2011 WL 3475274, at *6 (S.D. Cal. Aug. 5, 2011) (finding that proposed intervenor could object or opt out was "fatal" to the claim that resolution of preliminary approval "will impair or impede her ability to protect her interests"). Because Movants can object to the proposed Settlement now and will have the opportunity to opt-out if the proposed Settlement is preliminarily approved, their rights are not impaired by denying intervention.

*Third*, Movants' interests are adequately represented. Where "existing parties adequately represent [the proposed intervenor's] interest," the Court need not permit intervention. Fed. R. Civ. P. 24(a)(2). Here, Movants have not presented any evidence to establish that current Plaintiffs and Interim Co-Lead Counsel are not adequately protecting the interests of Movants. *See Hawaii-Pac. Venture Cap. Corp. v. Rothbard*, 564 F.2d 1343, 1346 (9th Cir. 1977) (holding proposed intervenors' "dissatisfactions with the conduct of the class action proceedings" were "insufficient" to meet the requirements for intervention as of right). In fact, as described further below, Interim Co-Lead Counsel have negotiated a straightforward opt out process such that putative class members like Movants can opt out should they wish to not participate in the Settlement. And, to the extent Movants' interests do diverge slightly, those interests are adequately protected by Movants' counsel who can (*and are*) opposing discrete aspects of the Motion for Preliminary Approval *without* intervention.

*Finally*, Movants argue, in the alternative, that they are entitled to permissive intervention under Rule 24(b). A court may permit a party to intervene where the movant establishes the

following: (1) timeliness, (2) a claim that shares with the main action a common question of law or fact, and (3) intervention will not unduly delay or prejudice the adjudication of the original parties' rights. Fed. R. Civ. P. 24(b). In exercising its discretion to permit intervention, a court must consider whether the intervention will "unduly delay or prejudice adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997). Courts in this Circuit routinely deny permissive intervention where the proposed intervenor has the opportunity to object to a proposed settlement. *See Cody v. SoulCycle, Inc.*, 2017 WL 8811114, at *5 (C.D. Cal. Sept. 20, 2017) (denying permissive intervention because class member's request was untimely, and he could assert his objections under Rule 23).

Here, because the intervention motions are unnecessary to protect the Movants' interests and for all of the same reasons intervention as of right should be denied, permissive intervention should also be denied. Moreover, Movants failure to submit a pleading setting out any proposed claim or defense with its motion provides an independent basis for denial, because Rule 24(c) requires that the motion be accompanied by such a pleading. Here, the absence of any Rule 24(c) complaint-in-intervention is further evidence that intervention is simply not the proper procedural tool, where Movants are not in fact asserting an independent claim or defense in this action.

## II.     THE OBJECTIONS TO THE MOTION FOR PRELIMINARY APPROVAL SHOULD BE OVERRULED.

### A.     The Objections to the Preliminary Injunction Should Be Overruled.

Movants object to the preliminary injunction sought in the Motion for Preliminary Approval because it will temporarily stay arbitration proceedings for Movants and arbitration claimants during the opt-out period. These objections should be overruled, and the Court should enter the preliminary injunction.

As a threshold point, Movants question why Plaintiffs did not exclude pending arbitrations from the definition of the Settlement Class, as was done in *In re T-Mobile Customer Data Sec. Breach Litig.*, No. 4:21-MD-03019-BCW, 2023 WL 11878508, at *4 (W.D. Mo. June 29, 2023). Plaintiffs agree that under ordinary circumstances those initiating arbitration should

be excluded from the definition of a settling class, as was the case in *T-Mobile*.[4] However, in this case, 23andMe faces a tenuous financial situation, as detailed in Plaintiffs' Supplemental Brief. Dkt. 123 at 1-2; *see also* Dkt. 105, Guyon Decl. ¶¶ 11-21. Absent a stay, the economic impairment on 23andMe, should it be forced to pay the arbitration fees during the opt out period for claimants who may or may not opt out of the Settlement when given the choice, would imperil the Settlement itself. These facts present "extraordinary circumstances" not usually present, and which were not present in *Arena v. Intuit Inc.*, 2021 WL 834253, at *11 (N.D. Cal. Mar. 5, 2021), a case cited heavily by Movants.[5] Interim Co-Lead Counsel is of course tasked with representing the interests of the more than 6 million class members, but 23andMe's financial condition justifies the entry of the preliminary injunction because it will protect *both* the rights of the Settlement Class (by preventing the possible accelerated demise of 23andMe's financial condition before final approval of the Settlement) and the Movants' rights (by pausing only shortly their ability to arbitrate pending submission of a valid opt out request, and providing them with the opportunity to evaluate their options about participating in the Settlement or proceeding to arbitration).

Moreover, Movants' criticism of the request for preliminary injunction ignores the fact that a preliminary injunction provision is a relatively common feature in class action settlements at the preliminary approval stage. *See, e.g.*, *Keirsey v. eBay, Inc*, 2013 WL 5755047, at *7 (N.D. Cal. Oct. 23, 2013); *In re Hewlett-Packard Co. S'holder Derivative Litig*., 2015 WL 1153864, at *7 (N.D. Cal. Mar. 13, 2015); *Zakikhani v. Hyundai Motor Co*., 2022 WL 17224701, at *7 (C.D. Cal. Oct. 20, 2022) (issuing preliminary injunction at preliminary approval, including for those

---

[4] Interim Co-Lead Counsel here, Mr. Siegel and Ms. Laufenberg, are *also* Settlement Class Counsel in *T-Mobile*, in which they crafted a settlement class that excluded those that had initiated arbitration.

