Cari Campen Laufenberg (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel: (206) 623-1900
claufenberg@kellerrohrback.com

Gayle M. Blatt (SBN 122048)
CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
gmb@cglaw.com

Norman E. Siegel (*pro hac vice*)
STUEVE SIEGEL HANSON LLP
460 Nichols Road
Suite 200
Kansas City, MO 64112
Tel: 816 714-7100
siegel@stuevesiegel.com

*Interim Co-Lead Counsel*

Rebekah S. Guyon, SBN 291037
GREENBERG TRAURIG LLP
Rebekah.guyon@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: 310-586-7700

Ian Ballon (SBN 141819)
ballon@gtlaw.com
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303
Telephone (650) 328-8500
Fax: (650) 328-8508

Stephen L. Saxl (*pro hac vice*)
saxls@gtlaw.com
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-8184

Kristin O'Carroll, SBN 312902
ocarrollk@gtlaw.com
101 Second Street, Suite 2200
San Francisco, CA 94105-3668
Telephone: 415-655-1300

*Attorneys for Defendant 23andMe, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE: 23ANDME, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Related to: ALL ACTIONS | No. 3:24-md-03098-EMC<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Date: October 29, 2024<br>Time: 3:30 PM<br>Courtroom: 5, 17th Floor<br>Judge: Hon. Edward M. Chen |

# TABLE OF CONTENTS

A.   23andMe's Financial Condition ...................................................................1

B.   Investigation and/or Discovery ................................................................2

C.   Cause of the Data Breach ........................................................................4

D.   Compromised Personal Information .......................................................5

E.   Class Size ...................................................................................................8

F.   Maximum Value of the Case ...................................................................8

G.   Net Settlement Fund ..............................................................................10

H.   Claims Rates and Average Awards .......................................................11

I.   Plan of Allocation / Settlement Benefits Plan ....................................14

J.   Injunctive Relief .....................................................................................19

K.   Attorneys' Fees .......................................................................................20

L.   Settlement Administration Costs ..........................................................22

M.   Class Notice.............................................................................................22

N.   Response to Class Notice .......................................................................23

O.   Language in the Class Notice.................................................................25

P.   Preliminary Injunction..........................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguallo v. Kemper Corp.*,
  No. 1:21-cv-01883 (N.D. Ill), Dkt. 45, 46, 51, 53 ............................................................16

*In re Ambry Genetics Data Breach Litig.*,
  567 F. Supp. 3d 1130 (C.D. Cal. 2021) ............................................................17

*In re Anthem, Inc. Data Breach Litig.*
  327 F.R.D. 299 (N.D. Cal. 2018) ............................................................15, 17

*Cochran et al. v. Accellion, Inc. et al*,
  No. 5:21- cv-01887-EJD (N.D. Cal.), Dkt. 31, 104, 115 ....................................................16

*In re: Facebook Consumer Privacy User Profile Litigation*,
  3:18-md-02843-VC (N.D. Cal.) ............................................................24, 25

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ............................................................17

*Heath v. Insurance Technologies Corp.*,
  3:21-cv-01444-N (N.D. Tex.), Dkt. 35, 39, 45, 52 ............................................................16

ii

In response to this Court's Order Regarding Supplemental Briefing and/or Evidence, the Parties submit the following answers to the Court's questions. Dkt. 111. Except where indicated expressly or by context, this is a joint submission of the Parties.

## A. **23andMe's Financial Condition**

**Question:** "Plaintiffs indicate that 23andMe's financial condition played a factor in deciding to settle and the terms of the settlement. According to Plaintiffs, '[p]rior to [the second] mediation [with Mr. Wulff], the group [of Plaintiffs' lawyers participating in the mediation] engaged an independent forensic accounting firm to advise it with respect to 23andMe's financial condition.' Co-Lead Counsel Decl. ¶ 24. What did the firm learn about the company's condition and what did it advise? (If there is any concern here about privilege or trade secrets, the information may be lodged with the Courtroom Deputy (EMCCRD@cand.uscourts.gov) instead of filed. Alternatively, the information may be filed under seal.)."

**Answer[1]**: Plaintiffs engaged consultants to provide an independent assessment of 23andMe's financial condition. These consultants evaluated 23andMe's current financial condition including available cash, prospective business prospects, and access to capital. With respect to 23andMe's financial condition, the firm summarized the financials as follows:

> Operating Income had been negative, with losses between $185.2m [and] $234.8m in FY 2019 to 2022. These losses increased to $324.0m in FY 2023. For L9M 12/31/2023, losses are $189.0m. EBITDA had been negative, with losses between $167.1.2m and $211.1m in FY 2019 to 2022. These losses increased to $291.2.0m in FY 2023. For L9M 12/31/2023, losses are $243.3m. There was no analyst EBITDA estimate for FY 2024, but for FY 2025 and FY 2026, EBITDA is estimated by a single analyst at losses of $183.7m and $154.4m, respectively.

The consultants also outlined 23andMe's deteriorating cash position: "As of December 31, 2023, 23andMe had $242.4m in cash on its balance sheet, down from $553.2m and $386.8m at March 31, 2022, and 2023, respectively. The reductions in cash over the last two periods are due primarily to operating losses." In 2024, 23andMe reported $216 million in unrestricted cash

---

[1] 23andMe does not join in Interim Co-Lead Counsel's response to Request (A). 23andMe's financial condition is accurately disclosed in the public records through its SEC filings.

and cash equivalents as of March 31, 2024, and $170 million in cash as of June 30, 2024. Based on 23andMe's average burn rate of approximately $45 million per quarter, the company would run out of cash in the next 12 months, absent access to new capital.

In evaluating future sources of cash, the consultants examined all revenue and potential revenue streams for the company and concluded:

> Overall, there appears to be low prospect for near-term growth in revenue from current operations, as revenue-generating operations are all on a marked downtrend, including the Telehealth segment that stemmed from the acquisition of Lemonaid Health in November 2021. In addition, the Therapeutics operating segment has overall been pre-revenue for the past three fiscal years.

These conclusions regarding 23andMe's business prospects—in conjunction with growing litigation risk—supported the consultant's conclusion that 23andMe would have significant challenges raising new capital.

Plaintiffs note that even since the filing of their Motion for Preliminary Approval, 23andMe's financial condition has continued to deteriorate. On September 17, 2024, all of 23andMe's independent directors resigned, an extraordinarily rare event for a public company. In their letter to CEO Anne Wojcicki, the seven resigning directors said they had yet to receive a "a fully financed, fully diligenced, actionable proposal that is in the best interests of the non-affiliated shareholders" from the chief executive after months of efforts.[2]

## B. Investigation and/or Discovery

**Question:** "What investigation and/or discovery was done, both by Plaintiffs and 23andMe? *See* Sett. Agmt., Recital ¶ 14."