[5] *Arena* is also distinguishable because, there, Defendant Intuit sought to compel arbitration, the District Court denied the motion to compel arbitration, and Intuit successfully appealed that determination to the Ninth Circuit, seeking to compel the entire class to arbitration. *See Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020). Then, after the appeal, Intuit sought to stay the arbitrations it had so zealously sought to compel, making the class action settlement contingent on issuance of the preliminary injunction. *Arena*, 2021 WL 834253, at *5, 11.

"attempting to effect Opt-Outs of a class of individuals in any lawsuit or administrative, regulatory, arbitration, or other proceeding based on, relating to, or arising out of the claims and causes of action or the facts and circumstances giving rise to the Litigation"). Further, contrary to the Block Movants' contention, the Court has jurisdiction to issue a preliminary injunction as part of preliminarily approving the Settlement. "Rule 23(d) vests a district court with the authority and discretion to protect the interests and rights of class members and to ensure its control over the integrity of the settlement approval process." *Hanlon v. Chrysler Corp*., 150 F. 3d 1011, 1025 (9th Cir. 1998).

Movants assert that the FAA does not authorize a district court to enjoin arbitration. Dkts. 117-1 at 6, 119 at 12-13, 120-2 at 12-13 (citing *In re Piper Funds, Inc. Inst. Gov't Income Portfolio Litig.*, 71 F. 3d 298, 302-304 (8th Cir. 1995)). Specifically, the Movants argue that they have a contractual right to submit to arbitration and this Court may not circumscribe that right in furtherance of the proposed Settlement. However, the facts in *Piper* are fundamentally different than those at issue here. First and foremost, the claimant in *Piper* had submitted a letter to the district court expressly stating that the claimant "elected irrevocably to opt out of the class action." *See Piper*, 71 F. 3d 298, 304. Here, by contrast, **none** of the Movants have submitted opt outs or comparable statements expressing a clear intent to opt out of the settlement—and **as soon as** putative class members submit valid opt out requests, they can proceed with arbitration. Dkt. 103-1 at 39-40; Dkt. 103-2 ¶ 73(h). In *Piper*, by contrast, the preliminary approval order "enjoined arbitration by any class member until after the court distributes a class notice **and then rules on requests to opt out** of the class," which "significantly frustrated" the claimant's rights, as the arbitration procedure must "be speedy and not subject to delay and obstruction in the courts." *Piper*, 71 F. 3d at 300, 303 (emphasis added).

Further, in *Piper* the claimant filed a statement of claim requesting an arbitration award **prior** to the class action parties reaching a tentative settlement. *Id.* at 300 ("In January 1995, [claimant] filed a fifty-page Statement of Claim with the NASD," whereas the settling parties reached a tentative settlement in February of that year). As such, the claimant had "an immediate right to arbitrate its claim" when the settling parties sought to enjoin that right. *Id.* at 304. Here,

by contrast, the Block Movants did not file arbitration claims with JAMS until **after** the Parties had moved for preliminary approval. *See* Dkt. 119-1 at 5 (884 JAMS Claimants were finalized and filed with JAMS by September 13, 2024, following Plaintiffs' Motion for Preliminary Approval, Dkt. 103). Likewise, 4,866 of the Gonczi Movants' 4,966 claims were not filed until July 2024, and their counsel have yet to pay the corresponding filing fees for those claims, which are required for those claims to proceed. Dkt. 117 at 10. And counsel for the Adame Movants filed several thousand arbitration demands to JAMS in August 2024, and to date counsel for the Adame Movants have yet to pay any filing fees. Dkt. 120-3 at 4-5.

The Movants' reliance on *In re Cintas Corp. Overtime Pay Arb Litig.*, No. C 06-1781 SBA, 2009 WL 1766595 (N.D. Cal. June 22, 2009) is likewise inapposite. There, petitioner sought to enjoin arbitration proceedings brought in jurisdictions nationwide during the pendency of an appeal to Ninth Circuit. Thus, while the *Cintas* court found it lacked jurisdiction to consider the motion for injunction, it did so on the basis that a notice of appeal divests a district court of jurisdiction with respect to all matters involved in the appeal, not because it lacked jurisdiction under the FAA. *Id.* at *2. So too in *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1095 (11th Cir. 2004), which is relied on by the Adame and Gonczi Movants. There, the Eleventh Circuit reversed a district court ruling where the district court had enjoined arbitration of claims it had found arbitrable and which it had dismissed, while also enjoining the arbitration of claims it had determined were non-arbitrable.