**Answer**: In early October 2023, 23andMe's outside counsel Greenberg Traurig retained a third-party to assist it in undertaking a forensic investigation to determine the customer information the threat actor accessed and/or downloaded in each affected account. Thereafter

---

[2] 23andMe Press Release, *Independent Directors of 23andMe Resign from Board* (Sept. 17, 2024), https://investors.23andme.com/news-releases/news-release-details/independent-directors-23andme-resign-board.

until December 1, 2023, the third-party forensic investigator conducted an extensive investigation of the cause and scope of the security incident.

Prior to reaching the proposed Settlement in this matter, Interim Co-Lead Counsel received the following informal discovery:

1. A description of how the incident occurred;

2. An explanation of why the intrusion was not detected earlier;

3. The actions taken by 23andMe once it learned of the security incident;

4. Information regarding notification of the incident that was sent and to whom notification was sent;

5. What additional notices were sent directly to consumers in accordance with state and federal law;

6. The number of consumers affected by the act that allowed entry into 23andMe's database;

7. The types of information shared by class members on the Family Tree group and what information was potentially accessed through the DNA Relatives feature;

8. A detailed breakdown of the numbers of class members affected in each of these categories and their states of residence;

9. A breakdown of the health information at issue for the approximately 7,300 individuals whose health information was involved in the incident;

10. The states of residence of those with health information at issue in this security incident;

11. 23andMe's insurance information, including the total and what was left by the time the parties attended the initial mediation in January 2024;

12. Information regarding specific financial challenges 23andMe was facing;

13. 23andMe's security compliance and standards in place before the incident;

14. The nature of changes made to 23andMe's security policies upon learning of the incident; and

15. 23andMe's position on a number of issues relative to the merits of the case, class certification and class member damages.

In addition, Plaintiffs were able to question 23andMe's then Chief Administrative Officer directly at mediation and were able to do the same later with the Interim General Counsel for 23andMe. Ongoing communications regarding issues and questions that arose throughout the extended mediation processes were answered by counsel.

**Question**: "If either side engaged experts, *see*, *e.g.*, Sett. Agmt., Recital ¶ 6, what did the experts do?"

**Answer**: In addition to 23andMe's engagement of outside experts as set forth above, Plaintiffs engaged a cybersecurity consultant and a business valuation consultant. The cybersecurity consultant examined available information about the cause of the Security Incident as well as 23andMe's business practice changes following the Security Incident. As set forth above, the business valuation consultant was engaged to address and contribute to Plaintiffs' understanding of the financial condition of the company, and was asked to advise as to possible business transactions that might affect 23andMe's financial situation.

### C.  Cause of the Data Breach

**Questions**: "What do the parties know about the cause of the data breach? Were Plaintiffs able to confirm one way or the other the cause claimed by 23andMe? *See* CAC ¶ 2 ('Defendant has publicly stated that the Data Breach was a result of compromised user credentials whereby attackers gained access to data through passwords that users had reused from other website that were hacked . . . .')."

**Answer**: 23andMe's investigation determined the Security Incident was the result of a credential stuffing attack wherein the threat actor was able to access certain accounts in instances where usernames and passwords that were used on 23andMe.com were the same as those used on other websites that had been previously compromised or otherwise available. After independent investigation, Plaintiffs have not uncovered evidence of another cause of the Security Incident.

**D. <u>Compromised Personal Information</u>**

**Question #1:** "What personal information exactly was compromised? *See*, *e.g.*, CAC ¶ 424."

**Answer**: Based on its investigation, 23andMe identified two broad categories of information accessed in the incident. For the vast majority of impacted individuals, only non-health related information was compromised. For a small fraction of impacted individuals (0.01%) the compromised information was health-related. The two categories are described in more detail below.

**Non-health related information** encompasses the vast majority of information accessed and individuals impacted in the incident. The type of non-health impacted data varied on a person-by-person basis, but generally includes following information:

- *DNA Relatives Profile Information.*[3] DNA Relatives is an optional feature in which 23andMe customers may choose to share certain information with their genetic relatives. It is 23andMe's position that by electing to participate, customers agree to share their DNA Relatives information and identify themselves (using whatever display name they wish) to thousands of other customers who are their genetic relatives and who have also elected to participate in the feature. For impacted individuals whose DNA Relatives information was impacted, the nature of the information varied depending on the information that a customer chose to share through the feature, but generally included: display name (23andMe does not require customers to use their real names); how recently the customer logged in; and their relationship label, predicted relationship and percentage DNA shared with the genetic relative viewing their DNA Relatives profile information. The following information

---

[3] It is 23andMe's position that since the DNA Relatives and Family Tree profile information accessed by the threat actor was previously shared by impacted customers via the DNA Relatives feature it is neither private nor confidential, as it was information these customers voluntarily elected to share with other unknown and unidentified 23andMe customers also participating in the DNA Relatives feature who were identified to be their genetic relatives, which could total in the millions in some cases.

also may have been accessed if a customer chose to share it through the DNA Relatives feature: ancestry reports (which includes ethnicity information) and matching DNA segments (a basic chart showing chromosomes where they and their relative have matching DNA, which includes ethnicity information); self-reported location (city and/or zip code); ancestor birth locations and family names; birth year; a family tree created by the customer; and anything else the customer elected to share with other users via the "Introduce yourself" section of the customer's profile.[4]

- *Family Tree Profile Information*.[5] Like the DNA Relatives feature, customers may elect to participate in 23andMe's Family Tree feature, through which, 23andMe contends, customers disclose their family tree information to up to millions of other customers who have also elected to participate in the feature. The Family Tree Profile information accessed by the threat actor is a subset of the DNA Relative profile information described above but does not include any ethnicity information. For the Family Tree Profiles, the information accessed by the threat actor varied depending on the information that a customer chose to share through the feature, but generally included: display name (23andMe does not require customers to use their real names); relationship labels; and the percent of shared DNA with the customer viewing the Family Tree profile. The following information may have been accessed if a customer chose to share it through the Family Tree feature: birth year, and the self-reported location (city and/or zip code).

**Health Information** was impacted for a very small percentage of individuals. This information varied on a person-by-person basis and included the following: health reports

---

[4] A sample Ancestry Report is available at https://permalinks.23andme.com/pdf/samplereport_ancestrycomp.pdf.

[5] 23andMe maintains that since the DNA Relatives and Family Tree profile information accessed by the threat actor was previously shared by impacted customers via the DNA Relatives feature it is neither private nor confidential, as it was information these customers voluntarily elected to share with other unknown and unidentified 23andMe customers also participating in the DNA Relatives feature who were identified to be their genetic relatives, which could total in the millions in some cases.

derived from the processing of genetic information, including health-predisposition reports, carrier status reports, and certain wellness reports; self-reported medical information; and uninterpreted genotype data.[6]

**Question #2:** "If genetic information was compromised, can the parties explain what that information reveals about an individual – *e.g.*, ancestry, relationships, health, etc.?"