Further, Movants fail to identify any actual prejudice to their contractual and statutory rights. Dkts. 117-1 at 4; 119 at 8; 120-2 at 11-12.[6] To the contrary, their right "to arbitrate can be fulfilled, even if it is deferred in light of the issuance of a temporary stay." *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 217 (E.D.N.Y. 2013). The stay would be temporary, lifting as soon as Movants opt out if they so choose. Movants would be enjoined from arbitrating only until they decide not to participate in the Settlement by submitting a valid opt-out, at which point

---

[6] Only 100 class members have initiated arbitration by paying a fee to the arbitral forum. No other class members purportedly seeking arbitration are even arguably economically prejudiced by the injunction and opt-out procedures in the Settlement.

they are free to proceed forward in arbitration. The stay thus poses no risk of delaying Movants' arbitrations beyond the time needed for them to make informed choices about whether to forgo the proposed Settlement and proceed in arbitration.

Finally, and critically, the request for a preliminary injunction is severable from the Settlement, and the Court can approve the Settlement without entering the preliminary injunction. This is another fact distinguishing this case from the case Movants rely most heavily upon, *Arena v. Intuit Inc*., 2021 WL 834253, at *11, in which the settlement itself was contingent upon entry of an immediate injunction and where no extraordinary circumstances—such as financial condition that may imperil the rights of others to partake in the Settlement—were present.

**B.      The Objections to the Opt-Out Procedures Should Be Overruled.**

The Movants' attacks on the Settlement's opt-out process are without merit. The opt-out process requested here is standard and consistent with Federal Rule of Civil Procedure 23's policy that the right to opt-out must be exercised individually, which is why it was designed to ensure that each class member engages with the Settlement information and makes an individualized, informed decision about whether to accept the Settlement. Moreover, the individualized opt-out process, including email verification if an online form is filled out on the Settlement Website, is necessary to protect the Settlement Class from potentially fraudulent opt-outs, as fraud related to class action settlements has become a growing problem in recent years.

Movants contend that the opt-out process is designed to suppress opt outs because it requires individualized opt outs, rather than permitting counsel to opt out thousands of Class Members *en masse*. But the relief requested by Movants violates the blackletter rule that opt-out rights are individual and "'must be exercised individually.'" *In re CenturyLink Sales Practices & Sec. Litig.*, 2020 WL 3512807, at *2 (D. Minn. June 29, 2020) (citing *In re Nat'l Football League Players' Concussion Injury Litig*., No. 2:12-md-02323-AB, 2019 WL 95917, at *5 (E.D. Pa. Jan. 3, 2019)). Accordingly, prohibiting mass opt-outs and requiring class members to submit signed requests electronically or in writing are mechanisms regularly endorsed by courts as designed to ensure that class members understand their rights and are voluntarily exercising them. In the *CenturyLink* matter, the court emphasized that:

> [i]n this case, the requirement that a class member must individually sign is vital, because it ***ensures that the class member is individually consenting to opt out***, and avoids a third party or lawyer representing that they have that class member's authority, without the class member making an informed, individual decision. Acceptance of an attorney-signed opt out is not required in a case involving more than 16,000 purported [] opt outs ***represented by a single small law firm when there exist questions regarding the informed decision of each client*** . . . .

*In re CenturyLink*, 2020 WL 3512807, at *3 (emphasis added). *See also Cochran v. Kroger Co.*, 2021 WL 8824962, at *3 (N.D. Cal. Nov. 5, 2021) (requiring individual opt-outs: "No Person may request to be excluded from the Settlement Class through 'mass' or 'class' opt-outs."); *Shuman v. SquareTrade, Inc.*, 2022 WL 10177658, at *3 (N.D. Cal. Oct. 17, 2022) (requiring individual opt-outs: "'mass' or 'class' opt-outs are not permitted").

To be sure, it is difficult to understand how the Movants can argue that submitting a signed opt-out request containing basic identifying information, the case name of the litigation, a signature (which can be electronic) and an attestation of their desire to be excluded is "unduly burdensome," especially given that they have shouldered the much greater burden of attempting to intervene in this federal class action proceeding to attack the Settlement Agreement. The same is true for a simple email verification; given the prevalence of online bots attacking Settlement Websites, email verification upon submission of a form protects against fraudulent submission of opt-outs via a publicly-available online form and ensures it is the individual exercising their right. *Cf. In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig*., No. 19-MD-02913-WHO, 2023 WL 6205473, at *9 (N.D. Cal. Sept. 19, 2023) (discussing thousands of mass ClaimClam submissions through the claims portal that had to be rejected).

The cases relied on by Movants are distinguishable. In particular, Movants rely heavily on *Arena v. Intuit Inc.* to support the contention that the opt-out procedures here are unduly burdensome. 2021 WL 834253, at *10. But the opt-out procedures in *Arena* imposed a far more burdensome process: "(1) a 'wet-ink' (not electronic) signature, (2) opt outs to be mailed in hard copy (though claims may be filed online), (3) a unique settlement ID, even though such an ID is not required to participate in the settlement, and (4) a case number for parallel proceedings, even though many arbitration claimants have not yet been assigned a case number." *Id.* In stark

1  contrast, the Settlement here allows claimants to sign by way of a "wet-ink signature, DocuSign,

2  or other similar process for transmitting authenticated digital signatures," including by filling out

3  the online form that will be easily accessible on the Settlement Website, which requires an email