**Answer:** *See* Response to Request D(1).

**Question # 3:** "Which genetic information can support submission of a Health Information Claim, and which genetic information cannot? *See* Sett. Ben. Plan. ¶ 5 (addressing Health Information Claims)."

**Answer:** Health Information Claims are available to customers whose (i) uninterpreted raw genotype data, (ii) certain health reports derived from the processing of their genetic information, including health predisposition reports, carrier status reports, and certain wellness reports, or (iii) self-reported medical information was accessed. *See* Response to Request D(1).

**Question # 4:** "Is there any indication whether compromised personal information has actually been used (*e.g.*, identity fraud, targeting ethnic groups)?"

**Answer:** 23andMe is unaware of any instances of identity theft or fraud or any other unauthorized access that is attributable to the incident. It is 23andMe's position that the information accessed cannot be used for identity fraud or pecuniary harm—customer financial information was not impacted, nor were social security numbers. It is 23andMe's position that neither the self-reported location (city and/or zip) nor the ancestor birth locations are specific enough to allow for targeting of particular racial or ethnic groups. It is 23andMe's position that without pairing this information with far more narrow community-level identifiers, this information would not provide an individual's location.

From the Plaintiffs' perspective, the discovery of the breach, the notices, and attendant

---

[6] A sample Health Predisposition Report is available at
https://permalinks.23andme.com/pdf/samplereport_genetichealth.pdf?_gl=1*robfth*_ga*MTE
xOTU3NTUwLjE3Mjc4Nzc1MTc.*_ga_G330GF3ZFF*MTcyNzg3OTQ3OC4yLjEuMTcyNzg
3OTc2My4wLjAuMA.

publicity have caused a lot of anxiety to the members of the class. Some of the Named Plaintiffs report being the target of increased spam calls and phishing emails after the Security Incident. Others report attempted credit card fraud or account openings. Some were concerned about their safety and reported purchasing lighting or monitoring systems to bolster their safety. And while many experienced concern and discomfort as a result of the disclosure, a small number of class members reported the need for therapy to assist with anxiousness caused by the incident.

Other than the use of the data by the criminals who posted some of it for sale on the dark web, Plaintiffs are unaware of any individual, targeted threat or harm to anyone in the ethnically targeted groups or otherwise.

### E. Class Size

**Questions:** "The parties indicate that the nationwide class size is about 6.4 million. *See* Co-Lead Counsel Decl. ¶ 44 ('23andMe's investigation determined the threat actor downloaded Personal Information without authorization relating to approximately 6.4 million natural persons in the United States.'). What are the best estimates for the size of the subclass, *i.e.*, how many class members resided at the relevant time in Alaska, California, Illinois, and/or Oregon?"

**Answer**: The total number of Settlement Class Members in this subclass is approximately 1,288,589. The breakdown of Settlement Class Members in this subclass by state is as follows:

| | |
|---|---|
| Alaska | 19,541 |
| California | 946,792 |
| Illinois | 197,187 |
| Oregon | 125,069 |

### F. Maximum Value of the Case

**Questions:** "What is the maximum value of the case if Plaintiffs were to prevail? An explanation of how this value was reached should be provided."

**Answer**: Plaintiffs submit that the maximum value of the Plaintiffs' claims in this

litigation, if Plaintiffs were to prevail, could be as high as approximately $47.8 billion.[7] Given that damages for some of Plaintiffs' claims could be considered duplicative if counted across multiple claims, Plaintiffs' calculation of maximum damages is based on an analysis of the categories of damages Plaintiffs could potentially recover. Plaintiffs' estimate of maximum damages is comprised of the following categories of damages: **(i) mitigation damages** (addressing, in whole or part, Plaintiffs' negligence, negligence per se, breach of confidence, invasion of privacy, breach of implied covenant of good faith and fair dealing, breach of fiduciary duties, California Consumer Legal Remedies Act, California Customer Records Act, Delaware Consumer Fraud Act, Florida Deceptive and Unfair Trade Practices Act, Georgia Uniform Deceptive Practices Act, Illinois Consumer Fraud Act, Massachusetts Consumer Protection Act, Maryland Consumer Protection Act, Missouri Merchandise Practices Act, New Jersey Consumer Fraud Act, New York General Business Law, North Carolina Identity Theft Protection Act, North Carolina Unfair Trade Practices Act, Pennsylvania Unfair Trade Practices and Consumer Protection Law, Virginia Consumer Protection Act, Washington Data Breach Notice Act, Washington Consumer Protection Act, and Wisconsin Deceptive Trade Practice claims); **(ii) disgorgement of profits/restitution damages** (addressing, in whole or part, Plaintiffs' breach of express contract, breach of implied contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duties claims, conversion, unjust enrichment, California Unfair Competition Law claims, and Florida Deceptive and Unfair Trade Practices Act claims); **(iii) injunctive relief damages** (addressing, in whole or in part, Plaintiffs' declaratory judgment, California Invasion of Privacy, Florida Deceptive and Unfair Trade Practices Act, Tennessee Unfair and Deceptive Trade Practices Act, and Wisconsin Breach of Confidentiality of Health Records claims); and **(iv) statutory damages** (addressing Plaintiffs' Alaska Genetic Privacy Act, California Confidentiality of Medical Information Act, California Consumer Privacy Act, Illinois Genetic Information Privacy Act, New York General Business Law, Oregon Genetic Privacy

---

[7] 23andMe does not agree that the maximum value could ever be that high if Plaintiffs were to prevail.

Law, Pennsylvania Unfair Trade Practices and Consumer Protection Law, and Wisconsin Breach of Confidentiality of Health Records claims).

Plaintiffs have computed the maximum value of these various forms of damages as follows:

| Form of Damage | Maximum Value | Basis of Value |
|---|---|---|
| (i)     Mitigation | $23 billion | Value of identity theft protection services ($30/ month for 10 years for 6.4 million Class members) |
| (ii)    Restitution/ disgorgement of profits | $128 million | Partial value of retail price of 23andMe kit (10% of $200 for 6.4 million Class members) |
| (iii)   Injunctive relief | $128 million | Value of profits 23andMe gained by not investing in adequate cybersecurity |
| (iv)    Statutory | | |
| a.   Alaska Genetic Privacy Act | $1.95 billion | $100,000 damages for 19,541 Alaska Subclass members |
| b.   California Confidentiality of Medical Information Act | $8.7 million | $4,000 statutory damages for 2,182 California Subclass members with Health Information Claims |
| c.   California Consumer Privacy Act | $710 million | $750 statutory damages for 946,792 California Subclass members |
| d.   Illinois Genetic Information Privacy Act | $2.95 billion | $15,000 statutory damages for 197,187 Illinois Subclass members |
| e.   New York General Business Law | $46 million | $50 statutory damages trebled for 306,659 New York Subclass members |
| f.   Oregon Genetic Privacy Law | $18.8 billion | $150,000 statutory damages for 125,069 Oregon Subclass members |
| g.   Pennsylvania Unfair Trade Practices and Consumer Protection Law | $19 million | $100 statutory damages for 193,292 Pennsylvania Subclass members |
| h.   Wisconsin Breach of Confidentiality of Health Records | $79 million | $1,000 statutory damages for 79,453 Wisconsin Subclass members |
| **TOTAL** | $47.8 billion | |

### G.  **Net Settlement Fund**

**Question #1**: The Court details its calculations on page 3 of Order. "If the maximum deductions above are made (excluding the unknown cost of Privacy Shield), this would appear

to leave about $21,244,000 for distribution to the class. Is this correct?"