4  verification to protect against fraudulent bots. Dkt. 103-2 at 23. Opt-outs here are not required to

5  be mailed in hard copy, nor are putative class members required to provide unique Settlement

6  IDs or case numbers for their arbitrations.

7         The other cases cited by Movants where courts have denied opt-out procedures are

8  likewise distinguishable. In those cases, class members who wished to exclude themselves from

9  the settlement had to, among other things, download, print, and mail in the opt-out form and sign

10 with a wet-ink signature, and no online option was provided. *See Hadley v. Kellogg Sales Co*.,

11 2020 WL 836673, at *8 (N.D. Cal. Feb. 20, 2020) (noting that the opt-out form and information

12 were riddled with inconsistencies and that the procedure was "needlessly burdensome" because

13 to opt out one must "download an Opt-Out Form from the Settlement Website,

14 www.CerealClaims.com, complete the form, and mail it to the Class Administrator."); *Newman*

15 *v. AmeriCredit Fin. Servs.*, *Inc*., 2014 WL 12789177, at *6 (S.D. Cal. Feb. 3, 2014) (criticizing

16 opt-out and claim process where no online option was proposed). At least one case cited by

17 Movants actually approved the mail-in process while requiring similar information as required

18 here. *See Smothers v. NorthStar Alarm Servs., LLC*, 2019 WL 3080822, at *5 (E.D. Cal. July 15,

19 2019) (permitting opt-out process that required mailing in opt-out request that included: "1) Your

20 intention to be excluded from the California Class Settlement, 2) Your name, address, telephone

21 number and the last four digits of your Social Security Number, and 3) your signature."). And

22 the *Arena* court expressly "[s]et[] aside the dispute about mass opt outs through counsel," an

23 issue it did not address nor rule on. *Arena*, 2021 WL 834253, at *10. Unlike these cases, Plaintiffs

24 have set forth an easy-to-navigate process: claimants need only fill out an online form, engaging

25 in exactly the same process as Settlement Class Members who wish to submit a claim and

26 providing the same information.

27        At bottom, the opt out requirements here include straightforward, basic information from

28 persons wishing to exclude themselves: (i) case name of the Litigation; (ii) name and current

email and mailing addresses of the Person seeking exclusion; (iii) 23andMe username or email associated with the 23andMe account for the Person seeking exclusion; (iv) signature of the individual seeking exclusion using wet-ink, DocuSign, or other similar process for transmitting authenticated digital signatures (and, if submitted via online form on the Website, a simple email verification); (v) an attestation clearly indicating the Person's intent to be excluded from the Settlement; and (vi) attestation that the Person seeking exclusion had a 23andMe user account as of August 11, 2023. Dkt. 103-2 at 22-23. These requirements are commonly accepted in this District, and therefore Plaintiffs respectfully request the Court grant Preliminary Approval without modification. *See, e.g., Lundy et al. v Meta Platforms, Inc*., No. 3:18-cv-06793-JD, Dkt. 199 at 4 (N.D. Cal. April 26, 2023) (approving exclusion process that permitted submission of individual opt-outs via portal, which required email verification of submitted forms, or mail but: "Opt-out requests seeking exclusion on behalf of more than one individual will be deemed invalid by the Settlement Administrator"); *In Re: Facebook, Inc. Consumer Privacy User Profile Litigation*, No. 18-md-2843-VC (N.D. Cal. Mar. 29, 2023), at Dkt. 1130 (granting preliminary approval to Class Action Settlement Agreement and Release, including the opt out provision at Dkt. 1096-2, ¶ 108: "To be effective and valid, opt-out requests submitted online must verify the Request to Opt-Out no later than the Opt-Out Deadline using the link sent to the individual who submitted the request for exclusion"); *Cochran* , 2021 WL 8824962, at *3 (N.D. Cal. Nov. 5, 2021) (approving exclusion process that permitted individual opt-outs by electronic form or mailed-in forms but disallowing mass opt-outs); *Shuman*, 2022 WL 10177658, at *3 (N.D. Cal. Oct. 17, 2022) (approving exclusion process via "online opt-out form" but "'mass' or 'class' opt-outs are not permitted"); *In re Facebook Biometric Info. Priv. Litig.*, No. 15-cv-03747-JD (N.D. Cal. July 22, 2020), at Dkt. 468, § 4.5 (law firms Labaton and Edelson acted as class counsel and agreed to an opt-out process that required individually mailed or emailed opt-outs that included "name, address and email; a signature, the name and number of the Action, and a statement that he or she wishes to be excluded from the Class for purposes of this Settlement" and which expressly prohibited "So-called 'mass' or 'class' opt-outs").