**Answer**: The Court's calculation is largely correct, excepting that Plaintiffs intend to request only $500 in service awards for the 31 Settlement Class Representatives listed in Exhibit 2 to the Settlement Agreement (Dkt. 103-2) and Plaintiffs anticipate expenses will be closer to $300,000, rather than $350,000 suggested previously. Therefore, deducting the upper limit of administration costs, attorneys' fees and expenses, the below-identified fee for Privacy Shield, and $15,500 for Service Awards, there will be $19,049,500 to distribute to the Class.

**Question # 2:** "What is the estimated cost of Privacy Shield (not its retail value to a consumer)?"

**Answer:** Interim Co-Lead Counsel negotiated a flat fee for purchasing Privacy Shield for all Settlement Class Members who enroll during the three-year service period. The flat fee is $2,097,000.

### H. Claims Rates and Average Awards

**Question #1**: "Do the parties have an estimate as to the expected enrollment rate for Privacy Shield? What has been the experience in other similar class actions?"

**Answer**: CyEx, the provider of Privacy Shield, has estimated an enrollment rate of approximately 20% based on previous experiences with Privacy Shield and Medical Shield, which are sold as separate products. Although the product offered here, Privacy & Medical Shield + Genetic Monitoring, is a newly enhanced and unique product created for this particular Settlement, Privacy Shield and Medical Shield – (products merged and enhanced for this Settlement) – have been offered in other recent settlements by CyEx with participation as high as 18.6% to 28.9%.

**Question #2**: "For the monetary relief, it appears 'the Settlement Administrator has estimated that there will be between a 5-10% claims rate based on its experiences in other data breach cases.' Co-Lead Counsel Decl. ¶ 66; Peak Decl. ¶ 37. Is this the estimated claims rate for each of the claims that can be made (Extraordinary Claims, Health Information, and Statutory Cash)? If not, what is the estimated claims rate for each?"

**Answer**: The 5-10% claims rate is the estimate for the overall claims that will be received based on the Notice and Claims Administrator's claims rates in comparable data breach settlements as detailed in the Peak Declaration. Dkt. 103-6, Peak Decl. ¶¶ 37-39.

The Notice and Claims Administrator estimates that the claims rate for the Statutory Cash and Health Information Claims will be 5-10% overall.

For Extraordinary Claims, the Notice and Claims Administrator expects the claims rate to be much lower, at 0.005%, based on its experiences with other data breach cases where claims could be made for out-of-pocket expenses incurred as a result of the Security Incident. This comports with Interim Co-Lead Counsel's prior settlement administration experiences and what they have learned from their extensive investigation and Plaintiff-vetting in this case. For example, it is likely that many Settlement Class Members have not experienced out-of-pocket, unreimbursed costs related to the Security Incident. Therefore, the number of Settlement Class Members who submit Extraordinary Claims will be far less than claims for Statutory Cash and Health Information Claims.

**Question #3**: "For Extraordinary Claims, do the parties have a sense of the number of likely claimants and how much an average award will be? In addition, do the parties have a sense of how much of the $5 million fund will be claimed?"

**Answer**: Based on the Notice and Claims Administrator's expected claims rate of 0.005% for Extraordinary Claims, Plaintiffs expect 500 or fewer valid Extraordinary Claims will be submitted. For these claims, it is difficult to predict the amounts that will be claimed and thus ultimately paid out; however, based on the Settlement Class Representatives' experiences, the main out-of-pocket expenses reported were purchase of a physical security system or time spent with a therapist for a counseling session. The average cost of a security system is $490 in 2024,[8] and an average therapy session in 2024 is $100-300 without insurance.[9] Therefore, taking the

---

[8] CNN Underscored, *Home security system cost: affordable options for your safety*, https://www.cnn.com/cnn-underscored/home/home-security-system-cost#:~:text= Key%20takeaways,have%20you%20do%20it%20yourself.
[9] Forbes, *How Much Does Therapy Cost in 2024?*, https://www.forbes.com/health/mind/how-much-does-therapy-cost/.

upper limit of a therapy session, we can estimate an average claim of approximately $400 for out-of-pocket, unreimbursed costs that qualify for Extraordinary Claims. If only 500 claims are filed for $400, then only $200,000 of the Extraordinary Claims fund will be used. If expectations are exceeded and, for example, 1,000 claims are filed for an average of $500, then $500,000 of the Extraordinary Claims Fund will be utilized. Plaintiffs wanted to ensure even an outlier claims rate for Extraordinary Claims would be compensated under the Settlement and therefore allocated up to $5,000,000 for these claims.

Based on their experience, Interim Co-Lead Counsel agree with the Notice and Claims Administrator and believe valid Extraordinary Claims will number less than 500 and will likely use less than $200,000 of that fund; therefore, the remainder of the $5,000,000 in the Extraordinary Claims Fund will be diverted to the Statutory Cash Claim Fund pursuant to the Settlement Benefits Plan.

**Question #4**: "For Statutory Cash Claims, do the parties have a sense of how much an average award will be? (The notices suggest $100.) How is that estimate calculated? In addition, do the parties have a sense of what the size of the fund for these claims will be?"

**Answer**: There are approximately 1,300,000 Settlement Class Members who reside in Alaska, California, Illinois, or Oregon and 7,355 Settlement Class Members whose health information was impacted in the Data Breach. Assuming a 10% claims rate for Statutory Cash Claims (130,000), a 10% claims rate for Health Information Claims (735), and that 500 Extraordinary Claims for an average of $400 are submitted thus utilizing $200,000 of the Extraordinary Cash Claims Fund, Statutory Cash Claimants would receive approximately $144 as laid out in the table below, which also includes assumptions about Attorneys' Fees (the upper limit), Expenses (the anticipated limit), Administration (the upper limit), and Service Awards ($500 for the 31 Settlement Class Representatives[10]). Given the assumptions below, the Statutory Cash Fund would be $18,775,950, which is Plaintiffs' best estimate assuming the maximum for Attorneys' Fees, Expenses, and Administration.

---

[10] Plaintiffs intend to ask the Court for $500 for each Settlement Class Representative.