**C.      The Melvin Plaintiffs' Objections Should Be Overruled.**

**1.      The Proposed Settlement Class and Statutory Subclass Are Well Defined and Do Not Create Intra Class Conflicts, and Additional Subclasses Are Neither Necessary Nor Advisable**

The proposed Settlement provides fair and adequate relief that is directly tailored to the types of injuries suffered by *all* Settlement Class Members, including three years of Privacy Shield identity theft protection and monitoring services, which is a unique and state of the art monitoring program with components designed specifically to assist in mitigating the damage caused by this Security Incident. Moreover, each Class Member is entitled to claim up to $10,000 in reimbursement for losses incurred as a result of the Security Incident—including the costs of installing home security systems as well as professional mental health treatment—the very out of pocket losses cited by class members as a result of the Security Incident.[7]

These Settlement benefits provide meaningful relief that is tailored to the injuries suffered by all Class Members—including those of Chinese and/or Ashkenazi Jewish descent whose Private Information was compromised in the Security Incident. For instance, Class Members of Chinese and/or Ashkenazi Jewish descent who installed home security systems or sought mental health treatment on account of being targeted and threatened as a result of the Security Incident would be able to recover for such damages. In this regard, the benefits provided by the proposed Settlement specifically address the harms and risks created by the Security Incident, including those related to having Private Information exposed on the dark web as well as those related to being targeted on account of Chinese and/or Ashkenazi Jewish ancestry.[8] These benefits stand in stark contrast to the Melvin Plaintiffs' baseless assertion that "the Settlement provides no

---

[7] In contrast, the Melvin Plaintiffs misleadingly assert that the relief provided to non-Statutory Subclass members is "limited only to credit monitoring." Dkt. 118 at 9.

[8] *See* Dkt. 123 at 18 (the Privacy Shield monitoring program "was designed to provide specific remedies to Settlement Class Members in the putatively-targeted groups, as it provides monitoring for genetic information on the dark web and will assist Settlement Class Members in remediation efforts if such information is located," and "the types of out-of-pocket costs reimbursable under Extraordinary Claims were also designed with specific considerations for the putatively targeted groups as Plaintiffs of the targeted groups reported that after the Security Incident, they were fearful and therefore purchased security systems or went to counseling," expenses for which are reimbursable under the Settlement).

particular relief for these individuals." *Cf.* Dkt. 118 at 9. To the extent the Melvin Plaintiffs argue the Settlement should provide greater benefits to Class Members of Chinese and/or Ashkenazi Jewish descent, the Melvin Plaintiffs have failed to identify what they think those additional benefits should be or why they should be provided.

The Statutory Subclass is likewise well-tailored to Settlement Class Members who are entitled to a Statutory Cash payment.[9] The Melvin Plaintiffs appear to argue that this Statutory Subclass should be further divided because it includes Settlement Class Members from different states who have claims under state statutes with different measures of statutory damages. Dkt. 118 at 7-8. But, as the very authority cited by the Melvin Plaintiffs makes clear, "not every difference in situation between groups of class members triggers the need for subclasses, and where the district court can be satisfied that all class members' interests have been fully and fairly represented and treated fairly, formal subclassing, with its attendant delay and expense, is neither necessary nor advisable." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 06-4333 PJH, 2013 WL 12333442, at *13 (N.D. Cal. Jan. 8, 2013), *report and recommendation adopted sub nom. In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486-PJH, 2014 WL 12879520 (N.D. Cal. June 27, 2014). In particular, *In re DRAM Antitrust Litigation* determined that subclasses are not recommended for an indirect purchaser settlement class— which encompassed numerous different types of purchasers with multiple different federal and state statutory claims—as the plan of distribution was one in which "all definable interests within the class were fully and fairly represented and were treated fairly," and which created "a structure of ensuring that reimbursement to class members reasonably will be tied to the extent of damages incurred." *Id.* at *12-13. As such, the court should reject the Melvin Plaintiffs' argument that the Statutory Subclass should be further divided.

Additionally, the Melvin Plaintiffs cite no case that supports the proposition that including class members with different state statutory claims in the same subclass creates inter-class conflicts. *See* Dkt. 118 at 7-8. Instead, the cases cited by the Melvin Plaintiffs involve facts

---

[9] "Statutory Subclass Members" are defined as "Settlement Class Members who were residents of Alaska, Oregon, California or Illinois as of August 11, 2023." Dkt. 103-2 ¶ 51.

starkly different than those at issue here. In *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065 (C.D. Cal. May 2, 2023), for example, the proposed distribution formula allocated each class member "shares of the settlement proportional to the number" of weeks in which a class member worked at least one shift "during the relevant periods." *Id.* at 1082. However, the court expressed concerns that this plan of allocation "appears likely to overcompensate certain class members and undercompensate others." including that "a traveling nurse who worked four shifts spread out over two weeks would be entitled to the same compensation as a traveling nurse who worked ten shifts within two weeks." *Id.* Similarly, "class members who worked longer shifts . . . could have disproportionately endured the statutory violations" encompassed by the proposed settlement, and certain class members would release "extra claims without a corresponding extra benefit." *Id.* at 1083. Likewise, in *Rollins v. Dignity Health*, 336 F.R.D. 456 (N.D. Cal. June 12, 2020), the court identified "a fundamental conflict of interest" between a subgroup and the rest of the class "that must be addressed by subclass certification," because the subgroup would "not benefit from class-wide prospective relief," and "were incentivized to seek 'generous immediate payments' while the rest of the class had an interest 'in ensuring an ample, inflation-protected fund for the future.'" *Id.* at 466-67. And in *Nacif v. Athira Pharma, Inc.*, No. C21-0861 TSZ, 2023 WL 6290582 (W.D. Wash. Sept. 27, 2023), the court denied preliminary approval because the proposed class representatives were bound by the earlier dismissal of certain claims, on account of which their claims were "not typical" and "conflict with those of other class members," including that one proposed class representative had interests "antagonistic toward all class members" because he could only recover through settlement." *Id.* at *2. Here, there are no such conflicts of interests, as all Statutory Subclass members have been injured by the same course of conduct, and all have suffered comparable harms from the release of their Private Information.