To be conservative and given it can be hard to predict participation, the estimate included in the Class Notice was for approximately $100, with cautionary language that the amount may be adjusted up or down pro rata depending largely on participation as well as on other factors, such as ultimate expenses, attorneys' fees, and service awards.

| **Assumptions** | | | | | |
|---|---|---|---|---|---|
| Settlement | $30,000,000.00 | | | | |
| Attorneys' Fees | $7,500,000.00 | | | | |
| Expenses | $300,000.00 | | | | |
| Administration | $1,038,000.00 | | | | |
| 3 year Monitoring | $2,097,000.00 | | | | |
| Service Awards (31 Class Reps) | $15,500.00 | | | | |
| **Balance** | **$19,049,500.00** | | | | |
| | | **Health Information Members** | **Payment Each** | **Claims Rate** | |
| Extraordinary Claims | $200,000.00 | | | | |
| Health Information Claims | $73,550.00 | **7,355** | **$100.00** | **10%** | |
| **Balance for Statutory Claims** | **$18,775,950.00** | | | | |
| | | **Statutory Damage Members** | **Claims Rate** | **Statutory Claims** | **Payment Each** |
| | | **~1,300,000** | **10.00%** | 130,000 | **~$144.43** |

## I.  Plan of Allocation / Settlement Benefits Plan

**Questions #1 and 6**: "Plaintiffs shall explain how they arrived at the plan of allocation, i.e., the Settlement Benefits Plan. For example, did Plaintiffs consider whether a nominal

payment should be given to all members in the nationwide class? Is preferential treatment being given to those with Statutory Cash Claims?"

**Answer**: Plaintiffs carefully considered whether a nominal payment should be given to Settlement Class Members in a nationwide class. Distributing the net Settlement Fund of $21,146,500[11] pro rata to the 6,400,000 would result in only $3.30 per Settlement Class Member. And, even if Plaintiffs did not do a direct distribution and instead had a claims process for the cash payment, at a 10% claims rate, claimants would receive only about $33.00. Plaintiffs concluded the more meaningful allocation was to tailor the distribution of the Settlement Fund to the harms at issue in the case while maximizing the use of the Fund. Therefore, Plaintiffs allocated approximately 7% of the fund to purchase Privacy & Medical Shield + Genetic Monitoring for the *entire* class and tailored the remainder of the Fund to redress other specific injuries experienced: (1) making available reimbursement for out-of-pocket costs associated with Extraordinary Claims, (2) providing cash payments to Settlement Class Members who had the added harm of having health information released (detailed further below), and (3) providing cash payments to Settlement Class Members who reside in states where privacy and genetic statutes entitle them to statutory damages. *In re Anthem, Inc. Data Breach Litig.* 327 F.R.D. 299, 332 (N.D. Cal. 2018) ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable") (citing cases).

The Court questions whether preferential treatment is being given to those with Statutory Cash Claims. The answer is that differing settlement benefits do not reflect preferential treatment. This is because the Statutory Subclass Members are potentially entitled to statutory damages in this case under their respective state laws that are not available to other Settlement Class Members. Indeed, statutory damages available for Plaintiffs' genetic privacy claims under Alaska, Illinois, and Oregon law can be significant, ranging from $100 for inadvertent violations to $150,000 or more for knowing or reckless violations. And, under California's Consumer

---

[11] This figure excludes the purchase of Privacy Shield, as it assumes solely a cash distribution to the Settlement Class.

Privacy Act, Subclass Members who resided in California are entitled to seek statutory damages up to $750 per consumer. Cash payments to victims of data breaches residing in states where statutory damages are available, while not providing the same benefit to other Settlement Class Members who do not reside in states with similar statutory damages, is appropriate and has been approved in numerous other data breach settlements, and the Court should do the same here. *See, e.g., Aguallo v. Kemper Corp*., No. 1:21-cv-01883 (N.D. Ill), Dkt. 45, 46, 51, 53 (data breach involving compromise of PII, medical leave information, and workers' compensation claim information, where California subclass members received an additional cash payment); *Cochran et al. v. Accellion, Inc. et al*, No. 5:21- cv-01887-EJD (N.D. Cal.), Dkt. 31, 104, 115 (data breach involving compromise of sensitive personally identifiable information, including social security numbers wherein California subclass members received twice the cash payment as other class members); *Heath v. Insurance Technologies Corp*., 3:21-cv-01444-N (N.D. Tex.), Dkt. 35, 39, 45, 52 (data breach involving compromise of personally-identifiable information wherein California subclass members received cash payments of $100-300 not available to other class members).

**Questions #2 and 5:** "Why do persons whose health information was compromised get a set payment, but not persons who had other personal information compromised?"

"What is the basis for concluding that only 7,500 customers had health information compromised – that is, information that would support a Health Information Claim? *See* Co-Lead Counsel Decl. ¶ 19 ("23andMe confirmed during negotiations that approximately 7,500 customers had some form of health information compromised in the Security Incident.")."

**Answer**: 23andMe confirmed that approximately 7,355 Settlement Class Members had some or all of the following health information compromised: "(i) uninterpreted raw genotype data, (ii) certain health reports derived from the processing of their genetic information, including health predisposition reports, wellness reports and carrier status reports, or (iii) self-reported health condition information was involved in the Security Incident." Dkt. 103-3, Settlement Benefits Plan ¶ 5. These Settlement Class Members received a unique notice from 23andMe that

their health information had been compromised, and these 7,355 Settlement Class Members are entitled to make a Health Information Claim.

Customers whose health data was compromised will receive a set payment because of the heightened sensitivity of this information and legal protections afforded to individuals for their health data. For this reason, Plaintiffs believe their payment should be fixed as a benefit of the Settlement to ensure it would be received. These Settlement Class Members not only had the same Personal Information compromised as the general Class,[12] but had *additional*, invasive health and genotype data accessed.[13]

The extent of the exposed data for these individuals is therefore greater and their claims under the law stronger, and so Plaintiffs decided that set, additional compensation was warranted. *See, e.g., In re Anthem*, 327 F.R.D. at 332; *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020) (for an invasion of privacy claim "the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy"); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021) (explaining that courts routinely refuse to dismiss invasion of privacy claims in data breach cases "involv[ing] medical information[] because the disclosure of such information is more likely to constitute an 'egregious breach of the social norms' that is 'highly offensive'") (citing cases).

**Question #3**: "Why did persons in putatively targeted groups (Ashkenazi Jewish or Chinese descent) not get recognized in the plan of allocation?"