Insofar as the Melvin Plaintiffs challenge why Statutory Subclass members from different states with claims providing for different measures of statutory damages "are claiming equal shares of the Statutory Subclass pot," Dkt. 118 at 7-8, this is fundamentally a challenge to the Settlement's plan of allocation, which "is governed by the same standards of review applicable

to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994). In this regard, "[i]t is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits," *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. Jan. 9, 2008), and "[a] plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable," *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1. Likewise, "'courts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.'" *Rieckborn v. Velti PLC*, No. 13-CV-03889-WHO, 2015 WL 468329, at *8 (N.D. Cal. Feb. 3, 2015) (*quoting Vinh Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014).

In the proposed Settlement, Statutory Subclass members are entitled to claim monetary payments on account of their residency in certain states with genetic privacy laws providing for statutory damages—specifically, the Alaska Genetic Privacy Act, the California Consumer Privacy Act, the Illinois Genetic Information Privacy Act, and the Oregon Genetic Privacy Law. As set forth in the preliminary approval motion (Dkt. 103) as well as the supplemental brief in support thereof (Dkt. 123), the maximum potential recoveries for Statutory Subclass members vary widely, from $750 for violations of the California Consumer Privacy Act to $150,000 for violations of the Oregon Genetic Privacy Law. *See* Dkts. 103-1 at 22-24; 123 at 10. Likewise, the maximum potential aggregate recoveries for Statutory Subclass members vary widely from state to state, ranging from $710 million for violations of the California Consumer Privacy Act to $18.8 billion for violations of the Oregon Genetic Privacy Law. Dkt. 123 at 10.

For reasons discussed in the preliminary approval motion, significant discounts have been applied to the values of these statutory claims in this Settlement. First, "[d]ue to the aggregate value of the statutory claims, if successful, an award of statutory damages would likely face a due process challenge and potentially be significantly reduced." Dkt. 103-1 at 23 (citing *Wakefield v. ViSalus, Inc.* 51 F.4th 1109, 1123 (9th Cir. 2022)). Second, "regardless of any constitutional issues, the financial condition of the Defendant would likely prohibit satisfaction

of any judgment under any of the statutory claims obtained through trial." *Id.* These due process and financial solvency concerns effectively place a cap on the amount of damages that could be recoverable in this action—which is likely significantly less than $710 million, the smallest maximum potential aggregate recovery available under the four statutory claims encompassed by the Statutory Subclass. In light of this effective cap on recovery resulting from due process and financial solvency considerations, the discounts applied to the statutory claims increase in proportion to the statutory damages available under each of these claims.

As such, there are reasonable, rational bases for providing the same relief to Statutory Subclass members from different states with claims providing for different measures of statutory damages, and the Melvin Plaintiffs' challenges to the Settlement's plan of allocation should be overruled. *See, e.g.*, *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, No. 3:18-MD-02843-VC, 2023 WL 8443230, at *4 (N.D. Cal. Oct. 10, 2023) (overruling objections to the plan of allocation, including that the plan "fail[ed] to accord increased value" to certain class members' claims, that the "[p]laintiffs have not accurately evaluated the Class's claims," and that "there is an intraclass conflict that requires separate representation"); *In re DRAM Antitrust Litig.*, 2013 WL 12333442, at *79–80 (recommending pro rata distribution of settlement proceeds and supporting the parties' choice "not to make any distinctions in the distribution formula to account for actual or perceived differences in the merits or 'strength' of the various settled claims") (citing *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 326–28 (3d Cir. 2011) (supporting pro rata distribution of settlement proceeds and rejecting objection that "differences in state law mandate a differential allocation in the percentage of recovery," because "each putative class member suffered the same alleged injury") (internal quotation marks and citations omitted)).

### 2.      This is Not a "Stock Data Breach Settlement"

Though repeatedly invited to participate, the Melvin Plaintiffs were not involved in any of the Settlement negotiations in this Litigation. Nonetheless, they criticize the Settlement and, in so doing, fail to acknowledge the unique challenges that Plaintiffs faced in designing a Settlement that would accommodate the needs of this Settlement Class, while also addressing the difficulties presented by 23andMe's financial condition. While the Melvin Plaintiffs

acknowledge the uncertainty of 23andMe's future, in the next breath, they wave away any concern by reference to an outdated article about CEO Anne Wojcicki's attempt to take 23andMe private. They do not address the ongoing and deteriorating condition of the company since that article was published. For example, they fail to acknowledge that the Special Committee of the Board of Directors evaluated and rejected Ms. Wojcicki offer or that on September 17, 2024, all of 23andMe's independent directors resigned, noting that there remains no evidence that Ms. Wojcicki has been able to secure adequate financing to take the company private, despite having had quite some time to do so.[10] The Settlement has to be viewed in light of factors including the advantages and risks to the Settlement Class of continuing litigation, wasting insurance and dwindling assets, competing claims for those assets, the ongoing exposure it has to claimants who will opt out of the Settlement, and the uncertain nature of 23andMe's future. The proposed Settlement does just that and offers the Settlement Class Members an opportunity to accept its benefits.