**Answer**: Settlement Class Members in the putatively targeted groups are not recognized by a separate cash payment benefit, but they are recognized within the plan of allocation in various ways. The categories of information released as to the putatively-targeted groups did not differ from the Settlement Class generally and given that there are no state statutory damages

---

[12] The vast majority of the Class had some or all of the following impacted: "name, sex, birth year, information about the customer's ancestry based on their genetic information, self-reported location (city/zip code), ancestor birth locations, family names and family tree information." Dkt. 103-1, Motion for Settlement at ECF Page 16.
[13] It is 23andMe's position that individuals with health information impacted did not consent to sharing the information accessed with thousands of other 23andMe customers.

available (unless they are also residents of certain states and qualify as part of the State Statutory Subclass), Plaintiffs ultimately concluded that a separate, additional payment to the putatively-targeted groups would not be included in the Settlement Benefits Plan. However, the components of the Settlement are designed to address the harms those in the targeted group identified.

Settlement Class Members who fall into the putatively targeted groups (Ashkenazi Jewish or Chinese descent) are entitled to *all* benefits under the Settlement Benefits Plan for which they qualify, including if they meet the requirements for cash payments under the State Statutory Cash Claims and Health Information Claims. Moreover, Privacy & Medical Shield + Genetic Monitoring was designed to provide specific remedies to Settlement Class Members in the putatively-targeted groups, as it provides monitoring for genetic information on the dark web and will assist Settlement Class Members in remediation efforts if such information is located.[14] Further, the types of out-of-pocket costs reimbursable under Extraordinary Claims were also designed with specific considerations for the putatively targeted groups as Plaintiffs of the targeted groups reported that after the Security Incident, they were fearful and therefore purchased security systems or went to counseling—reimbursable expenses under the Settlement. The Privacy Shield monitoring program is designed to assist those whose identity and ethnicity was publicly exposed and offers features to mitigate issues they may be confronting as part of the ethnically targeted groups.

**Question #4**: "Why are Extraordinary Claims limited to the costs specified in the Settlement Benefits Plan? *See* Sett. Ben. Plan. ¶ 4."

**Answer**: The Extraordinary Claims are limited to the three types of costs specified in the Settlement Benefits Plan because these are the types of out-of-pocket costs that could be reasonably tied to the Security Incident and the information at issue in the Security Incident. *First*, some Plaintiffs and members of the Settlement Class reported increased phishing attempts,

---

[14] It should be noted that information about a customer's ancestry (such as percentage Jewish or Chinese or German or Scottish etc.), which was impacted for the general Class and these putatively-targeted groups, is different than the "uninterpreted raw genotype data" and "health information derived from processing genetic data" that was impacted for the Health Information Subclass.

receipt of spam and fraudulent attempts at credit card or account openings.[15] Thus, a benefit is provided for Settlement Class Members who become victims of identity theft or falsified tax returns. Plaintiffs believe that unreimbursed costs associated with those harms should be compensated. *Second*, Plaintiffs reported purchasing physical security or monitoring systems in response to the Security Incident because they were concerned about being ethnically-targeted; therefore, unreimbursed costs for these purchases should be compensated. *Finally*, a small number of Plaintiffs reported seeking professional mental health counseling and treatment in the wake of the Security Incident, largely tied to the ethnic-targeting at issue here; therefore, unreimbursed costs for pursuing counseling and treatment should be compensated. Essentially, the Settlement's Extraordinary Claims parameters were defined by the feedback Plaintiffs' counsel and Plaintiffs have received.

### J. **Injunctive Relief**

**Question**: "Do the Business Practice Commitments, *see* Sett. Agmt. ¶ 70, differ from 23andMe's practices in the past?"

**Answer**: 23andMe has a developed data protection program, and has maintained certifications under ISO 27001, ISO 27018 and ISO 27701 since October 2020. As noted below, as result of the Incident and as part of the Settlement, 23andMe has enhanced many of its existing practices and has committed to put in place further security controls. The Business Practice Commitments outlined in the Settlement do differ from 23andMe's practices in the past as noted below.

1. Enhanced Password Protection – differs from past practices;

2. Mandated Multi-Factor Authentication – differs from past practices;

3. Annual Security Awareness Training – enhanced from past practices;

---

[15] It is 23andMe's position that because email addresses, credit card numbers, social security numbers, and other information that could cause pecuniary harm or be used to perpetrate identity theft was not compromised here, it is unlikely that these claimed harms resulted from the Security Incident.

4. Annual Computer Scans and Cybersecurity Audits – continues past practices, but includes new reporting to Interim Co-Lead Counsel;

5. Information Security Program – enhanced from past practices;

6. Maintenance of Data Breach Incidence Response Plan and Threat Management – enhanced from past practices; and

**7.** Retention of Personal Information – differs from past practices

**K.  <u>Attorneys' Fees</u>**

**Questions #1 and 2**: "Identify all timekeepers (grouped by firms) and their hourly rates. How much time did each firm spend on each major litigation task?"

**Answer:** Please see Exhibit 1 identifying all timekeepers who submitted time grouped by firms, their titles, and their hourly rates. Please see Exhibit 2, which contains charts showing how much time each firm spent on each major litigation task using the category codes set forth in the Protocol for Common Benefit Work and Expenses as Modified ("Protocol for Common Benefit Work"), Dkt. 72. The charts reflect reviewed lead and non-lead time that Interim Co-Lead Counsel believe is compensable for the reasons set forth in our Motion and in response to Question K.3 *infra*, though all time is subject to further review prior to the filing of the Motion for Fees and additional time that is submitted will be added.[16]

Chart #1 shows a breakdown of pre-appointment hours by firm that have been identified as compensable; Chart #2 shows a breakdown of post-appointment hours by firm that have been identified as compensable; and Chart #3 shows all hours by firm that have been identified as compensable. As the charts reflect, the major litigation tasks that consumed the most time were: (a) #11 (Pleadings/Briefs/Pre-trial Motions/Legal Memoranda), which includes hours spent vetting plaintiffs for the consolidated complaint, researching and preparing the consolidated complaint, and researching and preparing the Motion for Preliminary Approval and its attendant declarations and papers; and (b) #13 (Settlement), which includes hours spent on the three

---

[16] The charts reflect time submitted by non-lead firms through July 2024, and for lead firms submitted through August 2024. Additional time submissions are still under review and will be detailed in the forthcoming Motion for Fees.

mediation sessions, the development of the Settlement Benefits Plan including the specific benefits offered therein, and the negotiation of the Term Sheet and Settlement Agreement.

The charts exclude approximately $1,461,697 of time that Interim Co-Lead Counsel believe is not compensable under the Protocol for Common Benefit Work. *See* Dkt. 103-5, Class Counsel Decl. ¶¶ 52-53.

**Question #3**: "Why should *all* pre-appointment time associated with Settlement, Experts, and Discovery be compensated? Given the number of counsel involved before appointment of Co-Lead Counsel, isn't at least some of this duplicative?"

**Answer**: Interim Co-Lead Counsel preliminarily reviewed the time and expense records submitted by non-Co-Lead Counsel firms for the period prior to appointment. Based on that preliminary review, Interim Co-Lead Counsel believe certain pre-appointment time and costs associated with the mediation efforts which were incurred by non-Co-Lead Counsel should be compensable but limited to three categories which contributed to the Settlement: Settlement, Experts, and Discovery. The total pre-appointment non-Co-Lead Counsel time allocated to these categories is $637,817.