### 3.   Privacy & Medical Shield + Genetic Monitoring Is Not "Credit Monitoring"

The Melvin Response argues the Settlement's non-cash benefit—Privacy & Medical Shield + Genetic Monitoring ("Privacy Shield")—is "credit monitoring" and has no value to Settlement Class Members. But this a material mischaracterization of the product being offered. A product of this expanse and caliber has never been offered in any data breach case. Declaration of Gerald Thompson ("Thompson Decl.") Dkt. 103-7. As such, the Melvin Plaintiffs' purported survey regarding class members' views on completely different products is irrelevant to the

---

[10] *Genetic testing firm 23andMe rejects CEO's take-private offer*, Reuters (Aug. 2, 2024), https://www.reuters.com/business/healthcare-pharmaceuticals/23andme-rejects-ceo-wojcicki-take-private-offer-2024-08-02/; 23andMe Press Release, *23andMe Special Committee responds to CEO's take-private proposal* (Aug. 2, 2024), https://investors.23andme.com/news-releases/news-release-details/23andme-special-committee-responds-ceos-take-private-proposal (containing letter from the Special Committee of the Board of Directors to Ms. Wojcicki); *23andMe independent directors quit board over unsatisfactory buyout plan from CEO*, Reuters (Sept. 17, 2024), https://www.reuters.com/business/healthcare-pharmaceuticals/23andme-independent-directors-quit-board-over-unsatisfactory-buyout-plan-ceo-2024-09-17/; 23andMe Press Release, *Independent Directors of 23andMe Resign from Board* (Sept. 17, 2024), https://investors.23andme.com/news-releases/news-release-details/independent-directors-23andme-resign-board.

Privacy Shield service offered by the proposed Settlement—which is a product that was designed to address the concerns class members have about their information having been the subject of this Security Incident.

The Thompson Decl. (Dkt. 103-7) explains the product as a unique, comprehensive monitoring product that offers features designed to reduce Settlement Class Members' digital footprint and provides a number of tools that can be used by class members to control the use and sale of their private information. It will remove Settlement Class Members' personal data from all known data broker sites for the three years the service is offered and provides a protected environment for all Settlement Class Members to maintain and share documents among family members. Additionally, its password manager feature protects Settlement Class Members' online login information from threat actors, it provides a Virtual Private Network where Class Members can shop, bank and work anonymously, it allows for monitoring of genetic, dark web and stolen data, and provides a private search engine which allows Settlement Class Members to browse the internet without being targeted with ads and prevents data collection, among other features.

Privacy Shield also provides protection for the private medical information of Settlement Class Members and assists in preventing and mitigating the effects of health and medical fraud, including through outreach to insurance providers. For example, it facilitates updating medical identifiers linked to the Settlement Class Members and other family members on their medical insurance plan when their personal healthcare/medical records are located on the dark web or stolen data sites, assists with remediation of the leaked data by communicating directly with insurers and health care providers on Settlement Class Members' behalf and with altering their International Classification of Disease numbers in the national healthcare system, alerts Settlement Class Members if their medical information is exposed and prompts them to notify their medical insurance provider to request a new medical ID number and deactivate the old medical ID number. Privacy Shield also includes the ability to implement credit freezes through a common portal, provides insurance for covered identity theft expenses and a customer support and victim assistance department to give Settlement Class Members assistance and resources when they have suffered identity theft or healthcare-related fraud, including providing access to

1    expert specialists who are trained to provide restorative services.

2       The Melvin Plaintiffs assert that the genetic monitoring alerts and victim assistance

3 product is not meaningful to the Settlement Class Members, but the Settlement Class Members

4 should be given the opportunity to evaluate its worth for themselves. And while the Melvin

5 Plaintiffs question the customer support and assistance Privacy Shield will provide, they offer no

6 alternative suggestions for what benefits to offer Settlement Class Members, other than to

7 advocate for a modest cash payment.

8       The Melvin Plaintiffs' focus on cash payouts fundamentally misunderstands the unique

9 features of this case. Many of the Settlement Class Members are rightly frightened and anxious

10 and have concerns about their personal safety. But again, the Melvin Plaintiffs fail to recognize

11 the circumstances applicable to *this* Settlement. Interim Co-Lead Counsel agree that where funds

12 are sufficient to provide automatic payment to class members, that is usually the preferred

13 approach. But to the extent the Melvin Response is suggesting each Settlement Class Member

14 should receive an automatic payment of approximately $3.00 instead of the benefits offered by

15 the Settlement, this approach was considered by Interim Co-Lead Counsel and rejected as

16 insufficient in addressing the best interests of Settlement Class Members.