Given the unique procedural posture of this case at the time of Settlement—including the fact that all Plaintiffs' counsel were invited to participate in mediation prior to the appointment of Interim Co-Lead Counsel, and those mediations were productive early sessions that provided some foundation for the Settlement before the Court—it is a somewhat difficult task to differentiate which non-Co-Lead Counsel should be compensated for their efforts and which should be considered duplicative.

**Question #4**: "Why does Class Counsel expect to spend thousands of more hours on the case after preliminary approval of the settlement?"

**Answer**: Interim Co-Lead Counsel anticipates that it will incur at least 2,000 additional hours in fulfilling its obligations to ensure that the Settlement is finalized and Settlement Class Members receive Settlement benefits. That process will involve (i) briefing Plaintiffs' Motion for Final Approval of the Settlement and Motion for Attorneys' Fees; (ii) responding to objections and motions to intervene, some of which already have been received or previewed in

1   response to Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement; (iii)

2   attending the hearing on final approval; (iv) responding to any appeal(s) (which have become

3   commonplace in consumer class action settlements); (v) preparation for and argument of any

4   appeal; (vi) overseeing the Notice and Claims Administrator in ensuring that the Notice plan,

5   claims process and provision of benefits are executed on a proper and timely basis; and (vii)

6   responding to inquiries from the Settlement Class. Based on the time Interim Co-Lead Counsel

7   have previously incurred after the submission of preliminary approval in similar cases, which

8   have proceeded through the appellate process, the estimation of 2,000 hours of additional work

9   is conservative.

10       **L.  Settlement Administration Costs**

11       **Question #1**: "Will settlement administration cost be capped at $1,038,000 (e.g.,

12   regardless of the claims rate)?"

13       **Answer**: Settlement administration costs are capped at $1,038,000 if the claims rate does

14   not exceed 10%. If the claims rate does not exceed 7%, costs will be capped at $851,400. Verita's

15   bid is attached hereto as Exhibit 3.

16       **Question #2**: "Why is the cost of administration so high?"

17       **Answer**: Plaintiffs solicited bids from nine settlement administration vendors as part of

18   the Notice and Claim Administrator selection process. Verita was selected as the lowest bid

19   among those vendors Interim Co-Lead Counsel considered capable of handling a settlement of

20   this size. Verita's proposed cost of settlement administration was below several of the competing

21   bids (and approximately 25% below the highest bid), and represents approximately 3.3% of the

22   Settlement Fund, or $ 0.16 per Settlement Class Member. Based on Interim Co-Lead Counsel's

23   experiences in similar cases, the cost of administration is consistent with the administration cost

24   in comparable cases.

25       **M.  Class Notice**

26       **Question #1**: "For email notice, can the settlement administrator determine whether an

27   email has been received and opened?"

28       **Answer**: Verita, the Notice and Claims Administrator, has clarified that it is able to obtain

information regarding email open rates, however this information is limited in its accuracy and reliability due to technological developments in privacy software. These technological developments allow recipients and email providers to turn off open tracking and disable and block images and tracking pixels which are needed to track email open rates.

Verita further indicated that it receives information regarding whether an email has been delivered, if it bounces back and why it has bounced back. Typically, when an email initially bounces back, it is only temporary and due primarily to being blocked by Internet Service Providers (ISPs) due to the recipient's inbox being full, or technical difficulties such as the recipient's server being down, overloaded, or a server timeout. This type of bounceback ("soft bounceback") accounts for about 10-15% of all emails that are sent, and about 85% of these emails are deliverable if re-sent. Emails also bounceback from a hard bounce. A hard bounce results from a permanent delivery failure, usually when an email address is invalid, or a domain is blocked.

23andMe has reported that it received less than 1% bounceback in response to its email notifying Settlement Class Members of the Security Incident.

**Question #2**: "Did the parties discuss notice via social media advertising?"

**Answer**: The Parties discussed social media advertising; however, due to the robust direct notice effort, paid internet search campaign, press release, and 23andMe's agreement to place notices on its website and in-app, it was determined that social media was unnecessary as it would provide an insignificant amount of reach and reduce the amount of money available to Settlement Class Members.

### N. <u>Response to Class Notice</u>

**Question #1:** "Is it correct that class members will have 35 days to opt out, 35 days to object, and 90 days to file claims?"

**Answer**: The Opt-Out and Objection Deadlines are 35 days after the *Notice Deadline*. The *Notice Deadline* is 60 days following the Preliminary Approval Order. So, the Opt-Out and Objection Deadlines are 95 days following the Preliminary Approval Order.  The Claims Period runs for 90 days from the *Notice Deadline* (150 days following the Preliminary Approval Order).

**Question #2**: "For opt outs, why is an electronic opt out not recognized unless there is an additional verification? *See* Sett. Agmt. ¶ 82 ('To be effective and valid, Opt-Out requests submitted online through the claims portal must be submitted by the Opt-Out Deadline and must verify the Opt-Out request no later than three (3) business days following the Opt-Out Deadline using the link sent to the email address of the Settlement Class Member.')"

**Answer**: The opt-out confirmation requirement is part of the overall administration plan to mitigate fraud and maintain the integrity of the Settlement. Recently, in *In re: Facebook Consumer Privacy User Profile Litigation*, 3:18-md-02843-VC (N.D. Cal.), Judge Chhabria approved a similar opt-out confirmation procedure, designed to prevent fraud, which has become increasingly problematic in the class action claims process. Such interference in the administration of the Settlement only serves to increase costs of administration, which is detrimental to the Settlement process.

The opt-out verification requirement is not designed to discourage opt-outs nor is it intended to be a burden to those who do not wish to participate in the Settlement or be bound by its terms. For those represented by counsel, their counsel can simply advise them in advance, that if they choose to opt out of the Settlement, they should expect and execute the verification once received.

**Question #3**: "For opt outs, the parties shall provide the agreement made by the parties referred to in ¶ 88 of the Settlement Agreement – i.e., 23andMe's right to terminate the Settlement Agreement if there is a certain number of opt outs. The agreement may be lodged with the Court by emailing a copy to the Courtroom Deputy (EMCCRD@cand.uscourts.gov)."

**Answer**: This information was submitted via email to EMCOPO@cand.uscourts.gov at the Court on September 13, 2024, and will be resubmitted to the provided email address with the filing of this supplemental briefing.

**Question #4**: "For objections, why does an objector need to provide information verifying that they are a settlement member? *See* Sett. Agmt. ¶ 90.iii (providing that a written objection must include, inter alia, '[i]nformation which verifies the objector is a Settlement Class Member (e.g., a copy of the Class Notice or of the original notice of the security incident

addressed to the objecting Settlement Class Member)')."