17       As the Court is aware, benefits to a class can come in many forms and reasonable minds

18 can differ on what is the best form of relief. But the standard under Rule 23 is whether the

19 Settlement is fair, reasonable, and adequate given the circumstances of each case. Thus, class

20 action settlements have been approved even where the only benefit to the class is by way of *cy*

21 *pres* distribution because cash payments would be *de minimis*. *See*, *e.g.*, *In re Google Inc. St.*

22 *View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1116 (9th Cir. 2021) ("[T]he infeasibility of

23 distributing settlement funds directly to class members does not preclude class certification.");

24 *In re Netflix Priv. Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, at *7 (N.D. Cal. Mar. 18,

25 2013) (approving cy pres settlement where, "[g]iven the sheer size of the Class . . . each Class

26 member would receive a de minimis payment in the event of a direct class cash payout"").

27 Plaintiffs here chose to forego the nominal per-class member payment in favor of alternative

28 benefits of greater worth.

### 4.      The Notice and Claims Process are Reasonable and Designed to Encourage Claims

The Melvin Plaintiffs also argue that the Settlement's notice program and claims process are designed to suppress claims. Curiously,  they contend that, "[i]f there must be a claims process . . . individuals who have valuable claims should at least be *notified* that they have those claims." Dkt. 118-9. However, the Class Notice does just that—by informing Settlement Class Members that there was a cyberattack on 23andMe in which their personal information was compromised, explaining the types of information involved in the attack, and detailing the Settlement Class Members' eligibility for certain benefits as a result of the compromise of their personal information. Not only is this sufficient to put Settlement Class Members on notice of the very issues which the Melvin Plaintiffs complain are lacking but it is also sufficient under established Ninth Circuit law: [n]otice provided pursuant to Rule 23(e) must "generally describe[ ] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) (internal quotation marks omitted).

The Melvin Plaintiffs also complain that the Class Notice does not tell Settlement Class Members their information was posted on the dark web. While technically accurate, the Melvin Plaintiffs' assumption that this will serve to diminish claims is misplaced. Quite the contrary, there are a number of issues that would arise out of such attempted notification. Not all Settlement Class Members of Ashkenazi Jewish or Chinese ancestry had their information posted on the dark web. Moreover, for some Settlement Class Members, their full names were implicated, while for others, it was only their account IDs or fictitious names. Ultimately, 23andMe cannot confirm the identity of every Settlement Class Member whose information may have been posted on the dark web. As such, notifying all Settlement Class Members that their information is (or was) on the dark web would cause confusion, combined with the further complication that information available on the dark web is constantly in flux. Sharing this information would give rise to unnecessary anxiety for Settlement Class Members whose information is no longer posted for sale on the dark web or never was on the dark web in a format that could be traced to them.

The simple truth is that it is not possible to ensure that a unique notice to all Settlement Class Members whose information was posted for sale on the dark web would be neither underinclusive nor overinclusive. Under these circumstances, the Class Notice proposed here is likely to provide Settlement Class Members with accurate information on which to assess their review of the proposed Settlement.

The Melvin Plaintiffs finally provide a "kitchen-sink" argument that the presentation of the Settlement is "unacceptable."[11] Dkt. 118-10-11. Plaintiffs have provided the information required under the Northern District *Procedural Guidance for Class Action Settlements*[12] and addressed the Court's questions related to the Settlement. *See* Dkt. 123. Interim Co-Lead Counsel will of course address any addition questions the Court has about the Settlement.

### III.   CONCLUSION

For the foregoing reasons, the Motions to Intervene should be denied and all objections by the Movants and Melvin Plaintiffs should be overruled.

RESPECTFULLY SUBMITTED this 9th day of October, 2024.

*/s/ Cari Campen Laufenberg*
Cari Campen Laufenberg (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel: (206) 623-1900
claufenberg@kellerrohrback.com

---

[11] One issue the Melvin Plaintiffs raise that was not addressed in Plaintiffs' previous submissions is with regard to the scope of claims released in the Settlement. Dkt. 118 at 11. While it is not entirely clear, the Melvin Plaintiffs appear to be referring to claims about the possibility of the sale of data in 23andMe's possession; however, those claims are not—and never have been— part of this MDL action. The Melvin Plaintiffs previously raised that issue with the Court in February 2024, and the Court stated that issue was not raised in the complaints before the Court. Tr. of Proceedings at 11:14-19, 32:4-9, *Santana v. 23andMe, Inc.*, No. 3:23-cv-05147-EMC (Feb. 22, 2024). That has not changed, and the Settlement Agreement provides that the claims released are those "based on, relating to, or arising out of the same factual predicate as the allegations in the Litigation." Dkt. 103-2 at 9. This does not implicate the sale of data in 23andMe's possession.

[12] *Procedural Guidance for Class Action Settlements*, United States District Court for the Northern District of California, http://www.cand.uscourts.gov/ClassActionSettlementGuidance.

Gayle M. Blatt (SBN 122048)
CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD
LLP
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
gmb@cglaw.com

Norman E. Siegel (*pro hac vice*)
STUEVE SIEGEL HANSON LLP
460 Nichols Road
Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
siegel@stuevesiegel.com

*Interim Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I, Sarah Skaggs, hereby certify that on October 9, 2024, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

/s/ *Sarah Skaggs*
Sarah Skaggs