**Answer**: This is a standard requirement in many class action settlements. Here, this requirement can be satisfied by showing the Notice of the Settlement or by including the Settlement Class Member's unique ID located on their email notice. It can also be satisfied by other means at the option of the Settlement Class Member.

If the Settlement Class Member no longer has access to their email notice of the Security Incident or the Class Notice of the Settlement, they can contact the Claims Administrator to obtain a copy of the Class Notice. The requirement is simply to ensure that objections are made by those who were affected by the Security Incident, and can be matched to a specific Settlement Class Member.

**Question #5**: "For claims, why does a person making a Health Information Claim need to submit a claim if 23andMe already knows whose health information was compromised? *See* Sett. Ben. Plan ¶ 12.b (providing that "Settlement Class Members with Health Information Claims must submit a Claim Form"). Is this simply because a person may make a request for an electronic payment?"

**Answer**: The structure of the Settlement is such that all Settlement Class Members are required to make a claim, although those who wish to enroll in the Privacy & Medical Shield + Genetic Monitoring may enroll after the claims period for the remaining time left on the three-year service. Importantly, Settlement Class Members who are eligible for payment of Health Information Claims are also eligible for other benefits of the Settlement, including reimbursement for Extraordinary Claims, the monitoring program and for some Settlement Class Members, Statutory Cash Payments for which a Claim Form is required. Further, as the Court points out, a Claim Form is needed for selection of the method by which the Settlement Class Member would like their payment for their Health Information Claim and, as applicable, other benefits. Finally, the claims process will ensure that the Notice and Claims Administrator has accurate contact and payment information, and minimize instances of uncashed checks.

**O.  Language in the Class Notice**

**Requested Changes to Notices**: The Court requests a number of modifications to the

notices. Order at 6-9.

**Answer**: Plaintiffs hereby submit the revised email short form notice, postcard notice, in-app and web-based notice and long-form notice, both redlines and clean versions, as Exhibits 4-10, implementing the Court's comments.

**Specific Question #1**: "In the section "How To Get Benefits," why does a class member have to submit a claim in order to get an enrollment code for Privacy Shield? In other words, can an enrollment code be given as part of the class notice?"

**Answer**: In consultation with CyEx, which is providing the Privacy Shield monitoring program, the Parties opted not to send enrollment codes directly to Settlement Class Members with the Class Notice as, in our collective experience, many of these enrollment codes would likely go unused and would necessitate that the cost of the monitoring program be significantly higher.

Moreover, the monitoring program enrollment process will require Settlement Class Members to provide private information, requiring affirmative steps for enrollment and many Settlement Class Members will likely be eligible to qualify for other benefits for which a claim form is necessary. For these reasons, the Parties have opted to require Settlement Class Members to file a claim to receive the monitoring benefit.

Settlement Class Members may request enrollment in Privacy Shield by submitting a Claim Form, or after the Claims Period has ended, by simply emailing CyEx (this contact information will be provided on the Settlement Website) and requesting enrollment at any point during the three-year period that Privacy Shield is active. Those Settlement Class Members who submit their requests for enrollment after the Claims Period will be able to take advantage of the remaining time available on the three-year term of the program.

**Specific Questions #2-3**: "Also, is it correct that expenses are capped at $350,000? Finally, the settlement agreement refers to service awards of $1,000 each, and not $500, as stated in the notice. Which amount is correct? The total amount of service awards should also be expressly stated."

**Answers**: Yes, Plaintiffs' counsel will request no more than $350,000 in expenses. While

the Settlement Agreement provides that Plaintiffs may seek service awards up to $1,000 each, Plaintiffs have requested service awards of only $500 for each of the thirty-one Settlement Class Representatives, for a total of $15,500.

### P. Preliminary Injunction

**Question:** "Has either party discussed this requested preliminary injunction with the attorneys representing the plaintiffs in the state court cases or the claimants in the arbitration proceedings? If so, what is the substance of the communications?

**Answer:** Interim Co-Lead Counsel have spoken with counsel for the two known state court class action cases about the Settlement in general and they have expressed support for it. Interim Co-Lead Counsel have spoken with two firms with arbitration claims specifically about the injunction. Milberg Coleman Bryson Phillips Grossman, PLLC ("Milberg"), one of the firms representing a named Settlement Class Representative until recently when it withdrew as counsel on September 20, 2024 (Dkt. 108), also purports to represent thousands of claimants in arbitration. In its capacity as counsel representing a named Settlement Class Representative, Milberg lawyers have been aware of the settlement terms, including the proposed injunction. Moreover, Interim Co-Lead Counsel have had several conversations with Milberg regarding the proposed injunction, including why Plaintiffs support the injunction sought as part of the Settlement given the unique circumstances of this litigation.

23andMe states that in one individual arbitration proceeding, the assigned arbitrator has agreed to stay the arbitration pending the Court's ruling on preliminary approval, including the preliminary injunction that is agreed-to in the Settlement Agreement.

**Question:** Do the parties expect there to be substantial opt-outs because of the state court cases or arbitrations?"

**Answer:** 23andMe does not know how many of the individuals who filed state court cases or arbitrations will in fact opt out of the Settlement. Plaintiffs believe the percentage of opt-outs will be less than 1% of the Settlement Class.

RESPECTFULLY SUBMITTED this 5th day of November, 2024.

*/s/ Cari Campen Laufenberg*
Cari Campen Laufenberg (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel: (206) 623-1900
claufenberg@kellerrohrback.com

Gayle M. Blatt (SBN 122048)
CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD
LLP
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
gmb@cglaw.com

Norman E. Siegel (*pro hac vice*)
STUEVE SIEGEL HANSON LLP
460 Nichols Road
Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
siegel@stuevesiegel.com

*Interim Co-Lead Counsel*

*/s/ Rebekah S. Guyon*
Rebekah S. Guyon (SBN 291037)
Rebekah.guyon@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: 310-586-7700

Ian Ballon (SBN 141819)
ballon@gtlaw.com
GREENBERG TRAURIG LLP
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303
Telephone (650) 328-8500
Fax: (650) 328-8508

Stephen L. Saxl (pro hac vice)
saxls@gtlaw.com
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-8184

Kristin O'Carroll (SBN 312902)
ocarrollk@gtlaw.com
101 Second Street, Suite 2200
San Francisco, CA 94105-3668
Telephone: 415-655-1300

*Attorneys for Defendant 23andMe, Inc.*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Cari Campen Laufenberg, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of November, 2024, at Seattle, Washington.

*/s/ Cari Campen Laufenberg*
Cari Campen Laufenberg

**CERTIFICATE OF SERVICE**

I, Sarah Skaggs, hereby certify that on November 5, 2024, I electronically filed the

foregoing with the Clerk of the United States District Court for the Northern District of

California using the CM/ECF system, which shall send electronic notification to all counsel of

record.

*/s/ Sarah Skaggs*
Sarah Skaggs